# EXHIBIT A

**Mind Medicine (MindMed) Inc.**
Wildeboer Dellelce Place
365 Bay Road, Suite 800
Toronto, Ontario, M5H 2V1, Canada
P: (212) 220-MMED (6633)



August 31, 2020

<u>**VIA**</u>**:**
**FedEx – Signature Required**
**USPS – Certified, Return Receipt**
**Email – scott@sfreemanmd.com**

<u>**PERSONAL & CONFIDENTIAL**</u>

Dr. Scott Freeman
5357 Ravendale Circle
Las Vegas, NV 89120

Re:     Separation Agreement

Dear Dr. Freeman:

This letter sets forth the substance of the separation agreement (the "*Agreement*") which Mind Medicine (MindMed), Inc. (the "*Company*") is offering to you to aid in your employment transition.

      **1.**     **Separation**.  You have tendered, and the Company has accepted, your resignation as an employee of the Company.  Your last day of work with the Company and your employment termination date was August 31, 2020 (the "*Separation Date*").  By your signature to this Agreement, you resign from the employment with the Company, from the Board of Directors of MindMed Pty. Ltd. and from each officer position you hold with the Company effective as of the Separation Date.  You acknowledge and agree that the Company has waived the three-month notice requirement set forth in Section 5.05 of your disputed Executive Employment Agreement (attached hereto as Exhibit A), and you further acknowledge and agree that in exchange for such waiver you are not entitled to receive any compensation for the waived three month resignation notice period.

      **2.**     **Accrued Salary and Vacation**.  On or shortly after the Separation Date, the Company will pay you any accrued salary and any accrued and unused vacation earned through the Separation Date, subject to standard payroll deductions and withholdings.  You will receive these payments regardless of whether or not you sign this Agreement.

      **3.**     **Severance Benefits**.  The Company has executed the Consulting Agreement attached as Exhibit B (the "*Consulting Agreement*"), under which you will be eligible to provide services to the Company.  If you execute the Consulting Agreement on the Separation Date, then the consulting relationship will be effectively immediately.  If you then do not execute this Agreement, or execute but then revoke your acceptance of this Agreement, then the Consulting Agreement will automatically terminate, as described therein.

      **4.**     **Benefit Plans**.  If you are currently participating in the Company's group health insurance plans (medical, dental, and vision), your participation as an employee will end on the Separation Date.

Dr. Scott Freeman
August 31, 2020
Page 2 of 7

Thereafter, to the extent provided by the federal COBRA law or, if applicable, state insurance laws, and by the Company's current group health insurance policies, you will be eligible to continue your group health insurance benefits at your own expense. Later, you may be able to convert to an individual policy through the provider of the Company's health insurance, if you wish.

   **5.**  **Stock Options**. You were granted an option to purchase 2,000,000 shares of the Company's common stock under the Company's **2020 Stock Option Plan** (the "***Plan***") pursuant to the Disputed Executive Employment Agreement (the "**Grant**"). As of the Separation Date, no shares subject to the Grant have vested. In partial consideration of this Agreement and your Consulting Agreement, you agree to the cancellation by the Company of the option to purchase 1,000,000 shares under the Grant. The remaining 1,000,000 shares shall vest according to the original Grant vesting schedule and retain the option exercise price as per the Grant and you are deemed a Service Provider under the Consulting Agreement as defined in the Plan (the "**Consultant's Grant**").

   **6.**  **Other Compensation or Benefits**. You acknowledge that, except as expressly provided in this Agreement and the Consulting Agreement, you will not receive any additional compensation, severance or benefits after the Separation Date.

   **7.**  **Expense Reimbursements**. You agree that, within ten (10) days of the Separation Date, you will submit your final documented expense reimbursement statement reflecting all business expenses you incurred through the Separation Date, if any, for which you seek reimbursement. The Company will reimburse you for reasonable business expenses pursuant to its regular business practice.

   **8.**  **Return of Company Property**. By the Separation Date, you agree to return to the Company all Company documents (and all copies thereof) and other Company property that you have had in your possession at any time, including, but not limited to, Company files, notes, drawings, records, business plans and forecasts, financial information, specifications, computer-recorded information, tangible property (including, but not limited to, computers), credit cards, entry cards, identification badges and keys; and, any materials of any kind that contain or embody any proprietary or confidential information of the Company (and all reproductions thereof), with the exception of any property that the Company authorizes you to retain in connection with the Consulting Agreement (which property you must return to the Company, without retaining any reproductions, upon termination of the Consulting Agreement or earlier if requested by the Company). Please coordinate return of Company property with Madeline Feldman, Director of Operations & Administration. **Eligibility for the severance benefits described in Section 3 of this Agreement is expressly conditioned upon return of all Company Property.** To the extent Company Property is required for work pursuant to the Consultant's Agreement, it will be provided to you.

   **9.**  **Proprietary Information and Post-Termination Obligations**. Both during and after your employment you acknowledge your continuing obligations under your Employee Proprietary Information and Inventions Agreement and your Disputed Executive Employment Agreement not to use or disclose any confidential or proprietary information of the Company and to refrain from certain solicitation and refrain from certain other activities. A copy of your Employee Proprietary Information and Inventions Agreement is attached hereto as Exhibit C. If you have any doubts as to the scope of the restrictions in your agreement, you should contact Shah Hafizi, Corporate Counsel immediately to assess your compliance. As you know, the Company will enforce its contract rights. Please familiarize yourself with the enclosed agreements which you signed. Confidential information that is also a "trade secret," as defined by law, may be disclosed (A) if it is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, in the event that you file a lawsuit for retaliation

Dr. Scott Freeman
August 31, 2020
Page 3 of 7

by the Company for reporting a suspected violation of law, you may disclose the trade secret to your attorney and use the trade secret information in the court proceeding, if you: (A) file any document containing the trade secret under seal; and (B) do not disclose the trade secret, except pursuant to court order.

**10. Confidentiality**. The provisions of this Agreement will be held in strictest confidence by you and the Company and will not be publicized or disclosed in any manner whatsoever; provided, however, that: (a) you may disclose this Agreement to your immediate family; (b) the parties may disclose this Agreement in confidence to their respective attorneys, accountants, auditors, tax preparers, and financial advisors; (c) the Company may disclose this Agreement as necessary to fulfill standard or legally required corporate reporting or disclosure requirements; and (d) the parties may disclose this Agreement insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law. In particular, and without limitation, you agree not to disclose the terms of this Agreement to any current or former Company employee. Notwithstanding the foregoing, nothing in this Agreement shall limit your right to voluntarily communicate with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, other federal government agency or similar state or local agency or to discuss the terms and conditions of your employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act.

**11. Non-Disparagement**. Both you and the Company agree not to disparage the other party, and the other party's officers, directors, and employees, in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that both you and the Company will respond accurately and fully to any question, inquiry or request for information when required by legal process. The Company's obligations under this Section are limited to Company representatives with knowledge of this provision, which will include its officers. Notwithstanding the foregoing, nothing in this Agreement shall limit your right to voluntarily communicate with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, other federal government agency or similar state or local agency or to discuss the terms and conditions of your employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act.

**12. Cooperation after Termination**. You agree to cooperate fully with the Company in all matters relating to the transition of your work and responsibilities on behalf of the Company, including, but not limited to, any present, prior or subsequent relationships and the orderly transfer of any such work and institutional knowledge to such other persons as may be designated by the Company, by making yourself reasonably available during regular business hours.

**13. Release by You**. In exchange for the payments and other consideration under this Agreement, to which you would not otherwise be entitled, and except as otherwise set forth in this Agreement, you, on behalf of yourself and, to the extent permitted by law, on behalf of your spouse, heirs, executors, administrators, assigns, insurers, attorneys and other persons or entities, acting or purporting to act on your behalf (collectively, the "***Employee Parties***"), hereby generally and completely release, acquit and forever discharge the Company, its parents and subsidiaries, and its and their officers, directors, managers, partners, agents, representatives, employees, attorneys, predecessors, successors, assigns, insurers and affiliates (the "***Company Parties***") of and from any and all claims, liabilities, demands, contentions, actions, causes of action, suits, costs, expenses, attorneys' fees, damages, indemnities, debts, judgments, levies, executions and obligations of every kind and nature, in law, equity, or otherwise, both known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way related to agreements, events, acts or conduct at any time prior to and including the execution date of this Agreement, including but not limited to:  all such claims and demands directly or indirectly arising out of

or in any way connected with your employment with the Company or the termination of that employment; claims or demands related to salary, bonuses, commissions, stock, stock options, or any other ownership interests in the Company, vacation pay, fringe benefits, expense reimbursements, severance pay, or any other form of compensation; claims pursuant to any federal, state or local law, statute, or cause of action; tort law; or contract law (individually a "*Claim*" and collectively "*Claims*").  For the avoidance of doubt, reference to "officers" and "directors" is made in this Section 13 with respect to persons acting in their official capacity.  The Claims you are releasing and waiving in this Agreement include, but are not limited to, any and all Claims that any of the Company Parties:

- has violated its personnel policies, handbooks, contracts of employment, or covenants of good faith and fair dealing;

- has discriminated against you on the basis of age, race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, source of income, entitlement to benefits, any union activities or other protected category in violation of any local, state or federal law, constitution, ordinance, or regulation, including but not limited to: the Age Discrimination in Employment Act, as amended ("*ADEA*"); Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; 42 U.S.C. § 1981, as amended; the Equal Pay Act; the Americans With Disabilities Act; the Genetic Information Nondiscrimination Act; the Family and Medical Leave Act; the Nevada Fair Employment Practices Act, as amended; the Employee Retirement Income Security Act; the Employee Polygraph Protection Act; the Worker Adjustment and Retraining Notification Act; the Older Workers Benefit Protection Act; the anti-retaliation provisions of the Sarbanes-Oxley Act, or any other federal or state law regarding whistleblower retaliation; the Lilly Ledbetter Fair Pay Act; the Uniformed Services Employment and Reemployment Rights Act; the Fair Credit Reporting Act; and the National Labor Relations Act;

- has violated any statute, public policy or common law (including but not limited to Claims for retaliatory discharge; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family and/or promissory estoppel).

Notwithstanding the foregoing, other than events expressly contemplated by this Agreement you do not waive or release rights or Claims that may arise from events that occur after the date this waiver is executed and you are not releasing any right of indemnification you may have for any liabilities arising from your actions within the course and scope of your employment with the Company or within the course and scope of your role as a member of the Board of Directors and officer of the Company.

Also excluded from this Agreement are any Claims which cannot be waived by law, including, without limitation, any rights you may have under applicable workers' compensation laws and your right, if applicable, to file or participate in an investigative proceeding of any federal, state or local governmental agency. Nothing in this Agreement shall prevent you from filing, cooperating with, or participating in any proceeding or investigation before the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal government agency, or similar state or local agency (each a "*Government Agency*"), or exercising any rights pursuant to Section 7 of the National Labor Relations Act.  You further understand this Agreement does not limit your ability to voluntarily communicate with any Government Agencies or otherwise participate in any investigation or

Dr. Scott Freeman
August 31, 2020
Page 5 of 7

proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company. While this Agreement does not limit your right to receive an award for information provided to the Securities and Exchange Commission, you understand and agree that, you are otherwise waiving, to the fullest extent permitted by law, any and all rights you may have to individual relief based on any Claims that you have released and any rights you have waived by signing this Agreement. If any Claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a Claim in which any of the Company Parties is a party. This Agreement does not abrogate your existing rights under any Company benefit plan or any plan or agreement related to equity ownership in the Company; however, it does waive, release and forever discharge Claims existing as of the date you execute this Agreement pursuant to any such plan or agreement.

**14.   Release by the Company.** The Company hereby releases and forever discharges you of and from any and all claims, liabilities, demands, causes of action, costs, expenses, attorney's fees, damages, indemnities, and obligations of every kind and nature, in law, equity, or otherwise, related to your employment with the Company arising, accruing, or based on any conduct occurring at any time before the date it executes this Agreement. Notwithstanding the foregoing, the Company's release shall not apply to any claim, liability, demand, cause of action or other damages, indemnities or obligations based on or alleged to arise out of your service to the Company as an officer or director of the Company for which you are eligible to be indemnified under the Company's Articles of Incorporation or Bylaws covered by Directors and Officers liability insurance maintained by the Company. For the avoidance of doubt, the Company preserves all rights under Section 8.02 of the Executive Employment Agreement, including with respect to Competitive Business (as defined in the Executive Employment Agreement).

**15.   Your Acknowledgments and Affirmations / Effective Date of Agreement.** You acknowledge that you are knowingly and voluntarily waiving and releasing any and all rights you may have under the ADEA, as amended. You also acknowledge and agree that (i) the consideration given to you in exchange for the waiver and release in this Agreement is in addition to anything of value to which you were already entitled, and (ii) that you have been paid for all time worked, have received all the leave, leaves of absence and leave benefits and protections for which you are eligible, and have not suffered any on-the-job injury for which you have not already filed a Claim. You affirm that all of the decisions of the Company regarding your pay and benefits through the date of your execution of this Agreement were not discriminatory based on age, disability, race, color, sex, religion, national origin or any other classification protected by law. You affirm that you have not filed or caused to be filed, and are not presently a party to, a Claim against any of the Company Parties. You further affirm that you have no known workplace injuries or occupational diseases. You acknowledge and affirm that you have not been retaliated against for reporting any allegation of corporate fraud or other wrongdoing by any of the Company Parties, or for exercising any rights protected by law, including any rights protected by the Fair Labor Standards Act, the Family Medical Leave Act or any related statute or local leave or disability accommodation laws, or any applicable state workers' compensation law. You also acknowledge and agree that as of the Separation Date, you are not aware of any issues that must be reported to the Company or to a Government Agency which have not already been reported pursuant to applicable procedures. You further acknowledge and affirm that you have been advised by this writing that: (a) your waiver and release do not apply to any rights or Claims that may arise after the execution date of this Agreement; (b) you have been advised hereby that you have the right to consult with an attorney prior to executing this Agreement; (c) you have been given twenty-one (21) days to consider this Agreement (although you may choose to voluntarily execute this Agreement earlier and if you do you will sign the Consideration Period waiver below); (d) you have seven (7) days following your execution of this Agreement to revoke this Agreement; and (e) this

Dr. Scott Freeman
August 31, 2020
Page 6 of 7

Agreement shall not be effective until the date upon which the revocation period has expired unexercised (the "***Effective Date***"), which shall be the eighth day after this Agreement is executed by you.

**16.   No Admission**.  This Agreement does not constitute an admission by the you or the Company of any wrongful action or violation of any federal, state, or local statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or of any other possible or claimed violation of law or rights.

**17.   Breach**.  The parties agree that upon a legal finding of any material breach of this Agreement, the breaching party will forfeit all benefits of this Agreement.  Further, the parties acknowledge that it may be impossible to assess the damages caused by a violation of the terms of Sections 8, 9, 10 and 11 of this Agreement and further agree that any threatened or actual violation or breach of those Sections of this Agreement will constitute immediate and irreparable injury to the non-breaching party.  The parties therefore agree, in addition to any and all other damages and remedies available to the non-breaching party, that party shall be entitled to an injunction to prevent further violation or breach of this Agreement.  The parties agree that if either party is successful in whole or part in any legal or equitable action it brings to enforce this Agreement, the non-breaching party may recover from the breaching party all of the costs, including reasonable attorneys' fees, incurred in enforcing the terms of this Agreement.

**18.   Miscellaneous**.  This Agreement, including Exhibits B and C, which are incorporated by reference, constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to this subject matter.  It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations.  This Agreement may not be modified or amended except in a writing signed by both you and a duly authorized officer of the Company.  This Agreement will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, their heirs, successors and assigns.  If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified by the court so as to be rendered enforceable.  This Agreement will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of Nevada as applied to contracts made and to be performed entirely within Nevada.  Any suit involving this Agreement shall be brought in a federal or state court sitting in Nevada. The parties agree that venue shall be proper in such courts, and that such courts will have personal jurisdiction over them.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

If this Agreement is acceptable to you, please sign below and return it to me on or before the date that is twenty-one (21) days after you receive this Agreement.  The Company's severance offer contained herein will automatically expire if you do not sign and return the fully signed Agreement within this timeframe.

[Signature on next page]

Dr. Scott Freeman
August 31, 2020
Page 7 of 7

I wish you good luck in your future endeavors.

Sincerely,

**MIND MEDICINE, INC.**

By: _____
    **Jamon Alexander Rahn**
    **Co-Chief Executive Officer**

AGREED TO AND ACCEPTED:

_____          Signed: August ___, 2020
Dr. Scott Freeman                                        Las Vegas, NV USA

**Exhibit A – Disputed Executive Employment Agreement**
**Exhibit B – Consulting Agreement**
**Exhibit C – Employee Proprietary Information and Inventions Agreement**

CONSIDERATION PERIOD

I, Dr. Scott Freeman, understand that I have the right to take at least 21 days to consider whether to sign this Agreement, which I received on _____, 2020. If I elect to sign this Agreement before 21 days have passed, I understand I am to sign and date below this paragraph to confirm that I knowingly and voluntarily agree to waive the 21-day consideration period.

**AGREED:**

_____
Signature

_____
Date

**EXHIBIT A**

**Disputed Executive Employment Agreement**

CONFIDENTIAL

**EXHIBIT B**

**CONSULTING AGREEMENT**

**THIS CONSULTING AGREEMENT** (the "*Agreement*") by and between Mind Medicine, Inc. ("*Client"*) and Dr. Scott Freeman, an individual ("*Consultant*") is effective as of August 31, 2020, 2020 (the "*Effective Date*").

**RECITALS**

WHEREAS the parties desire for the Client to engage Consultant to perform the services described herein and for Consultant to provide such services on the terms and conditions described herein; and

WHEREAS, the parties desire to use Consultant's independent skill and expertise pursuant to this Agreement as an independent contractor;

NOW THEREFORE, in consideration of the promises and mutual agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

1. **Engagement of Services**. Consultant agrees to provide consulting services as an advisor to the Company at the request of, Jamon Alexander Rahn, the Co-Chief Executive Officer ("*Executive*") of the Client. Consultant agrees to exercise the highest degree of professionalism and utilize his/her expertise and creative talents in performing these services. Consultant agrees to make him/herself available to perform such consulting services throughout the Consulting Period, and to be reasonably available to meet with the Client at its offices or otherwise.

2. **Compensation**. In consideration for the services rendered pursuant to this Agreement and for the assignment of certain of Consultant's right, title and interest pursuant hereto, Client will provide Consultant the Consultant Option Grant (as defined in the "*Separation Agreement*" between the Client and Consultant dated August 31, 2020) while this Agreement remains in effect. All matters of vesting and exercisability of Consultant's Option shall be as governed by Section 5 of the Separation Agreement and the terms of the applicable Plan (as defined in the Separation Agreement) and grant documents. As additional consideration, upon presentation of an acceptable invoice to the Company, Consultant shall be paid Three Hundred Fifty Dollars ($350.00) per hour of consulting services for services requested in writing by the Company, as well as reimbursement of expenses pre-approved by the Company.

3. **Ownership of Work Product.** Consultant hereby irrevocably assigns, grants and conveys to Client all right, title and interest now existing or that may exist in the future in and to any document, development, work product, know-how, design, processes, invention, technique, trade secret, or idea, and all intellectual property rights related thereto, that is created by Consultant, to which Consultant contributes, or which relates to Consultant's services provided pursuant to this Agreement (the "*Work Product*"), including all copyrights, trademarks and other intellectual property rights (including but not limited to patent rights) relating thereto. Consultant agrees that any and all Work Product shall be and remain the property of Client. Consultant will immediately disclose to the Client all Work Product. Consultant agrees to execute, at Client's request and expense, all documents and other instruments necessary or desirable to confirm such assignment. In the event that Consultant does not, for any reason, execute such documents within a reasonable time of Client's request, Consultant hereby irrevocably appoints Client as Consultant's attorney-in-fact for the purpose of executing such documents on Consultant's behalf, which appointment is coupled with an interest. Consultant shall not attempt to register any works created by Consultant pursuant to this Agreement at the U.S. Copyright Office, the U.S. Patent & Trademark Office, or any foreign copyright, patent, or trademark registry. Consultant retains no rights in the Work Product and agrees not to challenge Client's ownership of the rights embodied in the Work Product. Consultant further agrees to

assist Client in every proper way to enforce Client's rights relating to the Work Product in any and all countries, including, but not limited to, executing, verifying and delivering such documents and performing such other acts (including appearing as a witness) as Client may reasonably request for use in obtaining, perfecting, evidencing, sustaining and enforcing Client's rights relating to the Work Product.

4.  **Artist's, Moral, and Other Rights.**  If Consultant has any rights, including without limitation "artist's rights" or "moral rights," in the Work Product which cannot be assigned (the "***Non-Assignable Rights***"), Consultant agrees to waive enforcement worldwide of such rights against Client. In the event that Consultant has any such rights that cannot be assigned or waived Consultant hereby grants to Client a royalty-free, paid-up, exclusive, worldwide, irrevocable, perpetual license under the Non-Assignable Rights to (i) use, make, sell, offer to sell, have made, and further sublicense the Work Product, and (ii) reproduce, distribute, create derivative works of, publicly perform and publicly display the Work Product in any medium or format, whether now known or later developed.

5.  **Representations and Warranties.**  Consultant represents and warrants that: (a) Consultant has the full right and authority to enter into this Agreement and perform his/her obligations hereunder; (b) Consultant has the right and unrestricted ability to assign the Work Product to Client as set forth in Sections 3 and 4 (including without limitation the right to assign any Work Product created by Consultant's employees or contractors); (c) the Work Product has not heretofore been published in its entirety; and (d) the Work Product will not infringe upon any copyright, patent, trademark, right of publicity or privacy, or any other proprietary right of any person, whether contractual, statutory or common law. Consultant agrees to indemnify Client from any and all damages, costs, claims, expenses or other liability (including reasonable attorneys' fees) arising from or relating to the breach or alleged breach by Consultant of the representations and warranties set forth in this Section 5.

6.  **Independent Contractor Relationship.**  Consultant is an independent contractor and not an employee of the Client. Nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship. The manner and means by which Consultant chooses to complete the consulting services are in Consultant's sole discretion and control. In completing the consulting services, Consultant agrees to provide his/her own equipment, tools and other materials at his/her own expense. Consultant is not authorized to represent that he/she is an agent, employee, or legal representative of the Client. Consultant is not authorized to make any representation, contract, or commitment on behalf of Client or incur any liabilities or obligations of any kind in the name of or on behalf of the Client. Consultant shall be free at all times to arrange the time and manner of performance of the consulting services. Consultant is not required to maintain any schedule of duties or assignments. Consultant is also not required to provide reports to the Client. In addition to all other obligations contained herein, Consultant agrees: (a) to proceed with diligence and promptness and hereby warrants that such services shall be performed in accordance with the highest professional standards in the field to the satisfaction of the Client; and (b) to comply, at Consultant's own expense, with the provisions of all state, local, and federal laws, regulations, ordinances, requirements and codes which are applicable to the performance of the services hereunder.

7.  **Consultant's Responsibilities.**  As an independent contractor, the mode, manner, method and means used by Consultant in the performance of services shall be of Consultant's selection and under the sole control and direction of Consultant. Consultant shall be responsible for all risks incurred in the operation of Consultant's business and shall enjoy all the benefits thereof. Any persons employed by or subcontracting with Consultant to perform any part of Consultant's obligations hereunder shall be under the sole control and direction of Consultant and Consultant shall be solely responsible for all liabilities and expenses thereof. The Client shall have no right or authority with respect to the selection, control, direction, or compensation of such persons. All assignments for the performance of Services shall be provided in writing by the Client to the Consultant in advance.

**8.     Tax Treatment.**  Consultant and the Client agree that the Client will treat Consultant as an independent contractor for purposes of all tax laws (local, state and federal) and file forms consistent with that status.  Consultant agrees, as an independent contractor, that neither he/she nor his/her employees are entitled to unemployment benefits in the event this Agreement terminates, or workers' compensation benefits in the event that Consultant, or any employee of Consultant, is injured in any manner while performing obligations under this Agreement.  Consultant will be solely responsible to pay any and all local, state, and/or federal income, social security and unemployment taxes for Consultant and his/her employees.  The Client will not withhold any taxes or prepare W-2 Forms for Consultant, but will provide Consultant with a Form 1099, if required by law.  Consultant is solely responsible for, and will timely file all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Consultant is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing services under this Agreement, except as provided herein.  No part of Consultant's compensation will be subject to withholding by Client for the payment of any social security, federal, state or any other employee payroll taxes.  Client will regularly report amounts paid to Consultant with the appropriate taxing authorities, as required by law.

**9.     No Employee Benefits**.  Consultant acknowledges and agrees that neither he/she nor anyone acting on his/her behalf shall receive any employee benefits of any kind from the Client.  Consultant (and Consultant's agents, employees, and subcontractors) is excluded from participating in any fringe benefit plans or programs as a result of the performance of services under this Agreement, without regard to Consultant's independent contractor status.  In addition, Consultant (on behalf of its/his/herself and on behalf of Consultant's agents, employees, and contractors) waives any and all rights, if any, to participation in any of the Client's fringe benefit plans or programs including, but not limited to, health, sickness, accident or dental coverage, life insurance, disability benefits, severance, accidental death and dismemberment coverage, unemployment insurance coverage, workers' compensation coverage, and pension or 401(k) benefit(s) provided by the Client to its employees.  Notwithstanding the above, this Agreement does not amend or abrogate in any manner any benefit continuation or conversion rights provided by the provision of a benefit plan or by law arising out of Consultant's previous employment relationship with Client.

**10.    Expenses and Liabilities**.  Consultant agrees that as an independent contractor, he/she is solely responsible for all expenses (and profits/losses) he/she incurs in connection with the performance of services.  Consultant understands that he/she will be reimbursed for any expenses necessitated by this Agreement that are pre-approved by the Company in writing, but the Consultant will not be reimbursed for operating costs, or the cost of doing business.  In addition, the Client does not guarantee to Consultant that fees derived from Consultant's business will exceed Consultant's costs.

**11.    Non-Exclusivity**.  The Client reserves the right to engage other consultants to perform services, without giving Consultant a right of first refusal or any other exclusive rights.  Consultant reserves the right to perform services for other persons, provided that the performance of such services do not conflict or interfere with services provided pursuant to or obligations under this Agreement.

**12.    No Conflict of Interest.**  During the term of this Agreement, unless written permission is given by the Executive, Consultant will not accept work, enter into a contract, or provide services to any third party that provides products or services which compete with the products or services provided by the Client nor may Consultant enter into any agreement or perform any services which would conflict or interfere with the services provided pursuant to or the obligations under this Agreement.  Consultant warrants that there is no other contract or duty on his/her part that prevents or impedes Consultant's performance under this Agreement.  Consultant agrees to indemnify Client from any and all loss or liability incurred by reason of the alleged breach by Consultant of any services agreement with any third party.

**13.     Confidential Information.**  Consultant agrees to hold Client's Confidential Information (as defined below) in strict confidence and not to disclose such Confidential Information to any third parties. Consultant also agrees not to use any of Client's Confidential Information for any purpose other than performance of Consultant's services hereunder.  "*Confidential Information*" as used in this Agreement shall mean all information disclosed by Client to Consultant, or otherwise, regarding Client or its business obtained by Consultant pursuant to services provided under this Agreement that is not generally known in the Client's trade or industry and shall include, without limitation, (a) concepts and ideas relating to the development and distribution of content in any medium or to the current, future and proposed products or services of Client or its subsidiaries or affiliates; (b) trade secrets, drawings, inventions, know-how, software programs, and software source documents; (c) information regarding plans for research, development, new service offerings or products, marketing and selling, business plans, business forecasts, budgets and unpublished financial statements, licenses and distribution arrangements, prices and costs, suppliers and customers; and (d) any information regarding the skills and compensation of employees, contractors or other agents of the Client or its subsidiaries or affiliates.  Confidential Information also includes proprietary or confidential information of any third party who may disclose such information to Client or Consultant in the course of Client's business.  Consultant's obligations set forth in this Section shall not apply with respect to any portion of the Confidential Information that Consultant can document by competent proof that such portion: (i) is in the public domain through no fault of Consultant; (ii) has been rightfully independently communicated to Consultant free of any obligation of confidence; or (iii) was developed by Consultant independently of and without reference to any information communicated to Consultant by Client.  In addition, Consultant may disclose Client's Confidential Information in response to a valid order by a court or other governmental body, as otherwise required by law.  All Confidential Information furnished to Consultant by Client is the sole and exclusive property of Client or its suppliers or customers.  Upon request by Client, Consultant agrees to promptly deliver to Client the original and any copies of such Confidential Information.  Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between Client and Consultant, nothing in this Agreement shall limit Consultant's right to discuss Consultant's engagement with the Client or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or other federal government agency or similar state or local agency or to discuss the terms and conditions of Consultant's engagement with others to the extent expressly permitted by applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure. Further, notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), Consultant shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

**14.     Term and Termination.**

**14.1     Term.**  The term of this Agreement and the "*Consulting Period*" is for sixty (60) months from the Effective Date set forth above, unless earlier terminated as provided in this Agreement.

**14.2     Termination.**

**(a)     Automatic Termination.**  If Consultant fails to execute the Separation Agreement within twenty-one (21) days of receipt, then this Agreement will automatically terminate effective the day immediately following the twenty-first day following Consultant's receipt of the Separation Agreement.  If Consultant revokes his acceptance of the Separation Agreement within seven (7)

4

days after executing the Separation Agreement, then this Agreement will automatically terminate on the day of such revocation.

**(b)  Termination upon Sale of the Client and Unavailability of Consultant.** The Client may terminate this Agreement upon the occurrence of any of the following events, which any one event will be treated as a termination without cause: (i) the sale, exchange or other disposition, in one transaction, of fifty-one percent (51 %) of the outstanding shares of the Client; (ii) a decision by the Client to terminate its business and liquidate its assets; or (iii) the merger or consolidation of the Client in a transaction in which the shareholders of the Client receive less than fifty per cent (50%) of the outstanding voting shares of the new or continuing entity; and (iv) the Consultant becomes unavailable for work during the assigned term for a continuous period exceeding thirty (30)working days

**(c)  Termination upon Breach.**  The Client may terminate this Agreement before its expiration immediately if the Consultant materially breaches the Agreement.  The parties agree that a "***Material Breach***" by Consultant shall occur if he/she: (i) fails to abide by any recognized professional standard, including any ethical standard, in carrying out services to the Client; (ii) fails to provide services as reasonably requested by the Executive; (iii) secures other full-time employment that prohibits his/her ability to provide services to the Client; (iv) breaches any other material obligations of this Agreement, or (v) violates local, state, or federal laws.

**14.3  Effect of Termination.**  Upon any termination or expiration of this Agreement, Consultant (i) shall immediately discontinue all use of Client's Confidential Information delivered under this Agreement; (ii) shall delete any such Client Confidential Information from Consultant's computer storage or any other media, including, but not limited to, online and off-line libraries; and (iii) shall return to Client, or, at Client's option, destroy, all copies of such Confidential Information then in Consultant's possession.  In the event the Client terminates this Agreement, or if Consultant terminates this Agreement, Consultant will not receive any additional consulting fees or other compensation as of the date of termination.

**14.4  Survival.**  The rights and obligations contained in Sections 3-6, 8-9, 13, 14.3, 14.4, and 15-23 will survive any termination or expiration of this Agreement.

**15.  Indemnification.**  Consultant shall indemnify and hold harmless the Client and its officers, directors, agents, owners, and employees, for any claims brought or liabilities imposed against the Client by Consultant or any of his/her employees or by any other party (including private parties, governmental bodies and courts), including claims related to worker's compensation, wage and hour laws, employment taxes, and benefits, and whether relating to Consultant's status as an independent contractor, the status of his/her personnel, or any other matters involving the acts or omissions of Consultant and his/her personnel.  Indemnification shall be for any and all losses and damages, including costs and attorneys' fees.

**16.  Insurance.**  Consultant will obtain for him/herself and his/her personnel before providing services, at his/her own expense, General Liability (GL) insurance coverage for consulting services performed under this Agreement and (if available under state law) worker's compensation coverage.

**17.  Successors and Assigns.**  Consultant may not subcontract or otherwise delegate his/her obligations under this Agreement without Client's prior written consent.  Client may assign this Agreement.  Subject to the foregoing, this Agreement will be for the benefit of Client's successors and assigns, and will be binding on Consultant's subcontractors or delegatees.

**18.  Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows with notice deemed given as indicated: (i) by overnight courier upon written

5

verification of receipt; or (ii) by telecopy or facsimile transmission upon acknowledgment of receipt of electronic transmission.  Notice shall be sent to the addresses set forth below or such other address as either party may specify in writing.

      **19.**    **Governing Law.**  This Agreement shall be governed in all respects by the laws of the State of Nevada, as such laws are applied to agreements entered into and to be performed entirely within Nevada between Nevada residents.  Any suit involving this Agreement shall be brought in a federal or state court sitting in Nevada.  The parties agree that venue shall be proper in such courts, and that such courts will have personal jurisdiction over them.

      **20.**    **Severability.**  Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

      **21.**    **Waiver.**  The waiver by Client of a breach of any provision of this Agreement by Consultant shall not operate or be construed as a waiver of any other or subsequent breach by Consultant.

      **22.**    **Entire Agreement.**  This Agreement is being entered into as part of a Separation Agreement between Client and Consultant. This Agreement constitutes the entire understanding of the parties relating to the subject matter and supersedes any previous oral or written communications, representations, understanding, or agreement between the parties concerning such subject matter.  This Agreement shall not be changed, modified, supplemented or amended except by express written agreement signed by Consultant and the Client.  The parties have entered into separate agreements related to Consultant's previous employment relationship with Mind Medicine, Inc. whereby Consultant entered into restrictive covenants.  These separate agreements govern the previous relationship between Consultant and Mind Medicine, Inc., have or may have provisions that survive termination of Consultant's relationship with Client under this Agreement, may be amended or superseded without regard to this Agreement, and are enforceable according to their terms without regard to the enforcement provision of this Agreement.

      **IN WITNESS WHEREOF**, the parties have executed this Agreement effective as of the date first written above.

| "CLIENT" | "CONSULTANT" |
|---|---|
| **MIND MEDICINE, INC.** | **DR. SCOTT FREEMAN** |
| By: *[signature]* | |
| Name (print): | Name (print): |
| Title: | Address: |
| Telephone: | |
| Fax: | Tel: |
|  | Fax: |

6

**EXHIBIT C**

**Proprietary Information and Inventions Agreement**



232649612