# EXHIBIT B

Electronically Filed
7/26/2023 10:05 AM
Steven D. Grierson
CLERK OF THE COURT

**COMPB**
**DICKINSON WRIGHT PLLC**
JUSTIN J. BUSTOS, Nevada Bar No. 10320
Email: jbustos@dickinson-wright.com
100 West Liberty Street, Suite 940
Reno, NV 89501
Tel: (775) 343-7500
Fax: (844) 670-6009

**COOLEY LLP**
Sarah Lightdale
Kaitland Kennelly
Amanda Liverzani
Email: slightdale@cooley.com
Email: kkennelly@cooley.com
Email: aliverzani@cooley.com
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275

Alexandra Rex Mayhugh
Email: amayhugh@cooley.com
Wells Fargo Center, South Tower
355 South Grand Avenue, Suite 900
Los Angeles, CA 90071
Tel: (213) 561-3250
Fax: (213) 561-3244

(*pro hac vice applications forthcoming*)

*Attorneys for Plaintiff Mind Medicine (MindMed), Inc.*

CASE NO: A-23-874611-C
Department 14

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| MIND MEDICINE (MINDMED) INC., a British Columbia Corporation;<br><br>Plaintiff,<br><br>vs.<br><br>SCOTT FREEMAN, an individual, and FCM MM HOLDINGS, LLC, a Wyoming Limited Liability Company;<br><br>Defendants. | CASE NO.<br><br>DEPT.<br><br>**COMPLAINT**<br><br>**Exempt from Arbitration:**<br>**Damages in Excess of $50,000, Equitable Relief, and Business Court Matter**<br><br>**Business Court Requested:**<br>**EDCR 1.61 – Business Tort Claim** |

1

Plaintiff MIND MEDICINE (MINDMED) INC. ("MindMed," the "Company," or "Plaintiff"), by and through its counsel, the law firms of Dickinson Wright PLLC and Cooley LLP, hereby brings this Complaint and complains and alleges against DR. SCOTT FREEMAN ("Dr. Freeman") and FCM MM HOLDINGS, LLC ("FCM," and together with Dr. Freeman, "Defendants"), as follows:

## INTRODUCTION

1.     This case arises from Defendants' repeated and flagrant violations of the non-disparagement and confidentiality terms of a Separation Agreement executed by Dr. Freeman and MindMed, the biopharmaceutical company at which he was formerly employed.

2.     Dr. Freeman was suspended from his position at MindMed in June 2020, and Dr. Freeman and MindMed entered into the Separation Agreement on August 31, 2020.  In the Separation Agreement, Dr. Freeman committed, among other things, to maintain the confidentiality of MindMed's proprietary information and refrain from making any statements that were likely to harm MindMed or its officers, directors, or employees.  In exchange, MindMed agreed to provide Dr. Freeman with valuable severance benefits, including permitting the continued vesting of stock options.

3.     Following his departure from MindMed, Dr. Freeman, together with his then twenty-year-old nephew Jake Freeman, formed FCM.  FCM functions as Dr. Freeman's alter ego—it is controlled by Dr. Freeman, publicly adopts Dr. Freeman's statements (including those made in litigation) as its own, claims to represent Dr. Freeman's approximately 3% interest in MindMed, and appears to have been formed for the sole purpose of interfering in MindMed's operations.

4.     In August 2022, Dr. Freeman, by and through FCM, launched a campaign to reinstall himself at MindMed.  This campaign culminated with Defendants' initiation of a proxy contest in April 2023, through which Defendants sought to gain majority control of MindMed's Board of Directors by replacing incumbent directors with Dr. Freeman and three other candidates he had chosen.

2

**0008**

5.      From August 2022 to the present day, Defendants have ignored their obligations under the Separation Agreement and focused instead on dragging MindMed's business operations and management through the mud.  Defendants have conducted a widespread and vast smear campaign across social media, press releases, websites, interviews, private and public letters, and filings with the U.S. Securities and Exchange Commission ("SEC").  Defendants have also publicly disclosed and misused confidential MindMed information, which they should have given back to the Company long ago.

6.      Defendants' antics have wreaked havoc on MindMed.  The Company has been forced to expend extraordinary amounts of time and money to set the record straight and respond to Defendants' ad hominem attacks.  All of this has diverted resources from MindMed's core purpose: to develop life-changing treatments for individuals suffering from brain health disorders. Defendants' actions and disparaging statements have also harmed MindMed's business operations and reputation, as well as the reputations of MindMed's directors, officers, and employees.

7.      In June 2023, MindMed's shareholders demonstrated their confidence in its Board and management by electing all candidates recommended by the Board, soundly defeating Defendants' misguided proxy campaign.  But rather than respecting the wishes of MindMed's shareholders and complying with the obligations of the Separation Agreement, FCM has publicly proclaimed its intention to "[c]ontinue its fight" and "continue to place pressure on MindMed."

8.      MindMed brings this action for breach of contract, breach of the implied covenant of good faith and fair dealing, and injunctive relief due to Defendants' breaches of the Separation Agreement.

## THE PARTIES

9.      Plaintiff MindMed is a publicly traded, clinical stage biopharmaceutical company organized under the laws of British Columbia.  MindMed is a leader in the development of product candidates for the treatment of brain health disorders based on novel uses of psychedelic compounds.

10.      Prior to February 27, 2020, MindMed's operations were conducted through Mind

3

Medicine, Inc., a Delaware corporation ("MindMed US").  MindMed US was incorporated on
May 30, 2019.  On February 27, 2020, MindMed US completed a reverse takeover transaction
with Broadway Gold Mining Ltd. ("Broadway") by way of a plan of arrangement under the
Business Corporations Act of British Columbia, which resulted in Broadway (a) becoming the
legal parent company of MindMed US and (b) changing its name to MindMed.  MindMed has four
wholly owned subsidiaries, including MindMed Pty Ltd, which is a wholly-owned subsidiary of
MindMed US and a proprietary limited company organized under the laws of Australia.

11.     Defendant Dr. Scott Freeman is a former employee of MindMed.  In September
2019, Dr. Freeman became MindMed's President and Chief Medical Officer ("CMO") and, in
December 2019, Dr. Freeman became a director of MindMed Pty Ltd.  Just months later, Dr.
Freeman was removed from those positions.

12.     On August 31, 2020, MindMed and Dr. Freeman executed the Separation
Agreement, which is governed by Nevada law.  Attached to the Appendix of Exhibits as **Exhibit
A**, and incorporated herein, is a true and correct copy of the Separation Agreement.

13.     Upon information and belief, during the 10-month period in which he served as an
officer of MindMed and a director of MindMed Pty Ltd., Dr. Freeman resided in Nevada.  Upon
information and belief, Dr. Freeman has resided in the U.S. Virgin Islands since January 1, 2022.

14.     Since Dr. Freeman departed MindMed in August 2020, the Company has grown
from approximately ten to forty-eight employees.  MindMed's current six-member Board of
Directors—all of whom apart from MindMed's CEO are non-employee, independent directors—
and management team have extensive expertise in matters relevant to MindMed's business,
including research, development, commercialization, psychiatric, and technology expertise.
Additionally, the members of MindMed's current Board of Directors have significant experience
serving as directors and senior executives for leading public healthcare and biopharmaceutical
companies.

15.     On April 27, 2021, MindMed began trading on NASDAQ under the ticker symbol
MNMD.

16.     Defendant FCM is a Wyoming limited liability company formed in August 2022. Dr. Freeman and his twenty-one-year-old nephew Jake Freeman founded, manage, and direct FCM.

17.     At all relevant times, FCM served as Dr. Freeman's alter ego.

18.     In August 2022, Defendants initiated an activist shareholder campaign through social media, press releases, shareholder letters, and other sources to smear MindMed's current Board of Directors, management, and business operations, with the express goal of re-installing Dr. Freeman in director and management roles at MindMed.

19.     In April 2023, Defendants launched a proxy contest to remove and replace a majority of MindMed's Board of Directors with a slate of directors comprised of Dr. Freeman and three individuals hand-picked by Dr. Freeman.

20.     On June 21, 2023, Company shareholders elected all six of MindMed's nominees and none of FCM's slate.  The Inspector of Elections for the Annual General Meeting ("AGM") then provided the preliminary voting results to MindMed and FCM, and MindMed moved to certify the voting results.

21.     On June 22, 2023, Defendants issued a press release in which they acknowledged the election of MindMed's director nominees and stated that they intend to "continue to place pressure on MindMed."

22.     On June 27, 2023, Defendants' proxy solicitor, Okapi Partners, informed the Inspector of Elections that Defendants were challenging the preliminary voting results and "reviewing options with US and Canadian counsel."  After receiving the June 27, 2023 notice, MindMed cooperated fully with Defendants' requests for information, including providing copies of proxies, ballots, and other documents summarizing the voting on MindMed's proxy card at the AGM.

23.     On July 5, 2023, MindMed's proxy solicitor wrote to Defendants' proxy solicitor requesting that any challenges to the voting results be identified in writing and proposing a review meeting (at which the Inspector of Elections would afford Defendants the opportunity to present

5

their arguments in favor of their challenges to the preliminary voting results) to be held the week of July 10, 2023. When Defendants' proxy solicitor insisted that the meeting be held in late July to accommodate Defendants' availability, MindMed acquiesced, agreeing to a July 24, 2023 hearing before the Inspector of Elections.

24. On July 10, 2023, MindMed sent Dr. Freeman (through counsel) a document preservation notice in anticipation of litigation such as the instant action. Defendants have not disputed that they and their associates involved in the proxy contest and smear campaign against MindMed are obligated to preserve documents in their possession potentially relevant to MindMed's claims.

25. On July 22, 2023, Dr. Freeman informed the Inspector of Elections that FCM was refusing to attend the review meeting that it had requested, purportedly to challenge the tabulation of voting results from the AGM. Dr. Freeman complained to the Inspector of Elections that MindMed's document preservation notice was somehow improper. Defendants never specified any actual challenge or identified any actual issues with the tabulation of the voting results from the AGM. On July 24, 2023, MindMed sent the Inspector of Elections an email noting that Defendants had not raised any challenges to the tabulation of the AGM voting results and requested that the Inspector of Elections provide the final vote certification for the AGM. Early in the morning of July 25, 2023, Dr. Freeman notified the Inspector of Elections that the document preservation notice (as described *supra* in ¶ 24) sent by MindMed to Dr. Freeman "could be seen as intimidation to dissuade FCM's election challenge of the possible voter and election irregularities and could constitute election interference" and requested that the Inspector of Elections not certify the voting results of the AGM on a final basis and commence an immediate investigation. Notably, Dr. Freeman's email did not raise any challenges to the tabulation of the AGM voting results.

26. On July 25, 2023, at approximately 5:00 p.m. Eastern Time, the Inspector of Elections certified the results of the voting at MindMed's AGM on a final basis and made the final certified results available to representatives of FCM and MindMed.

0012

**JURISDICTION AND VENUE**

27. This Court has personal jurisdiction over Dr. Freeman because he has consented to the personal jurisdiction of the Nevada courts with respect to the claims asserted herein. *See* Ex. A at 407 (Separation Agreement § 18).

28. In addition, this Court has personal jurisdiction over Dr. Freeman pursuant to NRS 14.065 because Dr. Freeman has contacts with and affirmatively directs conduct toward Nevada, and the causes of action asserted herein arise from Dr. Freeman's purposeful contacts and conduct targeting the state of Nevada, including his execution of the Separation Agreement and misappropriation and unlawful retention of MindMed's confidential, trade secret, and proprietary information.

29. This Court has personal jurisdiction over FCM because Dr. Freeman directs and manages FCM, and FCM is an alter ego of Dr. Freeman. As a result, Dr. Freeman's consent to this Court's personal jurisdiction, as well as Dr. Freeman's contacts with and conduct targeting the state of Nevada, may be imputed to FCM for the purpose of establishing personal jurisdiction.

30. This Court has subject-matter jurisdiction pursuant to Article 6, § 6(1) of the Nevada Constitution and NRS 4.370(1)(a) because MindMed seeks damages in excess of $15,000.

31. Venue is proper in this district by agreement of MindMed and Dr. Freeman (*see* Ex. A at 407 (Separation Agreement §18)) and pursuant to NRS 13.010 and 13.040.

**GENERAL ALLEGATIONS**

**I.    MINDMED'S RESEARCH AND DEVELOPMENT PIPELINE**

32. MindMed is a clinical-stage biopharmaceutical company developing novel product candidates to treat brain health disorders using proprietary forms of psychedelic compounds such as rectus-3,4-methyl-enedioxy-methamphetamine ("R-MDMA") and lysergic acid diethylamide ("LSD").

33. MindMed, through its acquisition of Healthmode, Inc. in 2021, is also developing a digital medicine platform for monitoring patients' treatment with psychedelic-based therapies, with the aim of reducing the barriers to adoption of its psychedelic product candidates, should they

7

1  ultimately be approved by the U.S. Food and Drug Administration ("FDA").

2      **34.**      MindMed's current clinical stage product candidates are MM-120 for the treatment

3  of Generalized Anxiety Disorder ("GAD") and Attention Deficit Hyperactivity Disorder

4  ("ADHD"), and MM-402 for treatment of the core symptoms of autism spectrum disorder

5  ("ASD").

6      **35.**      MindMed's lead candidate, MM-120, is a proprietary, pharmaceutically optimized

7  formulation of LSD D-tartrate.

8      **36.**      In January 2022, the FDA cleared MindMed's investigational new drug ("IND")

9  application for MM-120, allowing the Company to initiate Phase 2 clinical trials.

10      **37.**      MindMed is currently conducting two Phase 2 clinical trials of MM-120: Study

11  MMED007, a randomized, double-blind, placebo-controlled, Phase 2a proof of concept trial for

12  the treatment of ADHD patients designed to assess the safety and efficacy of repeated low dose

13  MM-120 administration, and Study MMED008, a Phase 2, randomized, double-blind, parallel-

14  group, placebo-controlled, dose-finding study to assess the effect of four doses of MM-120 for the

15  treatment of GAD patients.

16      **38.**      MindMed anticipates reporting topline results from both the MMED008 and

17  MMED007 trials in late 2023.

18      **39.**      In May 2023, a leading FDA regulatory consulting firm, run by former senior FDA

19  officials, conducted an independent expert regulatory assessment of MindMed's MM-120 (LSD

20  D-tartrate) development strategy.

21      **40.**      The independent expert regulatory consultant concluded that, in light of MM-120's

22  regulatory history and relevant regulations, guidance, and precedent, MindMed's ongoing dose-

23  ranging clinical trial for MM-120 is an appropriate, and indeed essential, component of the drug's

24  development.

25      **41.**      MindMed's other lead product candidate is MM-402, a proprietary formulation of

26  R-MDMA.

27      **42.**      MindMed presented promising results from a preclinical study of MM-402 in a

28

8

model of ASD in the first half of 2023 and plans to initiate a Phase 1 study of MM-402 in 2023 to characterize the tolerability, pharmacokinetics, and pharmacodynamics of MM-402, and to evaluate early signals of efficacy.

43. Beyond its clinical-stage product candidates, MindMed is pursuing a number of programs, primarily through external collaborations, to expand its drug development pipeline and broaden the potential applications of its lead product candidates.

## II. DR. FREEMAN'S BRIEF TENURE AT MINDMED

### A. Dr. Freeman Becomes MindMed's President and CMO

44. From 2009 to 2019, Dr. Freeman served as the CMO of Savant HWP Inc. ("Savant").

45. During his ten years at Savant, Dr. Freeman unsuccessfully attempted to develop and commercialize a formulation of 18-Methoxycoronaridine ("18-MC").

46. Savant failed to bring a single product to market or generate any revenue under Dr. Freeman's leadership.

47. In 2014, the FDA provided adverse feedback on Savant's development plans for 18-MC. In February 2014, Savant submitted an IND application to the FDA with the intent of enabling a clinical trial of 18-MC in the United States. The FDA placed the IND on "Full Clinical Hold," prohibiting initiation of clinical research with 18-MC based on its concerns about findings from a preliminary study in mice that was conducted by Savant under Dr. Freeman's guidance. From June 2014 through August 2014, Savant corresponded with the FDA, culminating in a removal of the Full Clinical Hold with specific limitations on the dose and exposure of 18-MC allowable in clinical trials in the United States. The FDA informed Savant of the requirements for additional animal studies to overcome the concerns that led to the initial Full Clinical Hold. Dr. Freeman did not take any action in response to that feedback.

48. In July 2019, MindMed acquired all rights, title, interest, and assets in the 18-MC program from Savant Addiction Medicine (a subsidiary of Savant). The program was subsequently renamed MM-110.

49.     In connection with the transfer of MM-110, Dr. Freeman became President and CMO of MindMed in September 2019.

50.     On March 1, 2020, Dr. Freeman executed an Executive Employment Agreement (the "Employment Agreement"). The Employment Agreement provided that Dr. Freeman would serve for a one-year term with an option for Dr. Freeman and MindMed to negotiate subsequent renewal terms. The first six months of the Employment Agreement's term effectively served as a trial period, during which the Company could terminate Dr. Freeman without "Cause" (as defined in the Employment Agreement) without any obligation to pay him any severance benefits.

51.     On June 5, 2020, Dr. Freeman executed an agreement that set forth his confidentiality obligations with respect to MindMed's proprietary information (the "Proprietary Information and Inventions Agreement"). Attached to the Appendix of Exhibits as **Exhibit B**, and incorporated herein, is a true and correct copy of the Proprietary Information and Inventions Agreement.

52.     MindMed only fully discovered the extent of Dr. Freeman's failures with respect to MM-110 after the close of the Savant acquisition.

53.     The flawed clinical and regulatory strategies adopted during Dr. Freeman's tenure ultimately led MindMed to reallocate resources away from the MM-110 program.

**B.      Dr. Freeman Is Placed on Leave Pending an Investigation of Alleged Misconduct**

54.     In June 2020, MindMed's leadership received a complaint regarding Dr. Freeman's workplace behavior, and Dr. Freeman was subsequently placed on a temporary paid administrative leave.

55.     In July 2020, MindMed's leadership determined that Dr. Freeman should be removed from the Company.

56.     Over the next several weeks, MindMed and Dr. Freeman negotiated Dr. Freeman's removal from the Company.

0016

### III.    DR. FREEMAN'S SEPARATION AGREEMENT

**57.**    At the time of his removal from the Company, Dr. Freeman was not entitled to any severance benefits under his Employment Agreement (which, as described above, had effectively included a six-month trial period).

**58.**    Prior to his removal from the Company, Dr. Freeman had been granted an option to purchase 2 million shares of the Company's common stock (the "Grant") under the Company's 2020 Stock Option Plan (the "Plan").  At the time of his separation from the Company, no shares subject to the Grant had vested.

**59.**    The Company wished to separate from Dr. Freeman and manage the transition of his employment in an organized and non-disruptive fashion.

**60.**    On August 31, 2020, MindMed and Dr. Freeman executed the Separation Agreement.  As memorialized in the Separation Agreement, Dr. Freeman resigned from his positions as President and CMO of MindMed and as a director of MindMed Pty Ltd., effective August 31, 2020 (the "Separation Date").

**61.**    The Separation Agreement established, among other things, (i) Dr. Freeman's obligations relating to the return of MindMed company property, (ii) Dr. Freeman's eligibility to receive severance benefits and to provide consulting services to MindMed, (iii) Dr. Freeman's continuing nondisclosure obligations relating to MindMed's confidential, proprietary, and trade secret information, and (iv) the parties' mutual non-disparagement obligations.

**62.**    Concurrently with the Separation Agreement, Dr. Freeman executed an agreement that set forth the terms under which he could provide certain consulting services to MindMed, only if and as requested by MindMed, and be compensated for such services (the "Consulting Agreement").

**63.**    Both the Proprietary Information and Inventions Agreement and the Consulting Agreement are incorporated by reference into the Separation Agreement.  *See* Ex. A at 407 (Separation Agreement § 18).

**64.**    In partial consideration of the Separation Agreement and the Consulting

11

Agreement, Dr. Freeman agreed to the cancellation by MindMed of the option to pursue 1 million shares under the Grant (*e.g.*, half of the Grant). In turn, the Company agreed that Dr. Freeman's service as a consultant rendered him eligible under the Plan for the remaining 1 million shares under the Grant to vest according to the original Grant vesting schedule and price terms.

65. Absent the Company's entry into to the Separation Agreement (including the agreements incorporated by reference therein), Dr. Freeman would never have been able to exercise any portion of the Grant. Because of the Company's entry into the Separation Agreement, Dr. Freeman has enjoyed extraordinary financial gains. In 2021 alone, while still in possession of MindMed's confidential information and while purportedly harboring concerns about MindMed that he did not begin discussing publicly until much later, Dr. Freeman secured millions of dollars from selling MindMed stock.

66. To date, Dr. Freeman has not been asked to provide any services to MindMed pursuant to the Consulting Agreement, and he has provided no services to MindMed pursuant to the Consulting Agreement. However, despite the egregious conduct described herein, his valuable stock options have continued to vest.

67. On July 11, 2023, MindMed terminated the Consulting Agreement on the basis of Dr. Freeman's repeated material breaches, as described herein.

A. **Dr. Freeman's Obligations to Return MindMed's Property and Maintain the Confidentiality of MindMed Information**

68. Under the Separation Agreement, Dr. Freeman was required to return all MindMed documents and property in his possession to the Company. Specifically, under Section 8 of the Separation Agreement, Dr. Freeman agreed that, as of August 31, 2020, he would return all documents and property, including, but not limited to, business plans and forecasts, financial information, identification badges, computers, and any other materials embodying MindMed's proprietary or confidential information. Ex. A at 403. Section 8 clearly states that Dr. Freeman's severance benefits were expressly conditioned upon return of all Company property. *Id*. Under Section 4 of the Proprietary Information and Inventions Agreement, Dr. Freeman agreed that

12

"[u]pon termination of [his] employment with the Company for any reason whatsoever, voluntarily or involuntarily, and at any earlier time the Company requests, [he] [would] deliver to the person designated by the Company all originals and copies of all documents and other property of the Company in [his] possession, under [his] control or to which [he] may have [had] access." Ex. B at 3.

69.     The Separation Agreement also sets forth Dr. Freeman's continuing obligations relating to MindMed's confidential, proprietary, and trade secret information.

70.     Confidentiality provisions are essential elements of contracts in the biopharmaceutical industry for a number of reasons. Executives like Dr. Freeman have access to confidential information that could materially harm a company if publicly disclosed—for example, by making proprietary information (*e.g.*, intellectual property, research and development data, the terms of supply agreements), business strategy, and business operations privy to competitors; reducing trust with business partners and private investors who may enter into deals on the condition that certain terms of contracts or agreements remain non-public; and revealing sensitive patient information (*e.g.*, personal identifying information and private health information from clinical trials).

71.     Given the importance of securing MindMed's confidential, proprietary, and trade secret information, the Separation Agreement prohibits Dr. Freeman from (i) using such information outside the scope of his employment or provision of consulting services to MindMed and/or (ii) disclosing such information to third parties. *See* Ex. A at 403 (Separation Agreement § 9). The Proprietary Information and Inventions Agreement and Consulting Agreement are in accord.

       **(a)**     Section 4 of the Proprietary Information and Inventions Agreement states that Freeman would not "reproduce or appropriate for [his] own use, or for the use of others, any property, Proprietary Information or Company Inventions." Ex. B at 3.

       **(b)**     Section 13 of the Consulting Agreement states, "[Freeman] agrees to hold

13

> [MindMed's] Confidential Information . . . in strict confidence and not to
> disclose such Confidential Information to any third parties" and "not to use
> any of [MindMed's] Confidential Information for any purpose other than
> performance of Consultant's services [under the Consulting Agreement]."
> Ex. A at 413.

### B. Dr. Freeman's Non-Disparagement Obligations

**72.** The Separation Agreement prohibits Dr. Freeman from disparaging MindMed, as well as its management and directors, in any manner likely to be harmful to them or their business, business reputation, or personal reputation. *See* Ex. A at 404 (Separation Agreement § 11).

**73.** Absent this provision, MindMed would not have executed the Separation Agreement. At the time the Separation Agreement was executed, MindMed's leadership understood that, as a publicly traded company at the forefront of the emerging psychedelic biopharmaceutical industry, the reputational harm resulting from a former executive disparaging the Company would potentially be devastating to MindMed's stock price, as well as its ability to obtain outside funding and pursue strategic business partnerships.

**74.** To make the import of the above confidentiality and non-disparagement provisions clear, the parties included an acknowledgement in the Separation Agreement providing that any threatened or actual breach would constitute immediate and irreparable injury to the non-breaching party. *See id.* at 407 (Separation Agreement § 17). The same provision acknowledges that the non-breaching party is entitled to damages and injunctive relief to prevent further breaches of the Separation Agreement. *See id.*

### IV. DEFENDANTS' BREACHES OF DR. FREEMAN'S CONTRACTUAL OBLIGATIONS

**75.** While MindMed carried out its obligations under the Separation Agreement, including continuing to allow Dr. Freeman's options to vest, Dr. Freeman has flagrantly and repeatedly violated the Separation Agreement, both in his personal capacity and through his alter ego FCM, while retaining the financial benefits he received under the Separation Agreement. Further, Defendants' actions demonstrate that they will continue to breach the Separation

14

1    Agreement unless and until the Court enjoins them from doing so.

2        **A.    Theft and Disclosure of MindMed's Confidential Information**

3        **76.**    During his employment at MindMed, Dr. Freeman misappropriated confidential

4    MindMed information, which he continues to unlawfully retain and use to this very day.

5        **77.**    Shortly after Dr. Freeman was placed on leave, MindMed discovered that he had

6    sent hundreds of documents containing MindMed's confidential, proprietary, and trade secret

7    information to his personal email account.

8        **78.**    The documents that Dr. Freeman stole and misappropriated included

9    documentation of MindMed's clinical investigations, corporate bank statements, trial data, urine

10   results, toxicology studies, Board of Directors materials, clinical trial and results presentations,

11   commercial and clinical contracts, consulting and advisor agreements, and other documents and

12   materials containing MindMed's confidential, proprietary, and trade secret information.

13       **79.**    On June 20, 2020, MindMed sent Dr. Freeman formal written notice that he was in

14   breach of his confidentiality obligations and fiduciary duties to MindMed and demanded that he

15   immediately return all Company property of any type that he had taken from MindMed.

16       **80.**    When confronted about his theft of confidential MindMed information during a

17   July 2020 meeting with MindMed's in-house counsel, Dr. Freeman acknowledged that he had sent

18   MindMed's property to his personal account and expressed no remorse for doing so.

19       **81.**    MindMed and Dr. Freeman proceeded to negotiate the Separation Agreement,

20   which required Dr. Freeman to return all Company property to MindMed by the Separation Date.

21       **82.**    Because Dr. Freeman has not performed any consulting services for MindMed

22   since the Separation Date, he has had no conceivable reason to access, retain, or use any

23   confidential MindMed information since that date.

24       **83.**    When Dr. Freeman executed the Separation Agreement, he misrepresented to

25   MindMed that he had returned, or was in the process of returning, all MindMed property in his

26   possession as of the Separation Date.

27       **84.**    Upon information and belief, Dr. Freeman made this misrepresentation in order to

28

15

obtain financial benefits under the Separation Agreement, including the severance benefits described in Section 3 of the Agreement, which he would have otherwise not been entitled to receive.

85.     Defendants' public comments have revealed that, in actuality, Dr. Freeman retained the MindMed documents that were in his possession at the time he executed the Separation Agreement, including the documents he sent to his personal email account.

86.     It is evident that Dr. Freeman has disclosed certain of MindMed's confidential information to (at a minimum) Jake Freeman, and that, through Jake Freeman, FCM, and himself, Defendants have disclosed this information to the public at large.

87.     For example, in an October 6, 2022 video interview on the YouTube channel "Psychedelic Invest" (the "October 6 Interview"), Jake Freeman described and opined on the significance of certain communications from the FDA to MindMed that were memorialized in minutes prepared and maintained by the company (the "FDA Minutes").  FCM again referenced the existence of the FDA Minutes and described their contents misleadingly in a publicly-available presentation filed with the SEC during Defendants' proxy contest.

88.     In the October 6 Interview, Jake Freeman implied that Dr. Freeman had shared additional confidential MindMed information with him.  He claimed to be aware of "forced resignations" at MindMed while stating that he was "not at liberty to discuss them."  He also stated that he could not "comment" on claims asserted by Dr. Freeman in the Hurst Litigation (defined *infra* in ¶ 98) "since some of [the] information is confidential."

89.     A month later, Jake Freeman openly trumpeted his receipt of MindMed's confidential information.  When asked in a November 4, 2022 "Psychedelic Invest" interview whether he possessed "confidential info" relating to MindMed, Jake Freeman responded, "Yes" and claimed to have "a litany of nonpublic information."

90.     During this period, similar comments reflecting that MindMed's confidential information had been shared beyond MindMed were posted to the FCM Reddit account (discussed in more detail *infra* in ¶¶ 99-140).  Upon information and belief, Jake Freeman was the author of

16

these comments.



I cannot comment directly due to NDA implications. To my knowledge many executives who have left were forced out because they disagreed with management's plan.

⌃ 0 ⌄   💬 Reply   ⬆ Share   ···

 

We cannot comment on this as it is under a confidentiality agreement. Scott Freeman was Chief Medical Officer under Savant (the precursor to MindMed) since 2009. We believe all comments should be addressed the Company. It is important to recognize that Scott really wants MindMed to succeed and would love to reprise his role

⊖   ⌃ 13 ⌄   💬 Reply   ⬆ Share   ···

 FreemanCapitalMngmt  Yes, Jake Freeman Exists  OP 2 months ago
Certainly interesting. I am aware of certain confidential information which clears this matter up with respect to MindMed. Unfortunately, we cannot share it at this time.

## B.    Disparagement of MindMed and its Leadership

91.    Dr. Freeman's violations of the Separation Agreement have not been limited to his unauthorized retention and disclosure of MindMed's confidential information. Dr. Freeman has also waged a smear campaign against MindMed and its directors and officers, which eventually escalated into a full-scale proxy contest, in clear violation of the Separation Agreement's non-disparagement provision.

92.    Upon information and belief, on August 4, 2022, Dr. Freeman and Jake Freeman formed FCM to represent Dr. Freeman's financial interest in MindMed and to serve as a public relations vehicle for Dr. Freeman.

93.    Jake Freeman previously gained notoriety for obtaining a $110 million windfall by acquiring and selling a six percent stake in Bed Bath & Beyond, Inc. and by attempting to run for President of the United States at the age of eighteen.[1]

---

[1] *See* Federal Election Commission Form 1, FILING FEC-1408352, Jake Freeman For President, https://docquery.fec.gov/cgi-bin/forms/C00746958/1408352/; Financial Times, "How a 20-year-old student made %110mn riding the meme stock wave," (Aug. 22, 2022), https://www.ft.com/content/b83144bd-830e-4e1d-a9a1-a1ee1ba61dab.

17

94.     Dr. Freeman directs and manages FCM,[2] and Jake Freeman serves as FCM's Executive President and Chief Executive Manager.

95.     Upon information and belief, at the time of its formation, FCM's primary capitalization was from Dr. Freeman.

96.     Upon information and belief, FCM has no business operations aside from representing Dr. Freeman's financial interest in MindMed and being an activist shareholder in MindMed.

97.     FCM and Dr. Freeman are frequently referred to interchangeably in FCM's public statements.[3]

98.     Illustrating that FCM is Dr. Freeman's corporate alter ego, in July 2022, Dr. Freeman filed two substantively identical complaints in the state courts of California and Nevada asserting claims against MindMed's former co-CEO and Chairman, Stephen Hurst, among others (the "Hurst Litigation").[4]  FCM then publicly claimed credit for filing these complaints—despite the fact that Dr. Freeman is the sole named plaintiff in both the Nevada and California actions.[5]

99.     Upon information and belief, on July 23, 2022, prior to forming FCM, Dr. Freeman and Jake Freeman launched a Reddit account with the username "FreemanCapitalMngmt" for the

---

[2] *See* Press Release, FCM MM Holdings, LLC, "MindMed Co-Founder Dr. Scott Freeman Proposes Value Enhancement Plan," (Aug. 11, 2022), https://www.prnewswire.com/news-releases/mindmed-co-founder-dr-scott-freeman-proposes-value-enhancement-plan-301604278.html.

[3] *See, e.g.*, "FCM MM Holdings, LLC Additional Information Relating to Reddit," (Aug. 11, 2022), https://mindmed.zone/disclosures ("Jake Freeman, Scott Freeman, FCM MM Holdings, LLC, Freeman Capital Management LLC, and their affiliates  (collectively referred to as "We", "I", "Us", or Our" are party to the disclosure as they relate to the Reddit Account and Reddit Account Communications").

[4] The action filed in the Superior Court of the State of California, County of San Mateo, was captioned *Scott Freeman, M.D., as trustee for the Scott Mitchell Freeman Revocable Living Trust, dated March 10, 2012, for itself and as assignee of Ferdinand Belga v. Stephen Hurst, et al.*, Case No. 22-CIV-03024. The action filed in the District Court, Clark County, Nevada was captioned *Scott Freeman, M.D., as trustee for the Scott Mitchell Freeman Revocable Living Trust, dated March 10, 2012, for itself and as assignee of Ferdinand Belga v. Stephen Hurst, et al.*, Case No. A-22-855842-B.

[5] *See* Reddit Cmt. (Sept. 4, 2022), https://www.reddit.com/r/MindMedInvestorsClub/comments/x5sitl/comment/in3yioh/?utm_source=share&utm_medium=web2x&context=3 ("FCM filed this lawsuit under seal on July 22").

18

purpose of posting MindMed-related content on behalf of FCM to Reddit, including the "MindMed Investors Club" Reddit subpage.

100. On August 10, 2022, FCM registered the website domain name https://mindmed.zone/ ("MindMed.zone").

101. The landing page for MindMed.zone stated, "MindMed's Founders Have Returned[.]"[6]



102. MindMed.zone further stated, "The Founders are Back" and "We represent MindMed's original founders who have been working on MindMed since 2009."



103. Despite initially claiming on Mindmed.zone to represent "investments in 5.64%" of MindMed's outstanding shares, which would have triggered an obligation to file a Schedule 13D with the SEC, FCM never filed a Schedule 13D with the SEC and later claimed to only own 3.5% of MindMed's outstanding shares.

104. The "About Us" section of the MindMed.zone website included Dr. Freeman's headshot and biography.

---

[6] The screenshots of the MindMed.zone website contained herein were taken on September 30, 2022. The MindMed.zone website was redesigned in connection with the proxy fight initiated by Defendants in April 2023 (discussed *infra* in ¶¶ 141-182).

0025



**105.** According to a comment posted to the FreemanCapitalMngmt Reddit account, Dr. Freeman was closely involved in the creation and design of the MindMed.zone website.

**106.** Both in his personal capacity and through his alter ego FCM, Dr. Freeman has undertaken a multi-faceted attack on MindMed, its management, and its directors—in blatant violation of the Separation Agreement's non-disparagement provision, *see* Ex. A at 404 (Separation Agreement § 11)—as part of a brazen and desperate attempt to seize control of the Company.

**107.** Because FCM is Dr. Freeman's corporate alter ego, Dr. Freeman is liable for the disparaging statements made by FCM that are described herein, all of which are likely to harm MindMed's business operations and reputation, as well as the personal and business reputations of its management and directors. Accordingly, FCM is a party to the Separation Agreement and

20

should therefore be held liable for its repeated and egregious material breaches of that agreement's non-disparagement provision.

### 1. In Advance of a Planned Proxy Contest to Seize Control of MindMed, Dr. Freeman Wages Smear Campaign Against MindMed

108.     On August 11, 2022, Defendants initiated an "activist" campaign against MindMed by posting a letter to MindMed.zone (the "August 11 Letter") addressed to the Company's Board of Directors and signed by Dr. Freeman and Jake Freeman. Attached to the Appendix of Exhibits as **Exhibit C**, and incorporated herein, is a true and correct copy of the August 11 Letter.

109.     Under the guise of "express[ing] . . . concern about the Company's strategic direction and present[ing] a plan to turn the Company around[,]" the August 11 Letter levied a barrage of unfounded criticism at MindMed's business strategy and operations, as well as its management, directors, officers, and employees.

110.     The August 11 Letter accused MindMed's management of "divid[ing] its attention among too many different projects . . . [which] have come at the cost of cash and decreased focus on MindMed's core drugs" and engaging in "unnecessary cash burn" and "non-essential research and development." The August 11 Letter also contended that the "compensation structure for Board members does not create the correct economic incentives to maximize shareholder value."

111.     While the August 11 Letter was ostensibly directed to MindMed's Board of Directors, the target audience was clearly the public, as evidenced by Defendants' promotion of the Letter.

112.     On August 11, 2022, FCM posted to Reddit that they were "telegraphing" the letter to the public.

113.     That same day, Defendants issued a press release announcing the August 11 Letter and attributing it to Dr. Freeman, whom the press release described as "direct[ing] and manag[ing]" FCM.[7]

---

[7] *See* Press Release, FCM MM Holdings, LLC, "MindMed Co-Founder Dr. Scott Freeman Proposes Value Enhancement Plan," (Aug. 11, 2022), https://www.prnewswire.com/news-releases/mindmed-co-founder-dr-scott-freeman-proposes-value-enhancement-plan-301604278.html.

0027

114.   Shortly after publishing the August 11 Letter, Dr. Freeman gave two interviews on the YouTube channel "Psychedelic Invest" in which he parroted many of the disparaging comments from the August 11 Letter.

115.   In those interviews, dated August 16 and August 17, 2022, Dr. Freeman levied multiple attacks on MindMed's strategic direction and operations.  As in the August 11 Letter, Dr. Freeman claimed MindMed's cash burn rate was too high, its leadership was suffering from "a lack of focus," and its "course needs to be corrected."  Dr. Freeman further stated that, under its current management, MindMed had "lost [its] way."

116.   In a Reddit post dated September 22, 2022, Defendants admitted that they were attempting to effectuate a complete change in MindMed's Board of Directors and management, explaining that they planned to "go for a proxy vote – basically replace management and the board":



117.   That same day, Defendants boasted that they were "Prepar[ing] for War" and warned that they were "not going anywhere":

118.   On September 28, 2022, Defendants continued their assault on MindMed through the publication of a second highly publicized letter, again ostensibly addressed to MindMed's Board of Directors (the "September 28 Letter").[8]  Attached to the Appendix of Exhibits as **Exhibit**

---

[8] *See* MindMed.zone, MindMed Letter re Dilution, (Sept. 28, 2022),

22

**D**, and incorporated herein, is a true and correct copy of the September 28 Letter.

119.    As with the August 11 Letter, Defendants publicized the September 28 Letter on Twitter, Reddit, and by press release entitled "MindMed Board is Trippin': Significant Investor Calls for Termination of Highly Dilutive Equity Offering and Pledges to Hold Board and Management Accountable through Activist Campaign."[9]

120.    The September 28 Letter criticized MindMed's decision to undertake an underwritten public offering and called for MindMed's management and directors to be "held accountable."  The September 28 Letter also threatened to formally requisition a shareholder meeting to remove a majority of the Board of Directors and "take legal action against the Company and the Board."

121.    Defendants continued their attack on the Company in Jake Freeman's October 6 Interview with "Psychedelic Invest."  During that interview, Jake Freeman falsely claimed (on behalf of FCM) that MindMed's CEO Robert Barrow lacked "an advanced degree," which Barrow was "trying to make up for."  (Barrow in fact holds a master's degree in pharmacology.)  Jake Freeman joked that "the only thing bigger than . . . Barrow's ego is his paycheck" and accused Barrow of not understanding "FDA 101."  Jake Freeman, who was twenty years old at the time, then characterized MindMed's management, including Barrow, as "young and inexperienced" and speculated—with no basis—that MindMed's prior chief legal officer may have been "asked to do something that you know doesn't seem to be in her ethical duties as a lawyer."

122.    On October 8, 2022, "Psychedelic Invest" interviewed Barrow (the "October 8 Interview").  During the October 8 Interview, FCM tweeted that Barrow was making "false[] claims" about MindMed and had "misrepresented [] lab studies."[10]

---

https://mindmed.zone/letterdilution.

[9] *See, e.g.*, Press Release, FCM MM Holdings, LLC, "MindMed Board is Trippin': Significant Investor Calls for Termination of Highly Dilutive Equity Offering and Pledges to Hold Board and Management Accountable through Activist Campaign," (Sept. 28, 2022), https://www.prnewswire.com/news-releases/mindmed-board-is-trippin-significant-investor-calls-for-termination-of-highly-dilutive-equity-offering-and-pledges-to-hold-board-and-management-accountable-through-activist-campaign-301636059.html.

[10] *See* Freeman Capital Management Twitter (@capital_freeman) (Oct. 7, 2022),

0029

123. On October 13, 2022, Defendants published a letter addressed to MindMed's shareholders which purported to analyze Barrow's October 8 Interview (the "October 13 Letter").[11] Attached to the Appendix of Exhibits as **Exhibit E**, and incorporated herein, is a true and correct copy of the October 13 Letter.

124. The October 13 Letter conceded that Barrow's answers in the October 8 Interview "may appear to provide logical explanations for his actions" but nevertheless attacked Barrow as a "smooth-tongue [sic] and clean-shaven rhetorician." The October 13 Letter then accused Barrow of providing "misleading" responses that "ring hallow [sic]."

125. On October 21, 2022, Defendants published yet another missive against MindMed and Barrow (the "October 21 Letter").[12] Attached to the Appendix of Exhibits as **Exhibit F**, and incorporated herein, is a true and correct copy of the October 21 Letter.

126. The October 21 Letter falsely suggested that Barrow lied about his professional background in the October 8 Interview and argued that Barrow should "be recused" when certain MindMed issues are discussed by the Company's Board because "allowing [him] to participate in or be present would be a conflict of interest and potentially pose serious legal liability for both MindMed and each board member individually." Ex. F at 29. The October 21 Letter also criticized and mischaracterized Barrow's compensation, claiming that he received a pay raise of over "one hundred times" his pay at his prior company and suggesting that he received compensation as "a result of his connections" rather than his experience. *Id*. at 28.

127. Additionally, despite the fact that MindMed's 2022 executive compensation was below the median of its peers, the October 21 Letter claimed MindMed's "stock price has dropped 95% due to a myriad of factors including excessive executive compensation." *Id*. at 29.

128. On October 25, 2022, FCM returned to Twitter to lambast Barrow for having

---

https://twitter.com/capital_freeman/status/1578556772964442112.

[11] *See* MindMed.zone, In Re Barrow Interview (Oct. 13, 2022), https://mindmed.zone/barrow-interview.

[12] *See* MindMed.zone, MindMed Letter to the Board, (Oct. 21, 2022), https://mindmed.zone/board-letter-10%2F21%2F2022.

elected for the sale of a minimal number of the shares of MindMed common stock to satisfy withholding taxes associated with vesting of certain Restricted Stock Units he had been granted as part of his compensation package (*i.e.*, as part of a "sell to cover" election):



129.   The next day, on October 26, 2022, MarketWatch published an article in which Jake Freeman, speaking on behalf of FCM, reiterated FCM's desire to oust MindMed's current leadership and disparaged its work.  Jake Freeman stated that FCM "want[s] to get in while [MindMed] still has cash and we can get a good management plan in place."[13]

130.   On November 3, 2022, Defendants published a letter containing more false and disparaging allegations against MindMed and its leadership (the "November 3 Letter").[14]  Attached to the Appendix of Exhibits as **Exhibit G**, and incorporated herein, is a true and correct copy of the November 3 Letter.

131.   In the November 3 Letter, Defendants claimed to have filed a "complaint" with the SEC regarding MindMed and accused MindMed's executives of "allegedly engag[ing] in self-dealing at the expense of MindMed shareholders" and failing to "disclose material information to investors."  The November 3 Letter posited that if these allegations were true, "Robert Barrow may be implicated in criminal activity" and demanded that Barrow be terminated.

---

[13] MarketWatch, "20-year-old investor who made $110 million on a meme stock is now pushing for change at psychedelics company MindMed," (Oct. 26, 2022), https://www.marketwatch.com/story/20-year-old-investor-who-made-110-million-on-a-meme-stock-is-pushing-for-change-at-a-psychedelics-company-11666807126.

[14] *See* MindMed.zone, "FCM Demands Investigation, Termination of CEO," (Nov. 3, 2022), https://mindmed.zone/board-letter-11-3-2022.

0031

132.   On November 14, 2022, Defendants published another letter accusing MindMed of making misrepresentations in its SEC filings (the "November 14 Letter").[15]   Attached to the Appendix of Exhibits as **Exhibit H**, and incorporated herein, is a true and correct copy of the November 14 Letter.

133.   The November 14 Letter falsely accused MindMed of "misstat[ing] its related party transactions during the third quarter of 2021 and the nine months ending September 30, 2021" while being "embroiled in allegations of self-dealing and securities fraud. . . ."  The November 14 Letter omitted that Defendants were the sole source of such allegations and Defendants themselves had chosen to disseminate such allegations.

134.   Defendants' public attacks on MindMed's business strategy and operations, officers, directors, and employees have harmed MindMed's reputation among investors and the public at large.  This is reflected in comments responding to the "FCM drama" on Reddit:



135.   But Defendants have not limited their disparagement of MindMed and its management and directors to public letters and social media posts.

136.   On November 21, 2022, Defendants sent a letter to McLean Hospital Corporation ("McLean"), a leading, world-recognized psychiatric research hospital, which purported to detail "Serious Allegations" against Carol Vallone (the "November 21 Letter").  Attached to the Appendix of Exhibits as **Exhibit I**, and incorporated herein, is a true and correct copy of the November 21 Letter.

137.   Vallone serves as the chair of both MindMed's Board of Directors and McLean's

---

[15] *See* MindMed.zone, "In re MindMed Misstatements," (Nov. 14, 2022), https://mindmed.zone/board-letter-11-14-2022.

Board of Trustees.

138.     The November 21 Letter mischaracterized certain aspects of the MM-110 Phase 1 trial, suggesting that MindMed improperly used human subject studies contrary to FDA requirements.  The November 21 Letter went on to speculate that Vallone used the human subject studies for financial benefit—both hers and other executives.  The November 21 Letter then urged McLean to terminate Vallone for her allegedly unethical conduct.

139.     This misleading and unsubstantiated attack on Vallone, like Defendants' attacks on MindMed and Barrow, was entirely baseless and without merit.  The MM-110 program largely preceded Vallone's time at MindMed and was designed and overseen by Dr. Freeman, as described *supra* in ¶¶ 44-53.

140.     Upon information and belief, Defendants' disparagement of MindMed and its leadership during this period was intended to destabilize the Company and foment shareholder discontent in advance of a proxy contest, which Defendants officially launched in April 2023.

**2.     Defendants' Smear Campaign Persists During the Proxy Contest**

141.     On April 20, 2023, Defendants filed a Schedule 14A Preliminary Proxy Statement soliciting votes to elect a control slate of four FCM-nominated directors, including Dr. Freeman, to MindMed's board (the "Preliminary Proxy").  Attached to the Appendix of Exhibits as **Exhibit J**, and incorporated herein, is a true and correct copy of the Preliminary Proxy.

142.     FCM and Dr. Freeman are both included in the Preliminary Proxy's list of filers.

143.     The Preliminary Proxy purported to detail Defendants' "concerns" regarding MindMed's "poor corporate governance, high cash burn rate, unnecessary and highly dilutive recent financing and other issuances of securities, and long-term underperformance."  Ex. J at 101.  In doing so, the Preliminary Proxy accused MindMed's management of *inter alia* "lack[ing] [] experience," issuing "poor communications to investors regarding MindMed's pipeline," and making "irresponsible and exaggerated promises."  *Id*. at 104-105.

144.     The Preliminary Proxy also contended that MindMed "squandered over $14M" on a Digital Medicine Program and that MindMed's board "has not appropriately held management

27

accountable for the failures" of that program. *Id.* at 105.

145.     The Preliminary Proxy also rehashed Defendants' claims regarding MindMed's "persistent failures" and "high compensation," claiming that while MindMed's share price declined the "CEO and CMO received over 25% raises to their base compensation." *Id.* at 105-106.  In truth, MindMed executive compensation demonstrably declined in 2022 relative to 2021. *Id.* at 105.

146.     On May 3, 2023, Defendants filed a Schedule 14A Definitive Proxy Statement (the "Definitive Proxy") which was largely identical to the Preliminary Proxy Statement (and thus also replete with disparaging statements about MindMed).  Attached to the Appendix of Exhibits as **Exhibit K**, and incorporated herein, is a true and correct copy of the Definitive Proxy.

147.     In a May 5, 2023 letter addressed to MindMed's shareholders (the "May 5 Letter"), Defendants continued their assault on the Company and its leadership.  Attached to the Appendix of Exhibits as **Exhibit L**, and incorporated herein, is a true and correct copy of the May 5 Letter.

148.     The May 5 Letter contended that MindMed's current board has "overseen the destruction of over a billion dollars in shareholder value. . . while tripling their own compensation and lavishing themselves and executives with over $51M. . . ."  In urging shareholders to vote for Defendants' nominees, the May 5 Letter asserted that MindMed's current "Board and management has [sic] been responsible for MindMed's current course which is synonymous with critical delays, ill-conceived and botched regulatory strategies, excessive spending and compensation, and destructive financings. . . ."

149.     The May 5 Letter specifically targeted Barrow and MindMed's CMO, Dr. Daniel Karlin, alleging that Barrow "has no apparent experience with Phase III of the FDA process and has never brought a drug to market" and that Dr. Karlin "does not appear to have any experience in drug development."  According to the May 5 Letter, "this apparent lack of expertise by executives likely caused damaging and lasting reputation effects with the FDA – as the ill-conceived clinical trials in the MM-110 and MM-120 programs, some with patient safety implications, may lead to a more cautious and guarded FDA approach to MindMed's clinical trials

1    in the future."

2    **150.** There is absolutely no support for Defendants' proposition that MindMed's
3    relationship with the FDA is damaged. Defendants' statements otherwise were designed to
4    advantage Defendants in the proxy contest by harming MindMed's reputation with its shareholder
5    base, industry, and key regulator.

6    **151.** On May 15, 2023, Defendants issued a press release titled, "FCM Director
7    Nominees Will Put MindMed Drug Development Process Back on Track" (the "May 15 Press
8    Release"). Attached to the Appendix of Exhibits as **Exhibit M**, and incorporated herein, is a true
9    and correct copy of the May 15 Press Release.

10   **152.** The May 15 Press Release attacked MindMed's strategy with respect to MindMed's
11   "completely misguided" MM-120 program, contending that, "ongoing operations of MindMed are
12   mired in an ill-conceived, persistently delayed, and technically unsound Phase IIb dose finding
13   study, much to shareholders' detriment."

14   **153.** The May 15 Press Release leveled several direct attacks on Barrow and Dr. Karlin,
15   including:

16       **(a)** "MindMed's current approach is largely due to CEO Robert Barrow's [and]
17           CMO Danial [sic] Karlin's . . . erroneous belief that the FDA mandates a
18           Phase IIb study."

19       **(b)** "Notably, unlike Dr. Freeman, [neither Barrow nor Dr. Karlin] possess the
20           experience of successfully completing a Phase IIb or Phase III study . . . ."

21       **(c)** "Unfortunately, neither Mr. Barrow nor Dr. Karlin have the requisite
22           regulatory experience to bring MM-120 to market safely and efficiently."

23       **(d)** "Mr. Barrow's contention that the FDA requires a Phase IIb study
24           demonstrates a complete lack of understanding of the drug development
25           process." (The May 15 Press Release attributes this statement directly to Dr.
26           Freeman.)

27   **154.** The May 15 Press Release also attacked MindMed's "botched" MM-110 program,

28

29

arguing (without offering a scintilla of evidence) that that program "was ultimately shuttered because MindMed performed a phase I clinical trial without first obtaining the safety data required by the FDA, thus wasting tens of millions of dollars and potentially jeopardizing patient safety."

155.    On May 23, 2023, Defendants met with representatives of Institutional Shareholder Services ("ISS"), a leading proxy advisory firm that publishes recommendations to its subscribers as to how such subscribers should vote in contested director elections, to advocate for ISS's endorsement of their board nominees.  Defendants' presentation was accompanied by a 95-page slide deck (the "May 23 ISS Presentation"), which was subsequently shared with the public. Attached to the Appendix of Exhibits as **Exhibit N**, and incorporated herein, is a true and correct copy of the May 23 ISS Presentation.

156.    The May 23 ISS Presentation attacked MindMed and its directors and officers on numerous fronts, alleging that "current management's tenure at MindMed has been marked by apparent[] critical delays in clinical trials, ill-conceived and botched regulatory strategies, excessive spending and compensation, and destructive financings," and that "the only way to put MindMed back on track and stop the destruction of further shareholder value would be to reconstitute the Board . . . ."  Ex. N at 217.

157.    The May 23 ISS Presentation also said that "executive compensation has soared" and that "MindMed suffers from a severe pay for performance disconnect."  *Id*. at 212, 262.  In truth, MindMed executive pay has decreased materially—total named executive officer ("NEO") pay reported for 2022 was down 70% for 2021, equity grants to Barrow in 2022 reflect a 62% decrease from those granted in 2021, and Barrow's 2023 equity grants reflect a further 70% decrease.   Additionally, MindMed's executive compensation is directly linked to company performance, with over 80% of 2022 total NEO direct compensation currently "at risk" with payout and value directly dependent on the Company's performance.  And Barrow's actual realizable pay in 2022, which reflects the impact of stock price performance, was nearly 80% less than his reported pay.

158.    On May 25, 2023, Defendants issued a press release titled, "FCM Concerned

30

MindMed's Mismanagement Threatens Mental Health for Millions" (the "May 25 Press Release"). Attached to the Appendix of Exhibits as **Exhibit O**, and incorporated herein, is a true and correct copy of the May 25 Press Release.

159. In addition to its baseless and incendiary claim that the Company's management was "Threaten[ing] Mental Health for Millions," the May 25 Press Release contended that "irresponsible spending behavior and mismanagement has jeopardized bringing needed treatment for mental health disorders as evidenced by the LSD (MM-120) trial delays and the shuttering of MM-110."

160. The May 25 Press Release quoted Dr. Freeman as saying, "not only has MindMed threatened its own LSD drug development because of CEO Barrow's and CMO Karlin's inexperience and MindMed's reckless spending, but these missteps may have compromised LSD's clinical development at large."

161. On May 30, 2023, Defendants issued yet another press release (the "May 30 Press Release"). Attached to the Appendix of Exhibits as **Exhibit P**, and incorporated herein, is a true and correct copy of the May 30 Press Release.

162. The May 30 Press Release included a letter from Dr. Freeman detailing the "desperately needed change to MindMed's board of directors" resulting from purported "serious problems including . . . bloated costs, a history of punitive and dilutive financing, inflated executive compensation, and ill-conceived and chronically delayed clinical trials."

163. That same day, Defendants also revealed in a Schedule 14A that it had hired Troop, Inc. ("Troop"), a shareholder activist platform, to place sponsored posts by Defendants on various social media platforms, including Facebook, Instagram, TikTok, and YouTube (the "May 30 Schedule 14A"). Attached to the Appendix of Exhibits as **Exhibit Q**, and incorporated herein, is a true and correct copy of the May 30 Schedule 14A.

164. Troop's website described FCM as "an activist investment group led by Dr. Scott Freeman, co-founder and former chief medical officer of [MindMed]." Ex. Q at 321. Troop's sponsored posts directed viewers to the May 25 Letter and May 23 ISS Presentation, further

expanding the reach of Defendants' attacks.

165.    On May 31, 2023, Defendants distributed a supplemental 13-page slide deck that was ostensibly in response to MindMed's own presentation to ISS (the "May 31 Presentation"). Attached to the Appendix of Exhibits as **Exhibit R**, and incorporated herein, is a true and correct copy of the May 31 Presentation.

166.    In the May 31 Presentation, Defendants claimed that MindMed's ISS presentation included "several false assertions and mischaracterizations" and "evaded critical questions about their clinical programs; excessive and dilutive financing; egregious executive compensation and corporate governance practices; and value destructive capital allocation." Ex. R at 336.

167.    The May 31 Presentation also contended that MindMed's "current board was responsible for the decimation of MindMed's share price" and that the Board, together with management, has "obscured the facts from investors" about patient safety in clinical studies for MM-110. *Id*. at 336, 343 (emphasis in original).

168.    Additionally, the May 31 Presentation aimed to cast doubt on the independent expert regulatory assessment of development strategy that MindMed had sought.

169.    On June 2, 2023, Defendants issued a press release entitled "FCM Predicts Psychedelic Revolution in 2024: Urges Shareholders to Position MindMed for Success with a Reconstituted Board," which included a letter from Dr. Freeman to MindMed's shareholders (the "June 2 Press Release").  Attached to the Appendix of Exhibits as **Exhibit S**, and incorporated herein, is a true and correct copy of the June 2 Press Release.

170.    In the June 2 Press Release, Dr. Freeman is quoted as criticizing MindMed's "current management [for] jeopardizing the Company's future with excessive spending, outsized compensation, a botched regulatory strategy, and delayed clinical trials."

171.    Also on June 2, 2023, ISS released a report recommending that shareholders vote their shares for *all six of MindMed's director candidates* and *against each of FCM's candidates* (the "ISS Report").

172.    The ISS Report concluded that:

   (a)   MindMed's "regulatory strategy appears reasonable and has received third-party validation, and the drop in the company's share price after its September 2022 equity raise is in line with sectoral trends."

   (b)   "The company's trial strategy appears to be based on reasonable strategic considerations, and there seems to be no board dysfunction that is adversely affecting its oversight of the company's strategy."

   (c)   MindMed's "board has been able to attract an unusually strong collection of former and current executives in the fields of mental health (Vallone), drug development and commercialization (Bruhn, Crystal, and Krebs), and financial management (Gryska)" and that there is "a reasonable rationale for high director pay."

   (d)   "A review of the company's executive pay program does not raise significant concerns at this time."

173.   On June 5, 2023, in response to the ISS Report, Defendants issued a press release entitled "ISS Appears to Rely on MindMed's False and Misleading Statements to Justify the Company's Abysmal Performance; Seemingly Ignores MindMed's Apparent Disregard of Patient Safety" (the "June 5 Press Release").  Attached to the Appendix of Exhibits as **Exhibit T**, and incorporated herein, is a true and correct copy of the June 5 Press Release.

174.   In the June 5 Press Release, Defendants "condemned" the ISS Report as "baffling" while reciting the same disparaging and derogatory claims that have appeared repeatedly in Defendants' public statements.  Specifically, the June 5 Press Release contended that:

   (a)   "MindMed's fundamentally flawed clinical development strategy. . . has been plagued by delays and failure."

   (b)   "MindMed management's lack of experience and expertise, with executives and advisors Barrow, Karlin, and Liechti never having brought a drug to market . . . has led to fundamental errors in the Company's approach to clinical development."

33

**(c)** "The Company's September 2022 financing was punitive and massively dilutive to existing shareholders . . . ."

**(d)** "The Company's bloated G&A expenses and headcount . . . are consuming scarce shareholder capital that should be devoted to clinical development."

**(e)** "A massive pay for performance disconnect . . . continues to reward management for their failed leadership."

**(f)** "MindMed's MM-110 program . . . dosed patients at 35 times higher than what had been deemed safe by the FDA, then obscured the facts about the program in successive investor disclosures, and ultimately wasted $19 million."

**(g)** "The Board[] lack[s] . . . alignment with shareholders, owning just 0.22% of the outstanding MindMed shares vs. FCM's 3.5% beneficial ownership, which our principals have committed to hold until June 15, 2025."

**(h)** "The numerous unfulfilled promises . . . MindMed has made include purported partnerships in digital medicine and Phase II trials."

175. The June 5 Press Release also mischaracterized a report ISS issued in 2022, arguing that ISS "flip-flops on its 2022 recommendation to remove Carol Vallone as Chair of the Board . . . ." However, ISS's referenced 2022 recommendation was related to 2021 compensation practices that pre-dated Vallone's tenure on MindMed's board, and ISS recommended only to "withhold" a vote for Vallone—not to remove her from the Board, as FCM falsely stated.

176. On June 7, 2023, Defendants issued another press release (the "June 7 Press Release"). Attached to the Appendix of Exhibits as **Exhibit U**, and incorporated herein, is a true and correct copy of the June 7 Press Release.

177. The June 7 Press Release stated that "Time is Running Out to Save MindMed" and quoted Dr. Freeman as saying, "We [FCM] put our money where our mouth is, unlike the current management who appears to sell shares monthly." The June 7 Press Release attacked the purportedly "long, tortuous, and expensive path to FDA approval that MindMed is following" and

accused MindMed's management of "losing the opportunity to be first [to bring psychedelic drugs] to market."

**178.** On June 9, 2023, Defendants issued a press release entitled "FCM Calls for Socially Responsible Investors to Vote for Change at MindMed" (the "June 9 Press Release"). Attached to the Appendix of Exhibits as **Exhibit V**, and incorporated herein, is a true and correct copy of the June 9 Press Release.

**179.** The June 9 Press Release falsely represents that Dr. Freeman was removed from his position as MindMed's CMO for raising concerns about the safety of the MM-110 trial.

**180.** On June 12, 2023, Defendants disclosed in a Schedule 14A that they had sponsored posts promoting the June 9 Press Release through Troop on a variety of platforms (the "June 12 Schedule 14A"). Attached to the Appendix of Exhibits as **Exhibit W**, and incorporated herein, is a true and correct copy of the June 12 Schedule 14A.

**181.** The June 12 Schedule 14A featured a post that characterized the June 9 Press Release as "rais[ing] red flags at MindMed's management of safety procedures in clinical trials," and stated that Dr. Freeman "takes particular offense at MindMed dosing Australian volunteers in a study of the LSD drug MM-110, undertaken after his tenure, at levels 35 times higher than deemed safe by the U.S. Federal Drug Administration [sic]." Ex. W at 369. Another sponsored post disclosed in the June 12 Schedule 14A stated that Dr. Freeman had called MindMed's safety protocols "appalling." *Id*. at 370.

**182.** The June 12 Schedule 14A also disclosed that Dr. Freeman had appeared in a sponsored interview for Public.com. In that interview, Dr. Freeman again attacked MindMed's drug development strategy, describing the MM-120 clinical trials as "delayed" and "mismanaged," and contending that MindMed had used "the wrong dose regimen." *Id*. at 381. Dr. Freeman also claimed that MindMed management "really [has] no drug development . . . experience" and "the chief medical officer has . . . never taken the drug [sic] to market." *Id*. at 382. Dr. Freeman then accused MindMed of "overspending," "wasting money," and "trying to pull the wool over people's eyes." *Id*. at 382, 387.

35

### 3. Defendants Refuse to Accept Loss in Proxy Contest

**183.** MindMed's AGM, at which shareholders would vote on the composition of the Company's Board of Directors, was scheduled for 10:00 a.m. Eastern Time on June 15, 2023.

**184.** Prior to the AGM, Defendants deliberately acted to prevent the voices of all shareholders from being heard and the business of the AGM from being completed. For example, Dr. Freeman sent an email to the Liquidating Trustee of Savant complaining of what Dr. Freeman believed to be Savant's votes of their shares in favor of MindMed's nominees. In the email, Dr. Freeman threatened to have the Liquidating Trustee removed, to seek revocation of the trustee's license, and to ask the California Attorney General and San Francisco District Attorney to press charges against the Liquidating Trustee—all because Dr. Freeman believed that the Liquidating Trustee voted in favor of the Board's recommended nominees at the AGM (the Liquidating Trustee in fact did not vote or attend the AGM at all).

**185.** The week before the AGM, the Company received voting updates indicating that each of the Company's nominees for director had a clear lead over FCM's nominees. Although in the lead, the Company has a heavy retail shareholder base and, as such, was still working to achieve the quorum of 33 1/3% of the outstanding voting stock of the Company required by Section 11.3 of the Company's Amended and Restated Articles of Association (the "Articles"). However, Sections 11.7 and 11.8 of the Company's Articles expressly address what the Company must do if a quorum is not present within one half hour from the time set for holding the scheduled shareholder meeting. First, the meeting "stands adjourned to the time and place determined by the chair or board." Second, if a quorum is not present within one half hour from the time set for the succeeding meeting, "the person or persons present and being, or representing by proxy, one or more shareholders entitled to attend and vote at the meeting constitute a quorum." The Company planned to comply with Sections 11.7 and 11.8 of its Articles and British Columbia law in the event that there was not a 33 1/3% quorum present at its scheduled AGM.

**186.** On June 9, 2023, as the Company was getting closer to the 33 1/3% quorum requirement and Defendants faced an imminent defeat at the AGM, the Company received word

from its proxy solicitor that FCM had withdrawn its previously submitted voting instructions, making it more difficult and costly for the Company to achieve the 33 1/3% quorum requirement.

187.    Around this time, the Company also received correspondence from staff at Nasdaq asking for a call to discuss the Company's compliance with Rule 5620(c) of the Nasdaq Listing Rules, pursuant to which the Company was informed that Nasdaq would reprimand the Company if the Company relied on Section 11.8 of the Company's Articles as Nasdaq viewed this as a potential violation of 5620(c) of the Nasdaq Listing Rules.

188.    At 10:00 a.m. on June 15, 2023, MindMed convened the AGM and, after waiting 30 minutes to see if quorum would be achieved, adjourned the AGM until 10:00 a.m. on June 21, 2023 without conducting any business due to absence of quorum, as required under MindMed's Articles and British Columbia law.

189.    Following the adjournment of the AGM, on June 15, 2023, Defendants issued a press release entitled "FCM Denounces MindMed's Manipulation of Corporate Machinery to Protect Incumbent Board of Directors" (the "June 15 Press Release").  Attached to the Appendix of Exhibits as **Exhibit X**, and incorporated herein, is a true and correct copy of the June 15 Press Release.

190.    In the June 15 Press Release, Dr. Freeman is quoted as saying, "MindMed has a seemingly tenuous relationship with the duties of a public company and the law."  The June 15 Press Release accused MindMed of, *inter alia*, "issuing misleading press releases," "failing to make public disclosures about the alleged related-party transaction with Ceruvia Lifesciences involving MindMed's intellectual property surrounding LSD," and "systematically disenfranchis[ing] shareholders."

191.    In the June 15 Press Release, a statement attributed to FCM's director candidate Vivek Jain referenced "the Company's failure to engage shareholders," contended "the shareholder base is frustrated with current management," and accused MindMed's purportedly "entrenched board" of "tak[ing] inappropriate actions which imperil MindMed's future."

192.    On June 16, 2023, MindMed's counsel received an inquiry from the staff at the

37

SEC asking to discuss recent developments in the Company's proxy contest.

193.    At 10:00 a.m. on June 21, 2023, MindMed reconvened the AGM. The Company waited for 30 minutes and then determined that a quorum of shareholders was present. Specifically, there were 16,330,495 common shares present or represented at the AGM by valid proxies representing approximately 42.3% of the common shares entitled to vote at the AGM.  At the AGM, shareholders elected all six of MindMed's nominees and none of FCM's nominees, including Dr. Freeman.

194.    Upon information and belief, Defendants withdrew their previously submitted voting instructions and actively (albeit unsuccessfully) solicited Nasdaq and the SEC to take punitive actions against the Company.  Upon information and belief, Defendants took these actions as a deliberate effort to hinder the Company's efforts to achieve quorum, prevent the Company from holding its AGM and thwart the will of the shareholders who wanted to vote in favor of all of the Company's director nominees (and therefore against all of FCM's nominees).

195.    On June 22, 2023, Defendants issued a press release entitled "FCM Received Significant Support from Shareholders, Disappointed that 'Passive' Investors Saw Fit to Give Incumbent Directors Another Chance to Disappoint" (the "June 22 Press Release").  Attached to the Appendix of Exhibits as **Exhibit Y**, and incorporated herein, is a true and correct copy of the June 22 Press Release.

196.    The June 22 Press Release reiterates the same disparaging allegations about "MindMed's excessive spending, outrageous executive and director compensation, flawed corporate governance practices, and delayed and mismanaged clinical trials."  It also makes explicit that, despite their loss in the proxy contest, Defendants intend to "continue fighting" and "plac[ing] pressure on MindMed . . . ."

197.    Simply put, Defendants have made clear that they intend to continue publicly disparaging the Company and disclosing its confidential information, thereby continuing their repeated and flagrant breaches of the Separation Agreement.

198.    MindMed has incurred millions of dollars of costs and damages, including

attorneys' fees, as a direct result of the contractual breaches described above.  MindMed has thus been completely deprived of the bargain that it entered into when it agreed to provide valuable contractual consideration to Dr. Freeman in exchange for his commitment not to engage in exactly this sort of disparaging and inflammatory conduct.

199.    In addition to the harm MindMed has already suffered as a result of Defendants' breaches, MindMed will experience future harm if Defendants are not permanently enjoined from publicly disparaging the Company and disclosing its confidential information.  MindMed also reserves the right to seek preliminary injunctive relief if Defendants' conduct continues to disrupt and threaten the Company.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**(Against Scott Freeman and FCM MM Holdings, LLC)**

200.    Plaintiff repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

201.    The Separation Agreement is a valid and enforceable contract.

202.    Plaintiff fully performed under the terms of the Separation Agreement, or its performance was excused due to Defendants' actions, including Defendants' repeated breaches of the Separation Agreement.

203.    By the acts described herein, Defendants breached the Separation Agreement.

204.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages in excess of fifteen thousand dollars ($15,000), in an amount to be proven at trial.

205.    Plaintiff has been required to retain the services of an attorney and, pursuant to Section 17 of the Separation Agreement, is entitled to an award of attorneys' fees and costs incurred in this litigation, as well as those incurred before commencement of this action.

//

//

**SECOND CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Scott Freeman and FCM MM Holdings, LLC)**

206. Plaintiff repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

207. The Separation Agreement is a valid and enforceable contract.

208. In Nevada, all contracts contain an implied covenant of good faith and fair dealing.

209. Defendants have performed in a manner unfaithful to the purpose of the Separation Agreement and have denied Plaintiff's justified expectations under the terms thereof.

210. As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages in excess of fifteen thousand dollars ($15,000), in an amount to be proven at trial.

211. Upon information and belief, Defendants' conduct, as set forth herein, including their bad faith violation of the Separation Agreement, was intentional, knowing, willful, malicious and oppressive, thereby warranting the assessment of exemplary and punitive damages in an amount in excess of fifteen thousand dollars ($15,000), in an amount to be proven at trial.

212. Plaintiff has been required to retain the services of an attorney and, pursuant to Section 17 of the Separation Agreement, is entitled to an award of its attorneys' fees and costs incurred in this litigation, as well as those incurred before commencement of this action.

**THIRD CLAIM FOR RELIEF**
**(Injunctive Relief)**
**(Against Scott Freeman and FCM MM Holdings, LLC)**

213. Plaintiff repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

214. Plaintiff will suffer irreparable injury if Defendants continue to make disparaging statements regarding Plaintiff's business, goods, and services and to disclose MindMed's confidential, proprietary, and trade secret information.

215. Defendants have and continue to violate Sections 8-11 of the Separation Agreement and Section 13 of the Consulting Agreement.

40

216.    Section 17 of the Separation Agreement provides, with respect to Sections 8-11, that any threatened or actual violation or breach constitutes immediate and irreparable injury to the non-breaching party and, therefore, that the non-breaching party is entitled to injunctive relief.

217.    Section 14(c) of the Consulting Agreement, incorporated by reference in the Separation Agreement, provides that Dr. Freeman will be deemed to have materially breached the Consulting Agreement if he breaches any material obligations of the Consulting Agreement and that MindMed will be entitled to terminate the Consulting Agreement in the event of a material breach.  Defendants' unlawful disclosure of MindMed confidential information is a material breach of Dr. Freeman's obligation under the Consulting Agreement to hold all MindMed confidential information in strict confidence, to not disclose such confidential information to any third parties, and to not use any of MindMed's confidential information for any purpose other than Dr. Freeman's performance of his obligations under the Consulting Agreement.

218.    For the reasons stated above, Plaintiff is entitled to a permanent injunction requiring that Defendants cease engaging in the prohibited conduct and enforcing the terms of the Separation Agreement.

219.    Plaintiff has been required to retain the services of an attorney and, pursuant to Section 17 of the Separation Agreement, is entitled to an award of its attorneys' fees and costs incurred in this litigation, as well as those incurred before commencement of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

220.    For damages against Defendants for their wrongful conduct as set forth herein, in an amount to be proven at trial, but which Plaintiff alleges is in excess of fifteen thousand dollars ($15,000);

221.    For punitive and exemplary damages against Defendants for their intentional, knowing, willful, malicious, oppressive, wrongful, intentional and bad faith conduct as set forth herein, in an amount to be proven at trial, but which Plaintiff alleges is in excess of fifteen thousand

41

1   dollars ($15,000);

2   **222.** For an award of attorneys' fees, costs, and interest;

3   **223.** For preliminary and permanent injunctive relief; and

4   **224.** For such other and further relief as the Court may deem just and proper.

5

6   DATED this 26th day of July 2023.

7                                        **DICKINSON WRIGHT PLLC**

8                                        */s/ Justin J. Bustos*
                                         Justin J. Bustos
                                         NV Bar No. 10320
9                                        Email: jbustos@dickinson-wright.com
                                         100 West Liberty Street, Suite 940
10                                       Reno, NV 89501
                                         Tel: (775) 343-7500
11                                       Fax: (844) 670-6009

12                                       **COOLEY LLP**
                                         Sarah Lightdale
13                                       Kaitland Kennelly
                                         Amanda Liverzani
14                                       Email: slightdale@cooley.com
                                         Email: kkennelly@cooley.com
15                                       Email: aliverzani@cooley.com
                                         55 Hudson Yards
16                                       New York, NY 10001
                                         Tel: (212) 479-6000
17                                       Fax: (212) 479-6275

18                                       Alexandra Rex Mayhugh
                                         Email: amayhugh@cooley.com
19                                       Wells Fargo Center, South Tower
                                         355 South Grand Avenue, Suite 900
20                                       Los Angeles, CA 90071
                                         Tel: (213) 561-3250
21                                       Fax: (213) 561-3244

22                                       (*pro hac vice applications forthcoming*)

23                                       *Attorneys for Plaintiff Mind Medicine (MindMed)*
                                         *Inc.*

24

25

26

27

28

                                         42