# EXHIBIT G

1    DANIEL F. POLSENBERG (SBN 2376)
     ABRAHAM G. SMITH (SBN 13,250)
2    LAUREN D. WIGGINTON (SBN 15,835)
     LEWIS ROCA ROTHGERBER CHRISTIE LLP
3    3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169-5996
4    (702) 949-8200
     DPolsenberg@LewisRoca.com
5    ASmith@LewisRoca.com
     LWigginton@LewisRoca.com

6

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

7

| | |
|---|---|
| 8   MIND MEDICINE (MINDMED) INC., a British Columbia corporation, | Case No. 2:23-cv-1354-MMD-EJY |
| 9            Plaintiff, | |
| 10   vs. | |
| 11   SCOTT FREEMAN, an individual, and FCM MM HOLDINGS, LLC, a Wyoming limited liability company, | **SCOTT FREEMAN'S ANTI-SLAPP SPECIAL MOTION TO DISMISS** |
| 12            Defendants. | |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS ▯ ROCA

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... iv

SCOTT FREEMAN'S ANTI-SLAPP SPECIAL MOTION TO DISMISS ........................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 2

FACTS .......................................................................................................................... 2

    *MindMed's Founding and Hurst's Self-Dealing* ......................................... 2

    *Dr. Freeman Blows the Whistle and is Forced Out.* ................................... 3

    *MindMed Uses the Non-Disparagement Agreement
to Prevent Freeman From Disclosing Misconduct Post-Dating
His Separation and Not Contemplated Within the Agreement* ................... 5

    *Dr. Freeman Learns of Ceruvia's Existence
and the Full Extent of Hurst's Misconduct* ............................................... 7

    *Hurst Had Installed Ceruvia Loyalists at MindMed* .................................. 8

    *Hurst Sabotaged MindMed's Clinical Trials
to Extract a Non-Compete for Ceruvia* .................................................... 9

    *The Ceruvia Agreement Also Gave Away
Intellectual Property Rights To BOL-148* ............................................... 11

    *Hurst Steps Down, Barrow and Vallone Take Over* ................................ 13

    *FCM is Established and Puts the MindMed Board on Notice of its Complaints* ...... 15

    *MindMed Attacks Freeman* ..................................................................... 16

    *Barrow Gives a Misleading Interview and FCM Responds* ..................... 17

    *MindMed Sues to Silence Freeman and FCM* ......................................... 17

ARGUMENT .................................................................................................................. 18

I.    NEVADA'S ANTI-SLAPP STATUTE BARS PLAINTIFF'S MERITLESS LAWSUIT ................... 19

    A.    The Statements Were All Made in Good Faith, in Furtherance of Freeman's
Free Speech and on an Issue of Public Concern ...................................... 20

        1.    *Defendant's Communications Were
in Direct Connection With an Issue of Public Interest.* ................ 20

LEWIS ROCA

a.  MISCONDUCT AND MISMANAGEMENT AT A PUBLIC
    COMPANY ARE TOPICS IN THE PUBLIC INTEREST ............................. 21

b.  STATEMENTS FURTHERING BREAKTHROUGH DEVELOPMENTS
    IN EMERGING INDUSTRIES ARE IN THE PUBLIC INTEREST ................. 23

c.  THE STATEMENTS RELATE TO THE PUBLIC INTEREST ..................... 24

d.  IF FREEMAN USED CONFIDENTIAL DOCUMENTS TO MAKE
    THE STATEMENTS HIS CONDUCT WOULD BE PROTECTED ................ 25

2.  *The Statements Were Made in Good Faith* ................................. 26

    a.  ANY OPINION STATEMENTS ARE INCAPABLE OF BEING FALSE ........ 27

    b.  THE NON-OPINION STATEMENTS WERE MADE IN GOOD FAITH ...... 27

B.  Plaintiff Cannot Demonstrate by Prima Facie Evidence
    a Probability of Success on its Three Causes of Action ........................................... 29

    1.  *MindMed's Complaint Does Not State a Claim* ........................................... 29

    2.  *Because Freeman's Comments Were Truthful and in Furtherance
        of the Public Interest, NRS 41.650 Provides Total Immunity* ..................... 30

        a.  THE IMMUNITY NRS 41.650 PROVIDES HERE IS ABSOLUTE ............. 30

        b.  FREEMAN DID NOT WAIVE NRS 41.650'S PROTECTIONS ................ 32

    3.  *The Non-Disparagement Clause is Unenforceable* ..................................... 35

        a.  THE SEPARATION AGREEMENT
            IS VOID FOR LACK OF CONSIDERATION ............................................. 35

        b.  THE SEPARATION AGREEMENT IS VOIDABLE
            BECAUSE IT WAS INDUCED BY FRAUD ............................................ 35

    4.  *Even if the Non-Disparagement Clause Were
        Enforceable, the Statements Do Not Breach It* ............................................ 36

        a.  FREEMAN'S STATEMENTS PERMISSIBLY COMMENTED
            ON EVENTS AND PERSONNEL POST-DATING HIS SEPARATION ........ 36

        b.  FREEMAN IS NOT FCM'S ALTER EGO ............................................. 37

        c.  FREEMAN RETAINS HIS RIGHT AS AN EQUITY SHAREHOLDER ......... 38

        d.  THE STATEMENTS WERE NOT DISPARAGING ................................... 38

        e.  THE SEPARATION AGREEMENT EXPRESSLY
            CARVES OUT STATEMENTS TO THE SEC ........................................ 39

LEWIS ROCA

5.   *MindMed Cannot Show that Freeman Breached the Confidentiality Clause*........................... 39

6.   *Even if Freeman Breached, MindMed's Initial Breach Excused It* ........................... 41

7.   *MindMed Has No Damages* ........................ 42

8.   *Laches Bars MindMed's Claims* ................. 43

CONCLUSION .................................................................... 45

CERTIFICATE OF SERVICE ............................................... 46

LEWIS ROCA

**TABLE OF AUTHORITIES**

**Cases**

*Adelson v. Harris*,
133 Nev. 512, 402 P.3d 665 (2017) ...................................................................................28

*Agar v. Judy*,
151 A.3d 456 (Del. Ch. 2017).............................................................................22, 25, 27

*Applied Energetics, Inc. v. Gusrae Kaplan Nusbaum PLLC*,
2022 U.S. Dist. LEXIS 58737 (S.D.N.Y. Mar. 30, 2022)...............................................21

*Balestra-Leigh v. Balestra*,
3:09-CV-551-ECR-RAM, 2010 WL 4280424 (D. Nev. Oct. 19, 2010).....................................1

*Beazer Homes Nevada, Inc. v. Eighth Jud. Dist. Ct.*,
97 P.3d 1132 (Nev. 2004) ...............................................................................................30

*Bldg. & Const. Trades Council of N. Nevada v. State*,
108 Nev. 605, 836 P.2d 633 (1992) ...........................................................................43, 44

*Cain v. Price*,
134 Nev. 193, 415 P.3d 25 (2018) ...................................................................................41

*Carmody v. Toll Bros.*,
723 A.2d 1180 (Del. Ch. 1998) ........................................................................................38

*Charney v. Brown*,
No. B268464, 2017 WL 6350557 (Cal. Ct. App. Dec. 13, 2017) (unpublished)................22, 23

*Clark Cnty. Sch. Dist. v. Richardson Const., Inc.*,
123 Nev. 382, 168 P.3d 87 (2007) .............................................................................42, 43

*Conner v. So. Nev. Paving*,
103 Nev. 353, 741 P.2d 800 (1987) .................................................................................45

*Cooper Tire & Rubber Co. v. Farese*,
423 F.3d 446 (5th Cir. 2005).............................................................................................39

*Diaz v. Eighth Jud. Dist. Ct.*,
993 P.2d 50 (Nev. 2000) ...................................................................................................31

*Doe No. 1 v. Wynn Resorts Ltd.*,
2:19-cv-01904-GMN-VCF, 2022 WL 3214651 (D. Nev. Aug. 9, 2022) ........................31

*DuPont Merck Pharm. Co. v. Superior Ct.*,
78 Cal. App. 4th 562, 92 Cal. Rptr. 2d 755 (2000), a*s modified* (Jan. 25, 2000).........................24

*Erickson v. One Thirty-Three, Inc.*,
104 Nev. 755, 766 P.2d 898 (1988) .................................................................................43

LEWIS ROCA

*FilmOn.com Inc. v. DoubleVerify Inc.*,
  7 Cal. 5th 133, 439 P.3d 1156 (2019) ...........................................................................24

*Freeman v. Hurst et al.*,
  Case No. 2:22-cv-01433-RFB-VCF..............................................2, 3, 7, 8, 9, 10, 11, 13, 14

*GetFugu, Inc. v. Patton Boggs LLP*,
  220 Cal. App. 4th 141, 162 Cal. Rptr. 3d 831 (2013) ...............................................21, 22

*Glob. Plasma Sols., Inc. v. IEE Indoor Env't Eng'g*,
  600 F. Supp. 3d 1082 (N.D. Cal. 2021) ...................................................................23, 24

*Grayson v. State Farm Mut. Auto. Ins.*,
  971 P.2d 798 (Nev. 1998) ............................................................................................44

*Home Sav. Ass'n v. Bigelow*,
  105 Nev. 494, 779 P.2d 85 (1989) ...............................................................................43

*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*,
  89 P.3d 1009 (Nev. 2004) ............................................................................................35

*Kashian v. Harriman*,
  98 Cal.App.4th 892, 120 Cal.Rptr.2d 576 (2002) ........................................................29

*Kosor v. Olympia Companies*,
  LLC, 478 P.3d 390 (Nev. 2020)...................................................................................20

*Local Joint Executive Bd. of Las Vegas v. N.L.R.B.*,
  540 F.3d 1072 (9th Cir. 2008)......................................................................................33

*Mann v. Quality Old Time Serv., Inc.*,
  120 Cal. App. 4th 90, 15 Cal. Rptr. 3d 215 (2004) ......................................................23

*Metabolic Research, Inc. v. Ferrell*,
  693 F.3d 795 (9th Cir. 2012)........................................................................................31

*Miller v. Walser*,
  181 P. 437 (Nev. 1919) ................................................................................................44

*Muddy Waters, LLC v. Superior Ct.*,
  62 Cal. App. 5th 905, 277 Cal. Rptr. 3d 204 (2021) ....................................................22

*Navellier v. Sletten*,
  52 P.3d 703 (Cal. 2002) ...............................................................................................30

*Nevada Yellow Cab Corp. v. Eighth Judicial Dist. Court ex rel. Cty. of Clark*,
  123 Nev. 44, 152 P.3d 737 (2007) ...............................................................................45

*New Lifecare Hosps. of N. Nev. v. Wright*,
  No. CV14-01664, 2015 Nev. Dist. LEXIS 2751 (Sep. 18, 2015) (unpublished
  disposition) ............................................................................................................23, 26

LEWIS ROCA

*New Lifecare Hosps. of N. Nevada, LLC v. Wright*,
    131 Nev. 1326 (2015) .................................................................................... 26

*Omerza v. Fore Stars, Ltd.*,
    455 P.3d 841 (Nev. 2020) ...............................................................26, 28, 30, 31

*Packer v. Yampol*,
    1986 WL 4748 (Del. Ch. Dec. 8, 2005) ........................................................ 38

*Pell v. Kill*,
    135 A.3d 764 (Del. Ch. 2016) ................................................................... 21, 38

*Raiter v. Khosh*,
    491 P.3d 29 (Nev. Ct. App. 2021) ................................................................ 41

*Randazza v. Cox*,
    2:12-CV-2040-JAD-PAL, 2015 WL 1292273 (D. Nev. Mar. 23, 2015) ................. 1

*Rosen v. Tarkanian*,
    453 P.3d 1220 (Nev. 2019) ............................................................................ 27

*Salsberry v. Connolly*,
    183 P. 391 (Nev. 1919) ................................................................................. 30

*Shapiro v. Welt*,
    389 P.3d 262 (Nev. 2017) .............................................................................. 20

*Silver State Disposal Serv. Inc.*,
    326 N.L.R.B. 84 (1998) ................................................................................. 33

*Smith v. Zilverberg*,
    481 P.3d 1222 (Nev. 2021) ................................................................ 26, 27, 28

*Summit Bank v. Rogers*
    206 Cal. App. 4th 669, 142 Cal. Rptr. 3d 40 (2012) ...................................... 22

*Taylor v. Colon*,
    482 P.3d 1212 (Nev. 2020) ............................................................................ 27

*Teachers Ins. & Annuity Ass'n of Am. v. Pub. Storage, Inc.*,
    930 F.2d 29 (9th Cir. 1991) (unpublished) .................................................... 43

*Thompson v. City of N. Las Vegas*,
    833 P.2d 1132 (Nev. 1992) ............................................................................ 35

*TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*,
    913 F.2d 676 (9th Cir. 1990) ......................................................................... 43

*United Bhd. of Carpenters & Joiners of Am. v. Dahnke*,
    714 P.2d 177 (Nev. 1986) .............................................................................. 44

LEWIS ROCA

*USA Techs., Inc. v. Tirpak*,
  2012 WL 1889157 (E.D. Pa. May 24, 2012) ...............................................32, 33

**Rules**

FRCP 12(b)(6) ...........................................................................................................1

**Statutes**

27 Pa. Cons. Stat. §§ 8301-3 (2000) ........................................................................33

2013 Nev. Stat. 623 ...................................................................................................31

California Code of Civil Procedure 425.16 ..............................................................30

National Labor Relations Act § 7 .............................................................................33

NRS 41.637 ..........................................................................................................20, 34

NRS 41.650 .................................................1, 18, 19, 29, 30, 31, 32, 33, 34

NRS 41.660 ...............................................................................19, 21, 30, 45

NRS 41.660(2) ......................................................................................1, 28

NRS 41.660(3)(a) ....................................................................................19

NRS 41.660(3)(b) ...............................................................................19, 29

NRS 41.665(2) .........................................................................................34

**Legislative Materials**

Judiciary Committee Hearing on S.B. 286, RLG 52 (May 28, 2013) .......................32

Min. Sen. Committee on Jud. 7 (Mar. 28, 2013) ......................................................28

Minutes, Ass'y Comm. on Judiciary, 77th Sess., May 6, 2013 ..........................31, 32

S.B. 286 Bill Summary (77th Sess. 2013) .............................................................19, 23

**Treatises**

17A Am. Jur. 2d Contracts § 318 ..............................................................................38

23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2021) ...........................41

**Other Authorities**

Nicole Dwyer, *When Telling the Ugly Truth Can Cost Millions: Non-Disparagement Clauses in Employment-Related Contracts*, 37 Quinnipiac L.
  Rev. 807, 819 (2019) .............................................................................................39

LEWIS ROCA

Tanvi Valsangikar, *The Need for Uniform Exemptions in State Anti-SLAPP Statutes*, 49 RUTGERS L. REC. 1, 8 (2021) .................................................................33

Thomas C. Arthur, Tom Kirby & Bert W. Rein, *Defamation Suits as a Weapon in Corporate Control Battles* Bus. L. 1, 3 (1981) ........................................................22

LEWIS ROCA

## SCOTT FREEMAN'S ANTI-SLAPP SPECIAL MOTION TO DISMISS[1]

This suit is Mind Medicine (MindMed) Inc.'s attempt to silence Dr. Scott Freeman, a corporate whistleblower-turned-activist shareholder, and FCM MM Holdings, LLC, an entity committed to effecting change at MindMed. MindMed brandishes the non-disparagement clause in a purported separation agreement with Freeman. But that agreement is unenforceable for reasons that overlap with MindMed's mismanagement: MindMed leadership defrauded Freeman into signing the agreement while disguising the misconduct and conflicts of interest of its former Chief Executive Officer (CEO), Stephen Hurst, and his board. Moreover, even if the agreement were enforceable, MindMed's suit fails. It is based on Freeman's protected conduct—exercising his equity rights, pursuing board representation, and speaking about matters of public interest. Freeman blew a whistle on the mismanagement of a company that he helped found and in whose mission he deeply believes. Under NRS 41.650, Dr. Freeman is "immune from any civil action" for such good-faith communication. The parties did not—and could not—waive Freeman's statutory right.

Nor can MindMed succeed on the merits. The non-disparagement clause MindMed accuses Freeman of breaching prohibited him and MindMed only from making statements about the other regarding events that predated the agreement's execution. The statements attributed to Freeman concern either people who joined or events that transpired *after* the separation. He did not discuss the events that preceded it until MindMed publicized them and accused him of lying. That is, MindMed breached first, forfeiting MindMed's benefits under the plain language of the agreement. So even if any later statement were found to breach the non-disparagement clause, that breach would be excused.

MindMed's suit is a quintessential SLAPP. It must be dismissed.

---

[1] This motion may be filed "within 60 days after service of the complaint." *Balestra-Leigh v. Balestra*, 3:09-CV-551-ECR-RAM, 2010 WL 4280424, at *3 (D. Nev. Oct. 19, 2010) (quoting NRS 41.660(2)). It may be filed separately from a motion to dismiss under FRCP 12(b)(6). *See, e.g.*, *Randazza v. Cox*, 2:12-CV-2040-JAD-PAL, 2015 WL 1292273, at *1–2 (D. Nev. Mar. 23, 2015) (noting that anti-SLAPP motion should have been filed while Rule 12(b)(6) motion was pending).

LEWIS ROCA

## MEMORANDUM OF POINTS AND AUTHORITIES

## FACTS

### MindMed's Founding and Hurst's Self-Dealing

MindMed is a medical research company developing psychedelic treatments in the fields of psychiatry, addiction, pain, and neurology. (2 Compl. App. 212.)[2] MindMed was formed by purchasing a drug asset, 18-MC from Savant HWP, Inc. and Savant Addiction Medicine LLC (collectively, "Savant"). (*Freeman* ECF 41 ¶¶ 4, 6; *see also* 1 App. 2-56.) Savant and MindMed were once helmed by the same Chief Executive Officer (Stephen Hurst) and Chief Medical Officer (Freeman). (*Freeman* ECF 41 ¶¶ 4, 30.)

Hurst, a patent attorney, and Freeman, a medical researcher, founded Savant together. *(Id.* at ¶¶ 2, 48.) Freeman believed Hurst was his trusted friend and partner. (*Id.* at ¶ 483.) In fact, Hurst was abusing those relationships of trust, positioning himself to misappropriate the company's intellectual property—developed through Freeman's expertise—by establishing a secret competitor company, later known as Ceruvia Lifesciences Inc., with his friend and business associate Carey Turnbull. (*Id.* at ¶¶ 6, 106, 133; 1 App. 71-118.)[3]

Hurst then diverted a Savant drug asset, 18-MC, to a new company, MindMed, for 55,000,000 million founder shares of MindMed—a controlling stake—without Savant shareholder (member) approval, as required by the Savant operating agreements. (1 App. 23 ¶ 7.02; *Freeman* ECF 41 ¶ 128.) Again without Savant shareholder approval, Hurst arranged for Savant's shares to be locked up for two years, except that the shares could be voted. (1 App. 52-60, 62-69; *Freeman* ECF 41 ¶ 141.) This was contrary to Savant's operating agreement, which required that he distribute those shares to members. (1 App. 23 ¶ 7.02.) This structure gave Hurst near untrammeled

---

[2] All references to ECF are filings in this docket Case No. 2:23-cv-01354-MMD-EJY (*MindMed*). All references to "Compl." are to ECF 2-1. All references to "Compl. App." reference the appendix to MindMed's complaint, ECF 2-1, beginning at 7. All references to "App." reference the appendix attached to this motion. References to *Freeman* ECF are to ECF in the docket in Case No. 2:22-cv-01433-RFB-VCF.

[3] These circumstances are at the heart of a suit Dr. Freeman brought against Hurst, Ceruvia, and officers and directors who conspired with them to oust Dr. Freeman from Savant and MindMed while continuing to capitalize on his research efforts. *See Freeman v. Hurst et al.*, Case No. 2:22-cv-01433-RFB-VCF.

LEWIS ROCA

power. As managing member of Savant, Hurst claimed the power to vote these shares as a bloc. Because Hurst controlled Savant's shares in MindMed, he appointed himself CEO and chairman of MindMed. (*Freeman* ECF 41 ¶¶ 138, 156.) Savant members could not object, as the operating agreement allowed Hurst to veto a vote on his own ouster. (1 App. 22-25; *Freeman* ECF 41 ¶¶ 6, 148.)

As Chief Medical Officer (CMO) of MindMed, Freeman was responsible for MindMed's research and advancements in 18-MC (renamed to MM-110) and its other drugs LSD (MM-120) and BOL-148. (*Freeman* ECF 41 ¶¶ 106, 133.)

Meanwhile, Ceruvia was developing similar drugs to Savant and MindMed. (1 App. 120.) Hurst and Turnbull hired loyal underlings, such as Kathleen Monroe and Carol Nast, to form the Savant/Ceruvia enterprise (the "Enterprise")[4] to assist in misappropriating intellectual property from Savant and MindMed (the "Pattern") (1 App. 122-25, 127.)

Hurst then used the 55,000,000 voting shares to control MindMed's board of directors and to self-deal with Ceruvia. (*Freeman* ECF 41 ¶ 164.) When Freeman tried to gain control of his undistributed 20,000,000 shares to stop Hurst, Hurst and MindMed blocked him. (1 App. 128; 134; 137; 148.) And when Freeman raised these issues with the Board, he was told to cease and desist. (*Freeman* ECF 41 ¶ 220.) The efforts to block and silence Dr. Freeman ultimately led to this SLAPP. (1 App. 140-43, 145-47.)

***Dr. Freeman Blows the Whistle and is Forced Out***

Freeman learned only after MindMed's formation that Hurst had misled MindMed investors, including co-founder Leonard Latchman, about the market readiness of the drugs they were testing. (*Freeman* ECF 41 ¶¶ 140, 245-4.) Hurst falsely claimed that one of the drugs, 18-MC, was ready to enter phase 2, the efficacy evaluation phase with human test subjects. (*Id.* at ¶ 301(n).) In fact, the FDA had restricted 18-MC to low doses in humans in phase 1 pending additional animal safety studies. MindMed acknowledges this in its complaint, discussing the "Full

---

[4] The Enterprise is further detailed in the case *Freeman v. Hurst et al.*, pending before this Court as Case No. 2:22-cv-01433-RFB-VCF.

LEWIS ROCA

Clinical Hold" and the requirements for overcoming it. (Compl. ¶ 47.)[5] Awaiting these animal

studies, Freeman as CMO initiated a low-dose phase 1 safety study in humans in March 2020,

limited to 16 milligrams a day or less. (1 App. 157-231.)

As Freeman started asking about safety data, Hurst began targeting Freeman using the En-

terprise. On May 20, 2020, MindMed co-CEO Jamon Rahn (JR) revealed that Carol Nast was

spreading unsubstantiated allegations that Freeman was abusing his staff, despite her admission to

JR that she had not spoken to Freeman or initiated any administrative protocols. (S. Freeman Decl.

¶ 6.)

In what proved to be the final straw for Freeman's tenure at MindMed, Freeman canceled

the ongoing 18-MC trials based on safety concerns raised by the FDA. (3 Compl. App. 344; 1

App. 233, 235-42.) Hours later, Hurst suspended Freeman as CMO. (*See* 2 App. 244.) Despite the

safety risks, Hurst immediately restarted the trial and hired Robert Barrow, his eventual successor,

who in February 2021 amended the study protocol to dosing *35 times higher* (325 milligrams) than

what the FDA deemed safe. (1 App. 157-231.)

The timing of Hurst's actions suggests that Freeman's concerns about safety cost him his

position. Indeed, Freeman eventually learned that as a pretext for his removal, Hurst had Kathleen

Monroe, a MindMed consultant who was also working for Ceruvia, falsely accuse Freeman of a

workplace violation. (4 App. 346-350.)

Months later, JR acknowledged that Hurst had misled MindMed's board to vote for Free-

man's suspension. (2 App. 244.) Hurst also lied to Freeman, stating that he was not involved in the

investigation because of his conflict as CEO of Savant. (2 App. 246, 248.)

On August 31, 2020, under duress from MindMed, Freeman accepted a severance agree-

ment with the following non-disparagement clause:

> Both you and the Company agree not to disparage the other party, and the
> other party's officers, directors, and employees, in any manner likely to be
> harmful to them or their business, business reputation or personal reputa-
> tion; provided that both you and the Company will respond accurately and
> fully to any question, inquiry or request for information when required by
> legal process.

---

[5] Hurst and MindMed bought Latchman's silence (without disclosing the payment to the public
shareholders). (4 App. 541.)

LEWIS ROCA

1    (4 App. 404, ¶ 11.)

2          The agreement qualified that waiver, though: "This Agreement does not abrogate your ex-

3    isting rights under . . . any plan or agreement related to equity ownership in the Company." (*Id.* at

4    ¶ 13.) The agreement further clarified that Freeman did "not waive or release rights or Claims that

5    may arise from events that occur after the date this waiver is executed," or relinquish his right to

6    comment during legal proceedings and to governmental agencies, like the Securities and Exchange

7    Commission. (*Id.*) Finally, the agreement made clear that a breach of the non-disparagement

8    clause was a material breach, relieving the non-breaching party of any responsibilities under the

9    contract. (*Id.* at ¶17.) Nothing in the non-disparagement clause indicates any intent to cover events

10   post-dating the agreement.

11         On September 1, 2020, Freeman's options in 2 million MindMed shares vested. (Compl.

12   ¶ 50, 57-58.) The separation agreement supposedly took effect a week later, on September 8. (*See*

13   2 App. 254-55.) The agreement purported to strip Freeman of half of those vested options—1 mil-

14   lion shares—along with his position as an officer , his salary, and other severance and benefits. (2

15   App. 250-56 §§ 1, 4, 5, 6, 15.) Freeman also "waived the three-month notice requirement" to

16   which he was entitled, and which—if enforced—would have provided an additional three months'

17   salary and benefits. (*Id.* § 1.) Freeman also received a consulting agreement, which was never

18   used. Freeman did receive accrued salary and vacation, but the agreement is plain that Freeman

19   would have "receive[d] these payments regardless of whether or not [he] sign[ed] this Agree-

20   ment." (*Id.* at § 2.)

21   ***MindMed Uses the Non-Disparagement Agreement to Prevent Freeman From Disclosing***
22   ***Misconduct Post-Dating His Separation and Not Contemplated Within the Agreement***

23         In the winter of 2021, under the new leadership of CEO Barrow and board chair Vallone,

24   MindMed completed the phase 1 study at doses 35 times the dose permitted (325 milligrams) un-

25   der FDA requirements. In a later interview and in the proxy campaign, Barrow publicly admitted

26   that he knew that animal safety studies were required, and that the 18-MC program—now known

27   as MM-110–might not meet those safety standards. (*See* 2 App. 258-97.)

28         In an October 8, 2022 interview with "The MindMed Chronicles," Barrow stated,

                   (timestamp 36:49) the package of non-clinical data [animal safety] that FDA

was asking us for would take many months if not years and a considerable amount of financial resources and **has an uncertain outcome; it's not a guarantee that we do that research** and we're a position where they would say yes you can move forward into a phase two program

(*See* 2 App. 274 (emphasis added).) Thus, Barrow and Vallone understood that the MM-110 drug program needed extensive animal safety studies, and that those studies might not demonstrate MM-110 safety.

Rather than risk that outcome and stop the clinical trial to perform the required animal safety studies as Freeman had done, Barrow and Vallone bypassed animal studies and immediately tested MM-110 safety on humans at high doses, against FDA safety concerns. (1 App. 157-231.) Barrow and Vallone not only concealed this information from shareholders but made misleading press releases:

The results [phase 1 study] showed favorable safety and tolerability, support the advancement of MM-110, and have guided the Phase 2a dose, schedule, and design in individuals undergoing supervised opioid with-drawal………..A total of 72 participants received up to 325 mg of MM-110 (n=51) twice on a single day

(2 App. 305.)

Eventually, however, the FDA caught on. MindMed was forced to issue the following statement:

Following a productive Type C meeting (with the FDA), we received feed-back from the agency in which they requested Additional Preclinical Char-acterization of MM-110. That will **now** be required prior to initiating the proposed Phase 2a trial in the U.S. We agree with the agency, as this infor-mation would be necessary to treat participants and our plan Phase 2a clin-ical trial with what we believe to be an adequate dose and duration.

(2 App. 321 (emphasis added).)

Barrow and Vallone kept the fraudulent charade going as long as possible to continue re-ceiving their compensation from MindMed and selling stock at peak prices. The MindMed Board is the highest paid in the psychedelic sector with Vallone receiving a "one time" $1,000,000 com-pensation package in 2022 and Barrow and other executives receiving $51 million in compensa-tion for 2021 and 2022—exorbitant compensation for a stock that dropped 95% during this period. (*See* 2 App. 334.) In addition, Vallone and Barrow were selling MindMed stock while hiding the

FDA's safety concerns about MM-110 from shareholders. However, once their fraud was discovered, they lied and the story became only *now be required*, when in fact the FDA had required these safety studies for years and Barrow and Vallone knew it. (2 App. 299.)

**Dr. Freeman Learns of Ceruvia's Existence and the Full Extent of Hurst's Misconduct**

At the time of Freeman's ouster, and signing of the Separation Agreement and after, Freeman still was not certain that Hurst and his associates, (including Barrow and Vallone), were covering up fraudulent activity at MindMed. Today, it is clear that Freeman was standing in the way of their scheme: not only was Freeman halting unsafe MM-110 clinical trials until animal safety data could be performed, but he was working on two other MindMed drug programs, MM-120 and BOL-148, whose trade secrets and other intellectual property Hurst planned to steal for Ceruvia, as he had done at Savant to further the Enterprise.

The theft of trade secrets at Savant followed this pattern: without the approval or knowledge of the other Savant Entities' members (*Freeman* ECF 41 ¶ 59), Hurst and Savant member Carey Turnbull set up a secret company for years, first named Savant TAC, then CH TAC and finally Ceruvia. (1 App. 92; *Freeman* ECF 41 ¶¶ 57-61.)[6] Hurst and Turnbull continue to change the company's name to avoid Freeman and others from discovering their secret company (1 App. 72-88, 92, 94.) Hurst transferred Savant's BOL-148/LSD trade secrets to Ceruvia, unbeknownst to Savant member's knowledge (1 App. 75-88). There was no material disclosures or approval by the Savant members as required by the Operating Agreement. (*See* 1 App .23-24 ¶7.02(a).)

Hurst, Barrow, and Vallone meanwhile did the same thing at MindMed, transferring intellectual property rights of LSD (MM-120) and BOL-148 to Ceruvia while doing everything possible to keep the theft hidden from MindMed shareholders and the investing public. They continued to obscure the misconduct, despite that Freeman and FCM alerted Barrow and Vallone and the Board of Directors to other elements of Hurst's misconduct, between 2021 and 2023. ((1 App. 94-117, 129-33, 135-36, 147; 2 App. 336-37; *Freeman* ECF 41, ¶¶ 196-98.)

Ceruvia purported to be studying the exact same drugs and treatments as MindMed. (*Freeman* ECF 41, ¶¶ 197.) But Ceruvia was, in fact, leeching off Savant and MindMed research. (*Id.* at

---

[6] This motion refers to the secret company simply as "Ceruvia."

LEWIS ROCA

¶ 202.) Using insider knowledge of Savant and MindMed, Hurst and Turnbull had allowed Savant and MindMed to incur all the expense and risks of research, only to swoop in and usurp any opportunity that arose.

Freeman did not discover Ceruvia until August 2021, and Freeman learned only in August 2022 that Hurst was a co-founder who had siphoned Savant's trade secrets and other intellectual property to Ceruvia. Only after reviewing the Ceruvia website did Freeman begin to suspect the depth of Hurst's betrayal. (1 App. 94-118.)

The schemes of Hurst and his cohorts were aimed at misappropriating intellectual property from Savant and MindMed for Ceruvia. Freeman and FCM alerted Barrow, Vallone, and the MindMed board and Savant's members and legal counsel but have only been met with cease-and-desist letters from Savant and MindMed. (2 App. 339-41, 343-44.)

***Hurst Had Installed Ceruvia Loyalists at MindMed***

To pull off the theft, after MindMed's formation, Hurst began packing it with Ceruvia loyalists (the Enterprise), including Judy Ashworth, Kathleen Monroe (who accused Freeman of the workplace violation), Jeanne Bonelle, Jack Henningfield, Carol Nast, Robert Barrow, Carol Vallone, and Don Gelhert. (*Freeman* ECF 41 ¶ 169.) These insiders worked simultaneously for Ceruvia and MindMed and/or were Hurst loyalists. (1 App. 93-118, 120-25.)

MindMed had been infiltrated by Ceruvia at every level:

| *Name* | *Relationship with Ceruvia/Hurst* | *Role at MindMed* |
|---|---|---|
| Kathleen Monroe (Kay) | Ceruvia COO | MindMed LSD project manager |
| Jeanne Bonelle | Ceruvia QA/QC | MindMed QA/QC/CMC |
| Judy Ashworth | Ceruvia regulatory/clinical | MindMed regulatory/clinical |
| Jack Henningfield | Ceruvia regulatory | MindMed regulatory |
| Carol Nast | Hurst associate | MindMed COO |
| Robert Barrow | Hurst/Turnbull associate | MindMed CEO |
| Kenneth Krisko | Hurst associate | MindMed outside counsel at Cooley, LLP |
| Nico Forte | Hurst associate | MindMed chief of staff |
| Carol Vallone | Hurst recruit | MindMed board chair |

Using their insider positions, these members of the Enterprise were able to obtain confidential information related to two drugs BOL-148 and LSD; both programs were spearheaded by Freeman and publicly set for clinical trials, and were attractive for misappropriation by the Enterprise.

LEWIS ROCA

1    (*Freeman* ECF 41 ¶¶ 166-68.)

2    **Hurst Sabotaged MindMed's Clinical Trials to Extract a Non-Compete for Ceruvia**

3         Hurst sabotaged the LSD and BOL-148 programs at MindMed so as to let Ceruvia swoop-

4 in and save-the-day, but for a steep price, MindMed's intellectual property. As detailed below, this

5 sabotage occurred in three parts:

6       1.  Hurst used Carol Nast and Robert Barrow to delay the LSD program.

7       2.  Hurst blocked the filing of the BOL-148 patents.

8       3.  Hurst used Nast and Bonelle to delay the LSD manufacturing.

9         The LSD trials required clinical-grade LSD. (*Id.* at ¶ 172.) Hurst led Freeman to believe

10 MindMed could get it from a company called Onyx Pharmaceuticals, a company under Turnbull's

11 control, in time to maintain MindMed's clinical trial start dates. (*Id.* at ¶ 175). Shortly before the

12 clinical trial start dates, Freeman learned that Onyx could not supply the LSD. (*Id.* at ¶ 181.)

13         This was a crisis for MindMed: a delay of publicly announced clinical trials would sound

14 the death knell for its development program. So MindMed's Board of Directors reluctantly agreed

15 to purchase LDS on extremely lopsided terms, from Ceruvia (then known only as CH TAC), a

16 company that, according to Hurst, was a disinterested third party with an independent BOL-148

17 program that happened to have available clinical grade LSD, a precursor to BOL-148. But that

18 was a lie; only a year later did the Ceruvia website go public and reveal Ceruvia was interested,

19 not just in BOL-148, but in LSD itself. (1 App. 95-118; 2 App. 358.)

20         This was Hurst's plan from the outset. He knew that Onyx Pharmaceuticals, which was

21 controlled by Turnbull, would not be able to produce LSD in time for the MindMed trials. Still,

22 Hurst discouraged Freeman from obtaining LSD from an alternate source. (*Freeman* ECF 41 ¶¶

23 173-75, 177-79.) As a result, Turnbull was able to "f--- up" MindMed's LSD synthesis, as JR had

24 feared he might. (S. Freeman Decl., ¶ 7.)

25         JR was further kept in the dark about manufacturing at Onyx Pharmaceuticals, which was

26 overseen by Hurst and members of the Enterprise, Carol Nast and Jeanne Bonelle. Carol the CEO

27 was refusing to give CMC updates to the Board and Bonelle would not speak to JR. (*Id.* at ¶13.)

28         JR was not allowed to speak to Bonelle, who was overseeing manufacturing, and Carol

**LEWIS** □ **ROCA**

1  Nast as COO was not forthcoming with the Board about an indicator of LSD pharmaceutical qual-

2  ity known as "chemistry, manufacturing and controls," or CMC, as JR later told Freeman.

3      JR further indicated that even he as co-CEO was sidelined in favor of Hurst loyalists who

4  had infiltrated MindMed from Ceruvia:

5          **JR:** (September 2, 2020) I'm next. Kay [LSD project manager Kathleen Monroe]
           and [COO] Carol [Nast] are out for me now…..He [Hurst] has installed so many

6          yes people I don't even get cc'd on emails anymore. (Exhibit 54B, 55B)

7          **JR:** (Oct 4, 2020, 11:52 PM) Steve cares more about impressing Carrie than run-
           ning a company.

8  (2 App. 352, 354; 2 App. 356.)

9      Thus, when JR learned that Onyx could not supply the LSD, Hurst had a "backup": Ceru-

10  via. Over email, Hurst and Turnbull pretended to negotiate at arm's length, despite that they had

11  *jointly formed Ceruvia* and, on information and belief, Hurst was a co-owner of Ceruvia and had

12  been paid $500,000, some of which while MindMed CEO. (*Freeman* ECF 41 at ¶¶ 182-86.) Turn-

13  bull and Ceruvia agreed to sell a limited amount of LSD to MindMed on a short timeline. In ex-

14  change, MindMed would: (1) pay $300,000 to Ceruvia; (2) agree not to manufacture BOL-148 or

15  compete with Ceruvia as to the development of BOL-148 for regulatory approval; and (3) agree

16  not to assert any future LSD patent intellectual property rights against Ceruvia, such that Ceruvia's

17  rights to manufacture or sell LSD would remain unchanged. (2 App. 360-64.)

18      Given the impending trial start dates—MindMed had only twenty-four hours to decide

19  whether to agree—and without knowledge of Hurst and Turnbull's conflict of interest, MindMed's

20  board reluctantly agreed to these terms, despite that the third condition would effectively grant Ce-

21  ruvia a perpetual license to manufacture, develop, and sell LSD, notwithstanding MindMed's fu-

22  ture intellectual property rights. (*Id.*)

23      JR's text to Freeman in December 2020 summed it up:

24          **JR:** Now MindMed was forced to sign a non compete on bol 148….Due to
           Steve's manipulation…I brought it up with the board. Everyone seemed to

25          side with Steve and voted to give Carey the non compete because we needed
           lsd

26

27  (2 App. 358.)

28      As a MindMed Board Member put it, this transaction "g[a]ve the house away." (*Freeman*

LEWIS ROCA

1   ECF 41 ¶ 189; see also *Freeman* ECF 41-3.)

2       This transaction, along with the later cover-up by Hurst, Barrow, and Vallone, all occurred

3   after Freeman signed the Separation Agreement. The transaction was one-side and material (*see* 2

4   App. 360-64) and Peter Volk, MindMed's counsel, on November 13, 2021, told a MindMed share-

5   holder: "MindMed informs us that MindMed does not have an agreement with Ceruvia, and if

6   they did, they would have disclosed it." (2 App. 366.) This material agreement has never been dis-

7   closed by MindMed, despite that Ceruvia admits to it in their briefs in *Freeman v. Hurst*, Case No.

8   2:22-cv-01433-RFB-VCF, so its existence is not in dispute nor does Ceruvia deny the aforesaid

9   terms. (*Freeman* ECF 118, 16 ¶2.)

10      Barrow further made misleading statements when asked about MM-120 (LSD) in the Oc-

11  tober 8 interview.

12      QUESTION (Timestamp 17:15): does MindMed have exclusive rights to
    MM-120? does ceruvia have rights to mm-120? The lawsuit or the unre-
13      dacted documents in the lawsuit allege that ceruvia has freedom to operate
    in regards to mm-120 so can you comment on any of this

14  
15      ANSWER (Barrow): yeah I'm glad you're asking the question it is a really
    important one and one I hope to clear up once and for all uh the allegations
16      around our intellectual property are unfounded we have not given away any
    intellectual property rights

17  (2 App. 263-64.)

18  ***The Ceruvia Agreement Also Gave Away***
    ***Intellectual Property Rights To BOL-148***
19  

20      Freeman was also working on the drug BOL-148 for MindMed. And although Barrow

21  stated that no intellectual property rights have been given away (*see id.*), that statement is false as

22  to both MM-120 and BOL-148. BOL-148 is a congener of LSD with no hallucinogenic activity,

23  giving it tremendous potential for clinical development. Indeed, in a previous interview in Forbes

    magazine in June 2021 Barrow stated:
24  
25      "We have an inherent need to understand it, if we could turn LSD or psilo-
    cybin into a drug that doesn't make you trip for eight hours [BOL-148], we
26      have a blockbuster in the making with tolerable side effects," he [Barrow]
    says.

27  (2 App. 376.)

28      Yet the Ceruvia agreement essentially gave away MindMed's intellectual property rights to

LEWIS ROCA

this "blockbuster drug": according to the agreement with Ceruvia, MindMed now cannot develop BOL-148 without Ceruvia's permission. (*Cf.* 2 App. 360-64.) And Barrow's statement to Forbes was just a way to impress Turnbull, since Barrow knew MindMed could not develop this potential blockbuster drug and that Ceruvia, which had just publicly published its website in June 2021, was now touting its own development of BOL-148. Barrow, like Hurst, was trying to impress Turnbull, to eventually become CEO of MindMed.

In the spring of 2020, Freeman was writing a MindMed BOL-148 patent. (2 App. 380.) On May 25, 2020, JR told Freeman to file the BOL-148 patent (S. Freeman Decl. ¶ 5), but Hurst blocked the patent filing. On June 1, 2020, two weeks before Freeman's removal as CMO, Freeman asked JR what had changed. (*Id*.) JR explained that MindMed's patent counsel was conflicted because he also worked for Turnbull on BOL-148, and JR needed to work the conflict out with Hurst. (2 App. 380; S. Freeman Decl. ¶ 5.)

So, in addition to Freeman stopping the MM-110 trial for safety reasons, Freeman's actions on the BOL-148 program were interfering with Hurst's schemes to misappropriate MM-120 and BOL-148 intellectual property for Ceruvia's exclusive use.

In a series of test messages from JR to Freeman in December 2020, JR, who signed the Separation Agreement, for the first time suggested that Freeman may have been terminated because of his efforts on BOL-148, which Hurst wanted to misappropriate for Ceruvia:

> **JR:** But it pisses me off to learn you were filing a patent and steve shut it down. And now Carrie has a non compete with mindMed on bol 148. Steve and Carrie are bad news. They are evil. Maybe Steve pushed you out because you were working on bol-148?

> **JR:** He and Carrie stole bol from Savant shareholders and then promised it to MindMed shareholders. Now MindMed was forced to sign a non compete on bol 148. Due to Steve's manipulation.

(2 App. 380, 382.) When Hurst stepped down as CEO/Chair in January 2021, his handpicked successors, Barrow and Vallone, continued the cover-up.

In the fall of 2021, Freeman confronted Barrow and the board:

> [A]t the time of my departure I was working on a BOL-148 patent and a clinical trial with Dr. Liechti. What happened to this potential blockbuster clinical program and patent?

(1 App. 142.) Yet, in the October 8 interview, Barrow made misleading and false statements on

this point as well.

> QUESTION (Adam Tubero) (Time stamp 22:59): was [BOL]-148 something my [MindMed] ever considered at any time if yes it is still something being considered if not why not I that's a bit of our question I mean at any time
>
> ANSWER (Barrow): so I've been with Mind Med versus the chief development officer beginning in January of 2021 accepted the role of CEO at June of last year so whatever discussions happened before that time I was not a party too so to say at any time is a bit difficult for anyone to answer who wasn't there since I've been involved there's not been any discussion about BOL 148 or two bromo LSD being a part of MindMed

(2 App. 267.)

### Hurst Steps Down, Barrow and Vallone Take Over

Once Hurst's ties with Ceruvia came to light, he stepped down from MindMed and Savant to stay at Ceruvia as a director. (2 App. 384-87; *Freeman* ECF 41 ¶ 192.) But the Ceruvia insiders he had installed on MindMed's board made sure that his replacements covered up the scope of Hurst's self-dealing. The board elected Robert Barrow, who has worked with Hurst and Turnbull previously, as acting CEO. (2 App. 364-67.) Barrow has since been appointed to the position permanently, with Carol Vallone as chair of the board. (3 Compl. App. 353; 3 App. 389-92.)

Barrow was the perfect accomplice. Barrow lacks the qualifications to be MindMed's CEO. (*See* 3 App. 389-92.) Hurst brought him in for one purpose—to cover up. Barrow's background makes this plain. As Barrow stated publicly, he only had a "golf career" prior to biotech. He then went to Wake Forest (2006-2009) and graduated with a degree in finance. (*Id.*)

Barrow's first and main job within the biotech industry was as Vice President of Operations at Olatec Therapeutics, which developed topical gels. His qualifications for that job were unclear since he had just graduated college with a finance degree. (*Id.*) But further research revealed that Barrow had a connection to Olatec's CEO and co-founder through a classmate at Wake Forest. (3 App. 394-97; 399-401.)

Further evincing the difference between Barrow's first job and his position at MindMed is the utter lack of qualifications Oletec demanded of its vice president of operations. Indeed, within two years, Barrow was promoted to COO and then hired his mother, Ms. Cynthia Barrow—similarly unqualified—to replace him as Vice President of Operations. (2 App. 399-401; 4 App. 722.)

13

1  She graduated Wake Forest in 1981 with a degree in math and appears to have no relevant biotech

2  experience. (*Id.*)

3       Barrow states in the October 8, 2022 interview that he got the job at MindMed (with first-

4  year compensation of nearly $12 million in base salary and stock options) after working with

5  Hurst and Turnbull at Usona (where he made under $100,000 just the year before). (2 App. 283.)

6  Hurst and Turnbull needed loyal followers to help commit and cover-up fraud.

7       In truth, the agreement Ceruvia had extracted from MindMed had hamstrung MindMed's

8  ability to develop LSD and LSD-related drugs like BOL-148. (1 Compl. App. 19.) But Barrow re-

9  fused to admit that. He publicly denied that MindMed had sold any intellectual property rights. (

10      2 App. 264; *contra Freeman* ECF 118, at 16:13-16 (acknowledging that Ceruvia and

11  MindMed "entered into" a transaction).) He offered alternative explanations for MindMed's fail-

12  ure to develop BOL-148 with no basis in fact and terminated MindMed's then-COO when he

13  brought allegations of misconduct at MindMed to Barrow's attention. (2 App. 263-65.)

14      Barrow also dutifully followed Hurst's instructions when it came to the potentially danger-

15  ous clinical studies. Barrow worked with the new chair of MindMed's board, Vallone (a trustee at

16  McLean and Massachusetts General hospitals), to extend dosing trials in Australia in hopes of

17  avoiding the FDA's scrutiny, still dosing patients at rates about *35 times higher than* FDA re-

18  strictions. (1 Compl. App. 10; 3 Compl. App. 353-54, 362; 1 App. 157-231.) When the FDA fi-

19  nally discovered what was happening, they effectively shuttered the trials. (*See* 1 Compl. App.

20  303; 2 App. 321-42.) Barrow never alerted shareholders, investors, or patients to either the FDA

21  regulatory risk or potential patient safety concerns.

22      Barrow and Vallone have also engaged in securities fraud by selling MindMed restricted

23  stock units given to them as compensation while MindMed shareholders were left in the dark

24  about fatal flaws in MindMed's intellectual property portfolio. (1 Compl. App. 196.) Vallone has

25  been cashing in her director deferred stock units. (*See id.*)

26      Barrow and Vallone keep any board member from examining the misconduct to closely

27  by continually "refreshing" its members so they all have "plausible deniability." (S. Freeman

28  Decl. ¶ 8.) Since Freeman's ouster the *entire* membership of the board has changed multiple

14

times. (*See* 2 App. 337.) Meanwhile they pay themselves and their cycling board members hand-somely to look the other way: MindMed's board is the highest in the psychedelic sector with the average member receiving $500,000 in annual compensation and the Chair and Vice-Chair received $1 million each in compensation in 2022 alone. (2 App. 344).

### FCM is Established and Puts the MindMed Board on Notice of its Complaints

Despite the best efforts of Hurst, Barrow, and Vallone, MindMed could not hide its broken management from Freeman. And MindMed's shareholders were collectively watching MindMed's stock plummet (95 percent in two years). (*See* 2 App. 344.)

Freeman, the largest MindMed shareholder, first attempted to get his voting rights of his locked-up shares for the 2021 and 2022 General Annual Meeting, but Hurst and MindMed continued to block him. (*See* 1 App. 129-33, 135-36.)

So Freeman and other original MindMed shareholders, Jake Freeman and Chad Boulanger, formed the company FCM MM Holdings, LLC, Freeman's co-defendant here, to hold proxy rights of the shareholders to change MindMed's management and course. FCM also represented 10 shareholders other than Freeman. (1 App. 173.)

FCM first took its concerns to the MindMed board, via a letter to Vallone (the August 11 letter). (1 Compl. App. 9-14.) This letter presents a plan to the MindMed Board as it then-existed to help build shareholder value. It notably abstained from any discussion of the historical misconduct laid out above. Instead, the August 11 letter opened by stating that "MindMed's management has divided its attention among too many different projects resulting in the delayed development of MindMed's core drugs." (*Id.* at 9) The letter and attached strategic plan proposed ways for MindMed to cut costs and accelerate clinical trials. (*Id.* at 10-14) It concludes with the founders' "desire to work hand-in-hand with MindMed Board of Directors to unlock the Company's full potential." (*Id.* at 14) After publication of the letter MindMed stock soared.[7] (4 App. 570-74.) The Board did not act on FCM's proposal. (*See* 1 Compl. App. 16-17.)

Freeman then resigned as FCM's co-manager, abdicating decision-making authority to

---

[7] It is hard to reconcile MindMed's claim that FCM disparaged MindMed and caused harm to their reputation as the stock soared.

LEWIS ROCA

1   Jake Freeman, who became sole managing member. Thus, when FCM wrote its next letter to

2   Vallone (the September 28 letter), pleading with MindMed board to rethink its proposed public

3   offering of MindMed shares, only Jake Freeman and Boulanger signed. (*id.*) The tone of the Sep-

4   tember 28 letter was similarly measured, focused on MindMed's *current* mismanagement. (*Id.*)

5   The letter noted FCM's commitment "to taking the necessary actions to prevent the further de-

6   struction of shareholder value at MindMed," including "formally requisitioning a shareholder

7   meeting to give shareholders an opportunity to change the composition of the Board." (*Id.*) FCM

8   also proposed reinstating Freeman as Chief Medical Officer. (*Id.*)

9       The September 28 letter likewise advised MindMed that, in addition to this shareholder

10  activism, Freeman was prepared to bring legal action. (*Id.*.) Freeman did, indeed, sue Hurst,

11  Turnbull, Ceruvia, and other individuals entwined with the Enterprise. (Case No. 2:22-cv-01433-

12  RFB-VCF.) Freeman did not sue MindMed, however, hoping that the company could correct

13  course through FCM's guidance.[8]

14  ***MindMed Attacks Freeman***

15      MindMed responded with a smear campaign against FCM and Freeman, beginning Octo-

16  ber 8, 2023. (*See* 2 App. 262-99.) Despite Freeman's prior work as MindMed CMO and his hav-

17  ing founded Savant, MindMed advised shareholders that they "Should Not Entrust FCM and

18  Scott Freeman with MindMed's Development Pipeline." (*Id.* at 299.) The press release falsely

19  stated that Freeman's "only experience with a CNS drug candidate was unsuccessful" and ac-

20  cused him of having ignored the DFA's safety concerns. (*Id.*)

21      Of Freeman and FCM, MindMed later said, "do not—individually or collectively—pos-

22  sess relevant industry background or experience that would be additive." (3 App. 490.) Indeed,

23  according to MindMed, it was "abundantly clear that FCM does not understand MindMed's busi-

24  ness or the associated regulatory processes." (*Id.*) MindMed, advised shareholders via publica-

25  tion not to read FCM's proxy material or vote for FCM candidates.

26

27  [8] The anti-disparagement clause carved out statements made during any legal process. Still, in an abundance of caution Freeman redacted all references to MindMed in his complaint and the exhib-

28  its attached to the complaint filed it under seal. MindMed does not appear to argue that Freeman's suit violated the anti-disparagement agreement. Nor could it have, for the reasons stated here. On September 30, 2023, the Court ordered the suit unsealed.

LEWIS ROCA

***Barrow Gives a Misleading Interview and FCM Responds***

Meanwhile, in an attempt at damage control for Freeman's suit, Barrow gave the October 8 interview. (*See* 2 App. 258-97.) In that interview Barrow denied any continuing relationship with Hurst and repeatedly disclaimed any knowledge of the misconduct up to that point, despite having then been CEO for over a year, employed by MindMed for more than two years and, Freeman sending emails to Barrow and the board in 2021. (1 Compl. App. 19-25; 1 App. 128-50.)

FCM called this strategy of denial out in a letter to shareholders (the October 13 letter). The letter noted that Barrow could not continue to use ignorance as an excuse because it was his responsibility, as MindMed's CEO, to understand these serious issues with MindMed's prior management. (1 Compl. App. 19-25.) FCM went through Barrow's interview line by line, pointing out his misstatements of fact and obfuscation. (*Id.*) FCM also noted the inaccuracies in a letter to Vallone (the October 21 letter). (1 Compl. App. 27-29.)

After unsuccessfully attempting to get MindMed to correct the record, FCM filed a complaint with the Securities and Exchange commission (the SEC complaint). (1 Compl. App. 102.) FCM also asked, via another letter to Vallone, for immediate termination of Barrow and a Ceruvia loyalists on the MindMed Board, Bridgid Makes and Cooley counsel and Hurst loyalist, Kenneth Krisko (the November 3 letter). (1 Compl. App. 279.)

FCM then engaged in a proxy campaign for the 2023 AGM. Despite all FCM's efforts, the FCM proposed board did not take a majority of the shareholders' vote at the proxy contest. Ceruvia loyalists who retained a significant number of shares from Hurst's previous tenure at MindMed used their shareholder votes to retain control by a slim majority.

***MindMed Sues to Silence Freeman and FCM***

The rest of the story is familiar to this Court: MindMed sued Freeman. Beyond the five letters discussed above, MindMed raises two tweets posted by Jake Freeman (the October 8 and 25 tweets), another letter written to McLean Hospital criticizing Vallone's leadership and suggesting MindMed's drug study protocol was deficient (the November 21 letter), and multiple FCM press releases in the months that followed, each in this same vein.

MindMed alleges generally that Freeman had used and shared confidential information. MindMed's complaint was the first Freeman had heard of such an accusation. Prior to his separation with MindMed, Freeman had occasionally used his personal computer there as per instructions from Hurst. (S. Freeman Decl. at ¶11.) Freeman therefore did have some MindMed documents on his computer at the time of his separation. (*Id.*) But when Freeman signed the separation agreement he destroyed all MindMed documents on his computer to the best of his ability. He believed sections 8 and 10 required it. (*Id.* at ¶12.) In any case, the identified statements by defendants did not come from or contain any confidential information and MindMed does not claim otherwise.

MindMed claims that Dr. Freeman disclosed MindMed's FDA minutes. But MindMed's FDA minutes are dated after the separation agreement, so Freeman had no access to them. It was, instead, MindMed that publicly disclosed the contents of the minutes in a press release and made other publicly available documents—including the October 8 interview, the phase 1 protocol, and animal toxicology data—that formed the basis of FCM's opinion and statements. (1 App. 158-231; 2 App. 235-44; 3 App. 302-19; 324-32.)

Jake Freeman obtained nonpublic information through a third-party, Bradford Cross, MindMed's former COO, not Freeman. (J. Freeman Decl. ¶¶ 3, 7.) Cross contacted Jake Freeman and FCM, advising that he had been investigating securities fraud at MindMed prior to his termination, and was preparing to mount a legal challenge to that termination. (*Id.*) Cross also indicated there were suspicions that Barrow was taking kickbacks from short sellers. (*Id.*)

<u>**ARGUMENT**</u>

MindMed's claims all stem from speech protected by the First Amendment right to comment on a publicly traded company. NRS 41.650, the immunity provision in Nevada's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute, provides absolute immunity.



## I.

### NEVADA'S ANTI-SLAAP STATUTE BARS PLAINTIFF'S MERITLESS LAWSUIT

Most states rely solely on the First Amendment for speech protections. Nevada goes farther. NRS 41.650 substantively grants absolute immunity from suits "based on" certain speech:

> A person who engages in a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern *is immune from any civil action* for claims based upon the communication.

(Emphasis added.) The statute admits no exception or vulnerability to waiver. It stands on its own as a bar to civil action. (S.B. 286 Bill Summary (77th Sess. 2013) (noting that a speaker is immune from civil actions, not just ultimate liability under the newly added language).[9]

NRS 41.660 lays out the procedure a SLAPP defendant can invoke to enforce the immunity that NRS 41.650 grants. (*See id.* ("A person who engages in [protected] communication is immune from any civil action for claims based upon that communication. If a civil action is sought and the person who engaged in the communication files a special motion to dismiss, the measure adds a process for the court to follow."). That procedure is an anti-SLAPP motion to dismiss.

In weighing such amotion, this Court must first determine "whether the moving party has established, by a preponderance of the evidence, that the claim is based upon a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern." NRS 41.660(3)(a). If the movant meets that initial burden, this Court must then determine whether the plaintiff has presented "prima facie evidence of a probability of prevailing on the claim." NRS 41.660(3)(b).

Freeman easily meets his burden under subsection (3)(a). The crux of MindMed's complaint is that Freeman made public statements that fall into two broad categories. The first: allegations of mismanagement within MindMed, such as the appointment of Barrow and subsequent drop in stock value, and the overcompensation of the board and dilutive offering. The second: allegations of misconduct regarding Hurst's schemes to misappropriate MindMed programs for

---

[9] The compiled legislative history for this section is available at http://www.leg.state.nv.us/Division/Research/Library/LegHistory/LHs/2013/SB286,2013.pdf.

19

LEWIS ROCA

Ceruvia, his rampant self-dealing at the expense of MindMed's shareholders, and Barrow and Vallone's attempts to continue and cover-up the fraud, and the administration of 18-MC at 35 times a dose the FDA deemed unsafe.

MindMed also raises, with less specificity, a claim that Freeman wrongly shared confidential information while making the statements.

Freeman's statements are "all good faith communication[s] in furtherance of the right . . . to free speech" and made with an eye toward the interests of MindMed shareholders and the public at large. And, even if Freeman had kept and shared confidential information—which he did not, and MindMed has not adequately pleaded a claim for—that conduct would have been protected under Nevada's anti-SLAPP statute, in any case.

With the burden shifted its direction, MindMed's entire complaint falls. It cannot present prima facie evidence that it will be successful on the merits because the pleading itself reveals that this case is ripe for dismissal.

### A. The Statements Were All Made in Good Faith, in Furtherance of Freeman's Free Speech and on an Issue of Public Concern

A "[g]ood faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern" includes any "[c]ommunication [1] made in direct connection with an issue of public interest [2] in a place open to the public or in a public forum … [3] which is truthful or is made without knowledge of its falsehood." NRS 41.637. Taking the second requirement first: The complaint concedes the statements were made in a public forum. (*See* Comp. ¶ 85; 111). Requirements one and three are also met.

#### 1. Defendant's Communications Were in Direct Connection With an Issue of Public Interest

To qualify for anti-SLAPP protections, statements must be closely connected to and made in furtherance of a matter that is more than "mere curiosity" and of concern to a "substantial number of people." *Shapiro v. Welt*, 389 P.3d 262, 268 (Nev. 2017); *see also Kosor v. Olympia Companies*, LLC, 478 P.3d 390, 393 (Nev. 2020). Statements blowing a whistle on the mismanagement or abuse of a publicly-traded corporation, particularly during a proxy contest, plainly

LEWIS ROCA

meet this mark.[10]

a.      MISCONDUCT AND MISMANAGEMENT AT A PUBLIC COMPANY ARE TOPICS IN THE PUBLIC INTEREST

Whistleblowing on corporate misconduct is more than a matter of "mere curiosity" for the public. It protects the public's interest in a secure economy. That security, in turn, allows "[i]nvestors [to] turn to the markets to help secure their futures, pay for homes, and send children to college, making investor protection more compelling than ever." *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 151, 162 Cal. Rptr. 3d 831, 838 (2013).

Moreover, "the common interest of all Americans in a growing economy that produces jobs, improves our standard of living, and protects the value of our savings means there is a public interest in protecting investors so as to promote the capital formation that is necessary to sustain economic growth." *Id.* (internal citations omitted).[11] *See* Minutes, Assembly Comm. on Judiciary, 77th Sess., May 6, 2013, (Letter from Prof. Derek Baumbauer, University of Arizona) (arguing that an expanded anti-SLAPP protection would help "driv[e] economic growth and "redound to the benefit of both Nevada's citizens and economy").

Where, as here, those whistleblowing statements are made during a proxy campaign, the public interest is amplified. Added to the economic considerations is the interest in protecting the fundamental rights of corporate shareholders to vote for the officers and directors. *Pell v. Kill*, 135 A.3d 764, 794 (Del. Ch. 2016). Participating in a proxy campaign is a "sacrosanct" right of equity ownership. *See, e.g.*, *Applied Energetics, Inc. v. Gusrae Kaplan Nusbaum PLLC*, 2022 U.S. Dist. LEXIS 58737, at *43 (S.D.N.Y. Mar. 30, 2022) ("Of course, the ownership of Company shares would have afforded Defendants the right to take a position in the proxy contest."); *Pell*, 135 A.3d at 794 (Del. Ch. 2016). And that right can only be properly vindicated where the proxy campaign in question is fair before an informed electorate. *Pell*, 135 A.3d at 794.

---

[10] The Legislature has made plain that it intended for California case law on the question of what qualifies as a public interest would apply to Nevada's anti-SLAPP statutes. *See* (noting that in applying NRS 41.660, Nevada's courts would be able to rely "robust caselaw" from California and other states).

[11] Freeman understands these financial considerations well. As explained above he had invested a significant amount of his personal wealth in Savant, which was translated (against his will) into MindMed shares. He shares the public's interest in MindMed's continued financial health.

21

Thus, when individuals serve or seek to serve as directors of a publicly traded organiza-tion, they inject themselves into the "public eye." *Charney v. Brown*, No. B268464, 2017 WL 6350557, at *1 (Cal. Ct. App. Dec. 13, 2017) (unpublished). They "invite[ ] attention and com-ment on [their] official conduct and policies" and "voluntarily expose[ ] themselves" to share-holder scrutiny.[12]

This is particularly true in a proxy campaign. In such contests, "[c]harges of incompe-tence, ignorance, unethical and/or illegal conduct, or dishonesty, either direct or by innuendo, are not uncommon . . .." *Agar*, 151 A.3d at 484 (quoting Thomas C. Arthur, Tom Kirby & Bert W. Rein, *Defamation Suits as a Weapon in Corporate Control Battles*, 37 Bus. L. 1, 3 (1981)). There is a "tend[ancy] towards emphatic language in order to sway shareholders to the dissident's side." *Agar*, 151 A.3d at 484. A corporate actor that voluntarily participates in a proxy contest acquiesces to reputational risks associated with it.

Thus, the court in *Charney* deemed to be in the public interest an email sent by the chair of American Apparel's board of directors assuring American Apparel employees that the former CEO—with whom the board had been engaged in a "hostile proxy contest"—would not be re-hired at the company. *Id.* at *2. Charney, the disgraced CEO, had insisted the email was *not* in the public interest because his termination was "a private matter." *Id.* at *6. Charney further ar-gued that the information concerning his termination several months earlier was not offered in the public interest because he was no longer CEO at the time the email was sent. *Id.*

The California Court of Appeals was unpersuaded. The court said that American Apparel,

---

[12] *See Agar*, 151 A.3d at 478 (noting that "individuals seek[ing] to serve as directors" were public figures because they "voluntarily expose[] themselves to increased risk of injury); *see also Muddy Waters, LLC v. Superior Ct.*, 62 Cal. App. 5th 905, 277 Cal. Rptr. 3d 204 (2021) (finding that re-ports published by financial analysis firm concerned issue of public interest, as required to be pro-tected activity under anti-SLAPP law, where reports were published to highlight investigation and allegations that publicly traded company was engaged in scheme to artificially inflate its reported sales and business activity); *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 151, 162 Cal. Rptr. 3d 831 (2013) (reasoning that "investment scams are a matter of public interest" partic-ularly when they involve a publicly traded company); *Summit Bank v. Rogers* 206 Cal. App. 4th 669, 694, 142 Cal. Rptr. 3d 40 (2012) (commenting on stability of publicly traded bank "con-cerned an 'issue of public interest'"). *See also* Min. Sen. Committee on Jud 6 (Mar. 28, 2013) (bill sponsor noting that a public discussion of the internal workings of a partnership could become a matter of public interest if injected into the public eye, and that at that point the partnership "may not have the privilege of making [it] a private matter").

LEWIS ROCA

a publicly traded company, and its controversial CEO were in the public eye. *Id.* And because Charney's prior misconduct continued to impact American Apparel's economic health moving forward, the Court determined continuing shareholder criticism was protected. *Id.*

The statements at issue here are in a similar vein. The mismanagement allegations are fair comment on board members who have voluntarily put themselves in the public eye. The misconduct allegations are likewise fair game because Hurst's misdeeds continue to infect and hobble what was once the shining star of an emerging industry. Psychedelic medicines are of increasing interest to an increasing proportion of the public at large, and MindMed was (and Freeman believes, still can be) a key player in it. Hurst's notoriety and his undermining of MindMed's promise render the misconduct allegations of interest to the public.

        b.     STATEMENTS FURTHERING BREAKTHROUGH DEVELOPMENTS IN EMERGING INDUSTRIES ARE IN THE PUBLIC INTEREST

Beyond these interests is the public's interest in the responsible development and regulation of technologies to improve the public health and safety.[13]

That interest is even keener in this state: Nevada has a special relationship with breakout industries and the start-ups that make them. Indeed, the legislative history of Nevada's anti-SLAPP laws supports that Nevada's Legislature had emerging health companies specifically in mind when it expanded protections via Senate Bill 286. *See infra* Part B(1)(a). A proponent of SB 286 gave as an example of the statements the expansion should include: statements by a "start-up in the field of nutrition supplements" as to the safety and efficacy of a competitor's product. Minutes, Ass'y Comm. on Judiciary, 77th Sess., May 6, 2013, (Letter from Prof. Derek Baumbauer). It was argued that allowing the start-up to freely criticize its, perhaps more established, competitor would allow "Nevada [to] create an environment in which start-up firms thrive, driving economic growth and leveraging the state's other resources." Minutes, Ass'y

---

[13] *See, e.g.*, *New Lifecare Hosps. of N. Nev. v. Wright*, No. CV14-01664, 2015 Nev. Dist. LEXIS 2751 (Sep. 18, 2015) (unpublished disposition) (statements made and confidential information disclosed in furtherance of whistleblowing on hospital safety were made and disclosed in the public interest); *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 111, 15 Cal. Rptr. 3d 215, 227 (2004) (statements trying to protect public health and safety were in the public interest); *see also Glob. Plasma Sols., Inc. v. IEE Indoor Env't Eng'g*, 600 F. Supp. 3d 1082, 1093 (N.D. Cal. 2021) (statements regarding the effectiveness of air purifiers implicated a public interest because the efficacy of such products in important to the public health).

23

1   Comm. on Judiciary, 77th Sess., May 6, 2013, (Bambauer Letter).

2        The statements at issue here are in direct keeping with these themes. Freeman believed

3   that MindMed could relieve real suffering through its cutting-edge pharmaceutical development

4   program. The conditions MindMed's drugs were intended to treat—migraines, cluster headaches,

5   anxiety, depression—are wide-ranging and unfortunately common. Those who suffer from them

6   have symptoms ranging from inconvenienced to debilitated: the conditions can indeed be "seri-

7   ous[]." *DuPont Merck Pharm. Co. v. Superior Ct.*, 78 Cal. App. 4th 562, 567, 92 Cal. Rptr. 2d

8   755, 759 (2000), a*s modified* (Jan. 25, 2000) (suggesting that statements about medicinal devel-

9   opments are only subject to anti-SLAPP protection where the condition the development pur-

10  ports to treat is "serious[ ]" and affects many persons").

11       In addition to the importance of its products to the afflicted, MindMed, is a pioneer of

12  and ambassador for the psychedelic pharmaceutical industry. It has an obligation to the industry

13  and the public to *safely* develop its products. If MindMed's irresponsible study protocol injured a

14  participant, the fallout for the burgeoning psychedelic industry would be devastating.

15       MindMed's mismanagement was hindering its ability to produce drugs in which the pub-

16  lic had a strong interest, and threatening a groundbreaking industry in the process. Freeman's

17  statements calling that out were in the public interest.

18                     c.   THE STATEMENTS RELATE TO THE PUBLIC INTEREST

19       Finally, to qualify for anti-SLAPP protections, the statements must be "about" the matters

20  of public interest identified above. That turns on the "functional relationship [that] exists be-

21  tween the speech and the public conversation . . .." *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.

22  5th 133, 149–50, 439 P.3d 1156, 1165 (2019). For the relationship to suffice, "it is not enough

23  that the statement refer to a subject of widespread public interest; the statement must contribute

24  to the public debate. *Id.* at 150, 439 P.3d at 1166. Challenged speech contributes to the public de-

25  bate "when it does not just present negative commentary about a certain business or business

26  practice but provides information to aid consumers in choosing which businesses to patronize."

27  *Glob. Plasma Sols.*, 600 F. Supp. 3d at 1093.

28       The statements here did more than just report defendant's "negative commentary" about

LEWIS ROCA

1    MindMed's leadership and historical abuses. They attempted to educate MindMed's shareholders

2    as to a better course for the business. And they were made during a proxy competition, to encour-

3    age shareholders to a new direction that better protects MindMed's investors, shareholders, and

4    employees, with efficient development of a groundbreaking new pharmaceutical treatments.

5    Thus, a sufficiently functional relationship exists between the statements and the public interest.

6        The statements—whether the mismanagement or misconduct allegations—were all made

7    in furtherance of the proxy campaign, satisfying the functional relationship examination.

8    MindMed's complaint concedes this. (*See, e.g.*, Compl. ¶ 140.)

9        Nor does the ardent tone of certain statements by Jake Freeman forfeit protection. In ana-

10   lyzing statements made during a proxy campaign, courts err on the side of protecting the free

11   flow of information, even where the form of the information provided is "exaggerated, specula-

12   tive, and entirely one-sided." *See Agar*, 151 A.3d at 483. Thus, in *Agar*, five activist shareholders

13   signed a public letter before an annual meeting accusing the company's current directors of

14   "looting" the company, failing to pay investors, and concealing their misconduct. *Id.* at 467. The

15   *Agar* court was critical of the "Fight Letter['s]" language, but determined that the statements

16   were protected *despite* the letter's use of "vigorous epithet[s]." *Id.* at 485.[14] "[V]igorous" criti-

17   cism and "exaggerated characterizations" were expected. *Id.* Indeed, a proxy campaign would

18   typically bear the hallmarks of other heated electoral campaigns.

19       Regardless, Dr. Freeman's own statements were consistently professional and measured.

20   And this court should view them in the context of the long-simmering dispute and history of liti-

21   gation between the parties. So viewed, they reflect reasonable frustration with MindMed's con-

22   tinuing misconduct and mismanagement. Such statements are vital to the proxy campaign. The

23   shareholders can weigh their respective substance and merits, but having such statements availa-

24   ble in a proxy campaign still serves the public interest.

25               d.   IF FREEMAN USED CONFIDENTIAL DOCUMENTS TO MAKE THE
                      STATEMENTS HIS CONDUCT WOULD BE PROTECTED

26   For all the reasons laid out *infra* at I(B)(4), MindMed has failed to raise any plausible

27

28

---

[14] The court found the anti-SLAPP statute did not apply because of Delaware's narrower statute.

25

LEWIS ROCA

claim that Freeman wrongly retained or disseminated confidential information. MindMed cannot point with particularity to a single document or statement Freeman made that violates his confidentiality agreement.

But even if it had plead such a claim, and even if it were true, his use of that information in furtherance of the public interest would render it protected under anti-SLAPP to the same degree as the statements. *See Omerza v. Fore Stars, Ltd.*, 455 P.3d 841 (Nev. 2020) (recognizing that Nevada's anti-SLAPP "does not exclude any particular claim for relief from its scope because its focus is on the defendant's activity, not the form of the plaintiff's claims for relief").

In *New Lifecare Hospitals*, a respiratory therapist who disclosed confidential patient and hospital information was sued for breach of his fiduciary duty. 2015 Nev. Dist. LEXIS 2751, *5. He had disclosed the confidential information to a reporter, while blowing the whistle on safety issues at the hospital. *Id.* The second judicial district court for the state of Nevada determined that the suit was a "glaring example of when anti-SLAPP protection ought to apply." *Id.* *5.

The court noted that no evidence showed the information was being used for anything other than "alerting the government and public of the alleged dangers at TPH." *Id.* Thus, "[a]ll of the information . . . sent . . . [was] so obviously tied to his good faith communication . . . that to suggest otherwise is to invite incredulity." *Id.* Under Nevada's anti-SLAPP law, the court determined, the case had to be dismissed. *Id.*[15]

So, too, here. Taking MindMed's accusations at face value, it has not pleaded that Freeman used the allegedly stolen information for anything other than alerting the public and the SEC of the dangers MindMed posed. Because Freeman's use of the documents would have been tied to his good faith communications, such claims are subject to anti-SLAPP dismissal.

## 2. The Statements Were Made in Good Faith

Whether a statement is true or made without knowledge of its falsity (i.e., in good faith) turns on whether a preponderance of the evidence supports that "the gist of the story, or the portion of the story that carries the sting of the [statement], is true." *Smith v. Zilverberg*, 481 P.3d

---

[15] The hospital voluntarily dismissed the appeal it initially took from this decision. *See New Lifecare Hosps. of N. Nevada, LLC v. Wright*, 131 Nev. 1326 (2015).

LEWIS ROCA

1222, 1228 (Nev. 2021) quoting *Rosen v. Tarkanian*, 453 P.3d 1220, 1223 (Nev. 2019) (alteration

in original) (internal quotation marks omitted). Statements of opinion cannot be false. *See id*. In

determining good faith, this court considers "all of the evidence submitted by the defendant in

support of his or her anti-SLAPP motion." *Taylor v. Colon*, 482 P.3d 1212, 1217 (Nev. 2020).

                a.        A<span>NY</span> O<span>PINION</span> S<span>TATEMENTS</span> A<span>RE</span> I<span>NCAPABLE OF</span> B<span>EING</span> F<span>ALSE</span>

The Nevada Supreme Court has made clear that this requirement is necessarily met for all

opinion statements. *Smith*, 481 P.3d at 1228. To determine whether a statement is opinion, this

court "should analyze the common usage or meaning of the challenged language[,] . . .. deter-

mine whether the statement can be objectively verified as true or false[,] . . . [and] consider the

full context of the statement [and] . . . broader social context into which the statement fits." *Agar*,

151 A.3d at 481.

In *Agar*, a Delaware court deemed the accusations of corporate "looting" by directors

were opinions. *Id.* at 482. The court noted that the word "looting" is reasonably understood to

reflect "personal moral judgment" of the director conduct in question, not a factual statement of

criminal liability. *Id.* at 485.

The statements here are analogous. Most, if not all, of the specific statements the com-

plaint identifies fall within this category, including those "expressing . . . concern" that

MindMed's "course needs to be corrected," suggesting that the "MindMed Board is Trippin,'"

and joking that "the only thing bigger than . . . Barrow's ego is his paycheck." (ECF 2 ¶¶ 106-16,

119). Viewed in context of a long-standing dispute over corporate control, it is clear these state-

ments only reflect defendants' frustration with the board's mismanagement and obfuscation.

These strongly-held opinions formed during a life-altering feud. The law is clear. Such

statements are incapable of being false in Nevada. *Smith*, 481 P.3d at 1228.

                b.        T<span>HE</span> N<span>ON</span>-O<span>PINION</span> S<span>TATEMENTS</span> W<span>ERE</span>
                      M<span>ADE IN</span> G<span>OOD</span> F<span>AITH</span>

Even if all the statements were factual, Freeman has shown that they were made in good

faith by a preponderance of the evidence. To be clear, Freeman does not need to prove that the

gist of the statements was *true* under that standard, but that he *believed them to be true*. *Smith*,

LEWIS ROCA

481 P.3d at 1228 (emphasizing repeatedly that a movant's statements were "at least made without knowledge of their falsity"). Thus, in *Smith* the Nevada Supreme Court held that an anti-SLAPP movant's declaration that she made certain statements in good faith, along with supporting attachments—Facebook posts and messages and a YouTube video amounted to a preponderance of the evidence. 481 P.3d at 1228; *see also Omerza*, 455 P.3d at 841 (suggesting that sworn declarations alone might be sufficient to meet the evidentiary standard). All this Court needs to do is review the attachments to plaintiff's own motion to divine the "sting" of the statements. MindMed's prior CEO (Hurst) exploited the company, and complicit officers (Barrow) and directors (Vallone) covered it up for their own benefit, at the expense of MindMed's investors and medicines. Freeman's declaration and appendix make plain that he believed the statements to be true, and continues to believe them to be.

The content of FCM's letters and presentations, such as the October 21, 2022 letter, the May 24, 2023 presentation, and the proxy statements, are replete with footnotes and reference documents to support their allegations. Their allegations were obviously not lightly made. Each is supported by a footnote and reference document. Moreover, the source material shows that FCM had a reasonable basis for the statements (indeed, the references support the actual truth of the statements).[16] Freeman's belief in their truth is further supported by his bringing suit.

***

In sum, the statements were made regarding a matter of public interest and in good faith. And by MindMed's own admission they were made in public. That is all that NRS 41.660's first prong requires. The burden shifts to MindMed.[17]

---

[16] These references further alleviate any sting of overly "vigorous" statements. Using the sources provided, any proxy voter can review FCM's work and assess the truth of the statements for the proxy voter's self. In addition, linking to protected source material, such as a judicial proceeding, "suffice[s] as a report within the common law fair report privilege" and is protected under anti-SLAPP. *Adelson v. Harris*, 133 Nev. 512, 513, 402 P.3d 665, 666 (2017).

[17] The burden-shifting framework intentionally demands that a plaintiff front-load their case to prove its mettle. (Min. Sen. Committee on Jud. 7 (Mar. 28, 2013) ("[NRS 41.660] is a burden-shifting statute. But without that important element, defendants can be quieted and punished for exercising free speech rights simply by winning a case. That burden-shifting is important, necessary and proper.").

LEWIS ROCA

### B.    Plaintiff Cannot Demonstrate by Prima Facie Evidence a <u>Probability of Success on its Three Causes of Action</u>

MindMed cannot "demonstrate[ ] with prima facie evidence a probability of prevailing on [its] claim[s]." NRS 41.660(3)(b). Speculative inferences need not be considered. *See Kashian v. Harriman*, 98 Cal.App.4th 892, 931, 120 Cal.Rptr.2d 576 (2002).

NRS 41.650 provides absolute immunity here. The purported separation agreement is both unenforceable and inapplicable. The separation agreement is void for lack of consideration and voidable because it was induced by fraud. But even if not, the non-disparagement clause does not cover Dr. Freeman's speech because it addresses events post-dating the agreement and exercises his shareholder rights, expressly protected. Any disparagement, moreover, is excused because, according to its own definition of disparagement, MindMed breached first. Finally, MindMed has not stated a claim for dissemination of confidential information.

#### 1.    *MindMed's Complaint Does Not State a Claim*

MindMed cannot succeed on the merits of its breach-of-contract claim. Freeman's Rule 12(b)(6) (ECF 67) lays out many of these reasons and is expressly incorporated here by refer-ence: Briefly, no enforceable contract exists here. As is apparent from the face of the agreement, which is incorporated in the complaint, no consideration supports it: as of its effective date, the only "consideration" was a promise for MindMed to give Dr. Freeman *less* than what benefits had already contractually vested, along with an illusory promise to use Dr. Freeman's consulting services if it felt like it. *See* ECF 67 Section A, at 7-10.

Likewise, as detailed in Freeman's Rule 12(b)(6) motion, the statements attributed to Freeman do not constitute actionable disparagement as a matter of law. (ECF No. 67, at 10-22.) Many are statements of a separate party, FCM, who is not Freeman's alter ego. The others are protected communications with the SEC, part of Freeman's equity rights in his permitted proxy campaign, or otherwise relating only to events and personnel post-dating the agreement and ex-cluded from the agreement's waiver.

Nor does the complaint provide the requisite specificity as to the confidential information to enable Freeman to evaluate or respond to it. The sole specific allegation—that non-signatory

LEWIS ROCA

Jake Freeman had confidential information (Compl. ¶¶ 87-89)—fails to allege that Jake Freeman obtained this information through Dr. Freeman's breach of the separation agreement. Nor do the remaining broadsides about "defendants" "disclosing" unspecified "confidential information" (Compl. ¶¶ 197, 199) land, as they fail to allege that defendants obtained any confidential information through a breach of the agreement.

### 2. Because Freeman's Comments Were Truthful and in Furtherance of the Public Interest, NRS 41.650 Provides Total Immunity

a. THE IMMUNITY NRS 41.650 PROVIDES HERE IS ABSOLUTE

NRS 41.650 broadly grants absolute immunity from "any civil action" for claims qualifying under NRS 41.660. Notably absent from NRS 41.650 is any limitation on the sort of suit that might qualify as a SLAPP once the statements meet NRS 41.660's requirements. *Cf. Omerza*, 455 P.3d at 841 (citing *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002) ("Nothing in the statute itself categorically excludes any particular type of action from its operation, and no court has the 'power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.'").

As laid out above, the statements here qualify under NRS 41.660. Defendants are completely immune from "any civil action" stemming from them, including for supposed breach of contract.

The distinction between NRS 41.660 and NRS 41.650 is important. NRS 41.660's procedural structure mirrors California's corollary in California's Code of Civil Procedure 425.16. So Nevada courts have often used case law interpreting California's section 425.16 to understand NRS 41.660. *See Beazer Homes Nevada, Inc. v. Eighth Jud. Dist. Ct.*, 97 P.3d 1132, 1136 (Nev. 2004) ("When a legislature adopts language that has a particular meaning or history, rules of statutory construction also indicate that a court may presume that the legislature intended the language to have meaning consistent with previous interpretations of the language.")

NRS 41.650, on the other hand, is an addition all of Nevada's own. Its intentional asymmetry with California's anti-SLAPP law should be given meaning. *Salsberry v. Connolly*, 183 P. 391, 392 (Nev. 1919) ("We cannot presume that this change in the phraseology, made in 1909,

LEWIS ROCA

was not intentional and not for a purpose.").

And on its terms, NRS 41.650's protection is uniquely sweeping, *see Doe No. 1 v. Wynn Resorts Ltd.*, 2:19-cv-01904-GMN-VCF, 2022 WL 3214651, at *5 n.5 (D. Nev. Aug. 9, 2022) (noting the strength of Nevada's anti-SLAPP law). It vastly broadens the scope of immunity from SLAPPs beyond that offered by other states. *See Omerza*, 455 P.3d at 841 (recognizing that Nevada's anti-SLAPP applied even where the underlying accusations were "intentional torts and fraudulent conduct").

As originally enacted, NRS 41.650 provided "[i]mmun[ity] from civil liability" for SLAPPs. NRS 41.650 (effective through September 30, 1997). But after a Ninth Circuit decision read the former provision narrowly, to provide immunity from ultimate liability but not the process of the suit itself, *see Metabolic Research, Inc. v. Ferrell*, 693 F.3d 795, 801-02 (9th Cir. 2012), the Legislature amended it, "expand[ing] the anti-SLAPP provisions to cover *any civil action*, not just liability." *See* Minutes, Ass'y Comm. on Judiciary, 77th Sess., May 6, 2013, at 3 (statement of Senator Justin C. Jones (emphasis added)); 2013 Nev. Stat. 623, SB 286, § 2.

Accordingly, there should be no mistaking the meaning of NRS 41.650's language—it reaches "any civil action" that is a SLAPP, more broadly than the anti-SLAPP laws of Nevada's sister states.

It is not unexpected that Nevada legislators would offer more protection to speech than California's. *See* Minutes, Assembly Committee on Judiciary 6 (May 6, 2013) (SB 286 (2013) proponent indicating the drafters' "certainly would" consider adopting provisions that were more protective than any other state's). Nevada's civil libertarian streak means it has some of the most extensive protections of speech in other contexts. *See, e.g.*, *Diaz v. Eighth Jud. Dist. Ct.*, 993 P.2d 50, 54 (Nev. 2000) (noting that Nevada's reporters' shield law is among the most protective in the nation).

And the legislative history of NRS 41.650 (enacted by SB 286) makes plain that the goal of expanding the anti-SLAPP statute was likewise to "memorialize to Nevadans and the nation this State's commitment to truly open debate, free expression, and the sacrosanct principles enshrined in the First Amendment of the United States Constitution and Article I of the Nevada

31

LEWIS ROCA

1   State Constitution." Minutes, Ass'y Comm. on Judiciary, 77th Sess., May 6, 2013, Ex. D, 2 (Re-

2   port to Senate on Proposed Changes to Nevada's Anti-SLAPP Laws). Proponents argued that the

3   expansion "put [Nevada] at the forefront, . . . [and] is going to make [Nevada] a leader in this

4   area[.]" *Id.*

5        SB 286's proponents argued that its generous anti-SLAPP protections would further re-

6   dound to the benefit of Nevada's economy. *See* Exhibit, Judiciary Committee Hearing on S.B.

7   286, RLG 52 (May 28, 2013) (quoting ATRA president as saying "[e]very dollar spent defending

8   against a groundless lawsuit is a dollar that won't be spent on research and development, capital

9   investment, worker training or job creation"); Exhibit, Assembly Committee on Judiciary, Ex D,

10  2 (May 6, 2013) (arguing in favor of the anti-SLAPP expansion because it would encourage the

11  further development of "a nascent home-grown tech sector" in Las Vegas and "ensure more

12  funds are kept within Nevada"). Of notable importance to the bill's proponents were concerns

13  that emerging industries would explore opportunity in other Western states. Minutes, Assembly

14  Committee on Judiciary 5 (May 6, 2013) (arguing that "frivolous lawsuit threats . . . [that] hap-

15  pen[ ] here in Nevada . . . can cripple a fledgling tech company" and that anti-SLAPP protections

16  should be expanded so such companies are not "smothered in their cradle")). The Legislature ex-

17  pressed its hope that SB 286 would make Nevada a uniquely favorable environment for such

18  start-ups. *Id.*

19              b.   FREEMAN DID NOT WAIVE NRS 41.650'S PROTECTIONS

20       Indeed, SB 286 could be viewed as quite successful: the parties chose Nevada as the fo-

21  rum for enforcing their separation agreement. Now MindMed would have this Court ignore Ne-

22  vada's special reverence for the protection of speech, and the Legislature's desire to create a

23  friendly environment for emerging industries. Setting these aside, MindMed suggests that Ne-

24  vadans may waive their right to free speech, and that such a waiver can overcome NRS 41.650's

25  absolute bar.

26       But MindMed is forced to reach for Pennsylvania law for support, citing a case that does

27  not involve an anti-SLAPP statute at all. (ECF No. 33, at 16:14-17 (citing *USA Techs., Inc. v. Tir-*

28  *pak*, 2012 WL 1889157, at *9 (E.D. Pa. May 24, 2012).) The case plainly has no bearing here:

LEWIS ROCA

Unlike Nevada's, Pennsylvania's anti-SLAPP statute is "weak" and "extremely limited in the scope of the communications that could trigger anti-SLAPP protections." Tanvi Valsangikar, *The Need for Uniform Exemptions in State Anti-SLAPP Statutes*, 49 RUTGERS L. REC. 1, 8 (2021) (citing 27 PA. CONS. STAT. §§ 8301-3 (2000)). The cited case stands for the uninteresting proposition that "[c]onstitutional rights, including those guaranteed by the First Amendment, may be waived by agreement." *USA Techs.*, 2012 WL 1889157, at *9. It tells us nothing about when and whether Nevada's legislature believed NRS 41.650 could be waived.

If NRS 41.650 merely restated rights guaranteed by the U.S. or Nevada Constitution, it would be unnecessary. It gives Nevada citizens *more* protection. And there is no indication, whether on the face of NRS 41.650 or in its legislative history, that the Legislature intended its expanded protections to be undermined by waiver or exception.

Absent evidence of such intent, "[t]he standard for waiving statutory rights . . . is high." *Local Joint Executive Bd. of Las Vegas v. N.L.R.B.*, 540 F.3d 1072, 1079 (9th Cir. 2008). Such a waiver must be "explicitly stated, clear and unmistakable." *Id.* (quoting *Silver State Disposal Serv. Inc.*, 326 N.L.R.B. 84, 86 (1998)). In *Local Joint Executive Board*, for instance, the Ninth Circuit rejected an argument that the provision of certain collective bargaining rights "during the term of the Agreement" meant that the union waived those rights after the agreement's termination. *Id.* at 1076, 1081-82.

Here, there is no such waiver, never mind an explicit, "clear, and unmistakable" one that would be MindMed's burden to prove. *See id*. at 1079. The non-disparagement clause here is vague: from a mealy-mouthed prohibition of disparaging statements "likely to be harmful to [the parties] or their business, business reputation or personal reputation," the clause immediately launches into a series of caveats, including responses to legal process, communications to government agencies, and Section 7 of the National Labor Relations Act. (Separation Agreement § 11.) Although MindMed knew that its agreement would be "construed and enforced in accordance with the laws of the State of Nevada" (*id.* § 18), MindMed made no effort to waive the protections of NRS 41.650.

And because the non-disparagement clause can be construed consistently with NRS

33

LEWIS ROCA

41.650, it must be. The agreement remains effective to prohibit statements likely to harm the parties' "business, business reputation or personal reputation" so long as those statements are not "good faith communication[s] in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern"—i.e., that the statements are knowingly false or (1) *not* "aimed at procuring any governmental or electoral action, result or outcome," (2) *not* communicating to government "regarding a matter reasonably of concern to the respective governmental entity," (3) *not* "direct connection with an issue under consideration by" an official proceeding, and (4) *not* "made in direct connection with an issue of public interest in a place open to the public or in a public forum." *See* NRS 41.637. Freeman, for example, could not maliciously accuse a MindMed board member of some purely private indiscretion, such as an affair.

But, as discussed in greater detail below, the agreement expressly leaves intact Freeman's right to communicate with the SEC and other governmental agencies and also to exercise his rights as an equity shareholder. The agreement does not prohibit Freeman from seeking board representation, and without an express waiver of anti-SLAPP protections, MindMed cannot invoke the non-disparagement clause to silence the ordinary methods of such a campaign.[18]

Far from a clear and unmistakable waiver, the agreement specifically guards against such a waiver, providing that Freeman's "waiver and release do not apply to any rights or Claims that may arise after the execution date of this Agreement." (Separation Agreement § 15.) The post-execution rights that remain expressly intact include not just Freeman's right, as a major equity shareholder, to campaign for and elect his preferred representatives each year, as well as to expose wrongdoing in a publicly traded company, but also to remain "immune from any civil action" on the basis of his protected statements and to obtain expedited relief in the form of this anti-SLAPP motion. At the very least, the language of the agreement made it reasonable for Freeman to so believe, invalidating any attempted statutory waiver that was less than clear.

---

[18] NRS 41.650's broad *substantive* immunity does not appear in California's anti-SLAPP statute, which Nevada follows when interpreting *procedural* questions. *Cf.* NRS 41.665(2).


LEWIS ROCA

### 3. The Non-Disparagement Clause is Unenforceable

    a. THE SEPARATION AGREEMENT IS VOID FOR LACK OF CONSIDERATION

Freeman incorporates here his argument in ECF 67 that the agreement is void for lack of consideration. (ECF No. 67, at 7-10.)

    b. THE SEPARATION AGREEMENT IS VOIDABLE BECAUSE IT WAS INDUCED BY FRAUD

A contract is induced by fraud and voidable by the defrauded party where (1) one party makes a misrepresentation, knowing or believing its falsity, to induce the other party to contract; and (2) the other party justifiably relies upon the misrepresentation to its detriment. *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004). Likewise, one party cannot deceive another into waiving his or her rights and thereafter benefit from that deception. *See Thompson v. City of N. Las Vegas*, 833 P.2d 1132, 1134 (Nev. 1992) (explaining that "a waiver must occur with full knowledge of all material facts").

Here, MindMed and its Board and directors represented to Freeman that a good faith employment complaint had been made against him. This was untrue. As laid out above, Freeman stopped a clinical trial for safety issues, which is a material event. Meanwhile, Hurst and the Enterprise were trying to steal MindMed's BOL-148 and LSD intellectual property. Concocting a workplace violation not only limited Freeman's remuneration, but also allowed the Enterprise to accomplish its objectives—conceal the stoppage for safety issues, and facilitate the theft of trade secrets—without Freeman's interference.

MindMed knew that the employment complaint was false and intended that it would induce Freeman to sign the separation agreement. The complainant vaguely alleged that she overheard Freeman chastising a member of his staff, who did not himself complain. And it was put forward just hours after Freeman had postponed clinical trials out of concerns for the safety of MindMed's human subjects. (2 App. 233.)

Moreover, Freeman's MindMed shares sequestered at Savant were due to vest in the months that followed. Hurst and MindMed conspired to block Freeman's access to those shares,

35

LEWIS ROCA

1  which Freeman could have then used to influence a change in management. MindMed had a con-

2  tractual obligation to release all MindMed shares Hurst had sequestered at Savant. (1 App. 129-

3  49.) Instead, as a result of the separation agreement, Freeman remained unable to vote his shares

4  in MindMed's next annual shareholder meeting.

5       Freeman's reliance was justified. At the time he signed the separation agreement, Free-

6  man had some suspicions about Hurst's business practices, but it would still be years before the

7  full extent of his misconduct was revealed—much less possible to plead as a fraud—because

8  Hurst, Barrow, and Vallone were covering up fraud. Thus, Freeman resigned in justifiable reli-

9  ance on the representation of his long-time business partner that an employment complaint had

10  been made against Freeman. Hurst hid many facts, including that he was an owner of Ceruvia

11  and planning to misappropriate MindMed's intellectual property for Ceruvia, that the complain-

12  ant was a Ceruvia employee, and that Barrow and Vallone would cover up the misconduct. (1

13  App. 70-73, 90, 92, 94-95, 120-25, 127, 129-33, 145-56, 140, 143-45.)

14       Finally, Freeman was damaged by this misrepresentation. If he had known that the em-

15  ployment complaint was fabricated and designed solely to force him out, Freeman would never

16  have resigned on the agreement's terms. Freeman gave up 1 million shares in a then-successful

17  pharmaceutical start-up, gaining nothing but MindMed's release from liability for a false com-

18  plaint. (2 App. 244, 250-55.)

19       The evidence is clear and convincing: Freeman was fraudulently induced into executing

20  the separation agreement, and he can void it.

### 4. Even if the Non-Disparagement Clause Were Enforceable, the Statements Do Not Breach It

23     As detailed in Freeman's Rule 12(b)(6) motion, the statements attributed to Freeman do

24  not constitute actionable disparagement as a matter of law. (ECF No. 67, at 10-22.) But even if

25  the complaint plausibly stated a claim on its face, the record evidence refutes it.

#### a. FREEMAN'S STATEMENTS PERMISSIBLY COMMENTED ON EVENTS AND PERSONNEL POST-DATING HIS SEPARATION

27     Central to the Rule 12(b)(6) motion is the time limitation of the separation agreement,

28  which put to bed the parties' *prior* disputes. (ECF No. 67, at 15-17.) There is no evidence—at

LEWIS ROCA

least until MindMed itself began criticizing Freeman's work at MindMed—that Freeman criti-

cized the company or its officers or directors for any action taken before Freeman's separation.

(*See* ECF 2-C; 2-D; Compl. ¶¶ 153(d), 160, 182.) And Freeman did not "waive or release rights .

. . that may arise from events that occur after the date this waiver is executed," including his right

to protect his equity investment against post-separation mismanagement. (*See* ECF 2-A, § 10.)

### b. FREEMAN IS NOT FCM'S ALTER EGO

Nor has MindMed mustered any evidence that Freeman is FCM's alter ego. (ECF No. 67,

at 11-15.) This is true not just based on the absence of allegations in the complaint, but also be-

cause of affirmative evidence confirming the parties' separation.

Every communication from FCM, other than the first, was signed by only Jake Freeman

and Chad Boulanger. And by the time those statements issued Freeman had stepped down from

FCM leadership. Freeman and FCM observed all the corporate formalities, holding meetings and

elections. (*See* S. Freeman Decl. ¶ 9.) Freeman notably stepped down from FCM leadership to

avoid any perception that he was driving its activism for personal reasons. (*Id.* ¶ 10.) To be clear,

he was not. (*Id.*) Nor did FCM always do what Freeman preferred: its purpose was to benefit

MindMed, not install Freeman in any particular position. For example, on June 15, 2023, Jake

Freeman sent an email to Vallone proposing a settlement, whereby MindMed would agree to ap-

point two unspecified candidates from FCM's slate in exchange for suspension of the proxy con-

test. (*See* 3 App. 562-63.) Freeman was opposed to this course of action because Freeman knew

MindMed's choices would not favor him, personally. Over Freeman's objection, FCM made the

offer anyway. (S. Freeman Decl. ¶ 15.) FCM's operations, running a proxy campaign and engag-

ing in other activism seeking to change management at MindMed, were FCM's own and cen-

tered on MindMed's current lack of leadership, not its historical wrongs. Again, FCM only

pushed the misconduct allegations after Barrow had already denied them, and only to push back

against Barrow's lies.[19] FCM was not a party to Freeman's separation agreement. So just as it can

---

[19] MindMed does not even attempt to argue that Jake and FCM were alter egos. Thus any state-
ment by Jake cannot be attributed to FCM and his October 6 interview was not a breach by Dr.
Freeman.

37



1   neither be vicariously nor independently liable for the alleged breaches, nor can Freeman be lia-

2   ble for statements made by FCM as a non-signatory.

3           c.   FREEMAN RETAINS HIS RIGHT AS AN EQUITY SHAREHOLDER

4         Freeman's 12(b)(6) motion to dismiss outlines how his equity shareholder rights include

5   the right to seek board representation through a proxy campaign. (ECF No. 67, at 17-20; 2 App.

6   254 § 13 ("This Agreement does not abrogate your existing rights under any Company benefit

7   plan or any plan or agreement related to equity ownership in the Company . . . ."). If the non-dis-

8   paragement clause could be read to limit the scope of available information during such a context

9   it would threaten the "corporate electoral process, . . . carr[ying] with it the right of shareholders

10   to a meaningful exercise of their voting franchise and to a fair proxy contest with an informed

11   electorate." *Pell v. Kill*, 135 A.3d 764, 794 (Del. Ch. 2016) (quoting *Packer*, 1986 WL 4748, at

12   *14). And to the extent that the non-disparagement clause would "deter[ ] proxy contests to re-

13   place the incumbent board, thereby entrenching the incumbents in control," it would be contrary

14   to law. *Carmody v. Toll Bros.*, 723 A.2d 1180, 1189 (Del. Ch. 1998); *cf.* 17A Am. Jur. 2d Con-

15   tracts § 318 (collecting cases and noting that "an illegal contract cannot give rise to a viable

16   cause of action because a party cannot ask a court of law to help it carry out an illegal object").

17         Again, even if MindMed's complaint had stated a claim, to *prove* a claim under the anti-

18   SLAPP analysis, MindMed would have to show that Freeman's statements were gratuitous or

19   personal attacks, as opposed to relevant to his shareholder rights in seeking board representation.

20   MindMed has admitted the opposite. (*See, e.g.*, ECF 2 ¶ 140 (speculating that "Defendants' dis-

21   paragement of MindMed and its leadership during this period was intended to destabilize the

22   Company and foment shareholder discontent in advance of a proxy contest").) And Freeman's

23   statements speak for themselves: they are directed to the investing public as part of his *positive*

24   push for change.

25           d.   THE STATEMENTS WERE NOT DISPARAGING

26         Freeman's 12(b)(6) motion to dismiss also describes why the statements at issue do not

27   qualify as disparagement according to the term's ordinary meaning. (ECF No. 67, at 20-21.) The

28   term can and ordinarily should not be construed to prohibit the dissemination of information that

LEWIS ROCA

is either truthful or believed to be truthful. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 457 (5th Cir. 2005) (noting that such clauses "prevent a disgruntled former employee from disseminating sensitive or *false* information *in revenge for* being terminated" (emphases added)). And public policy prevents its extension to prohibit "dissemination of information regarding harmful employer practices." Nicole Dwyer, *When Telling the Ugly Truth Can Cost Millions: Non-Disparagement Clauses in Employment-Related Contracts*, 37 QUINNIPIAC L. REV. 807, 819 (2019).

As discussed (ECF No. 67, at 21), the statements regarding MindMed's current mismanagement were not derogatory because they did not "detract" from anyone's character. They expressed a difference of opinion as to how a publicly traded company should be managed. Statements describing the misconduct that preceded Freeman's separation agreement should be presumed to fall outside its scope as they were made in the public welfare. And if those statements are truly included within the anti-disparagement clause, the clause itself is void.

Moreover, the record makes plain that, even if the statements were not true, Freeman believed them to be. The statements and letters laid out in the complaint are critical of MindMed's management, but accurate, good faith criticism of a corporation is not disparagement.

e. THE SEPARATION AGREEMENT EXPRESSLY CARVES OUT STATEMENTS TO THE SEC

The few remaining statements allegedly attributed to Freeman himself (e.g., Compl. ¶¶ 143-45) are expressly protected within the terms of the agreement, as they are drawn from proxy filings submitted directly to the SEC and part of the "voluntarily communicate" with government agencies—including the Securities and Exchange Commission—that are exempted from the non-disparagement clause. (2 App. 252, § 11.)

5. *MindMed Cannot Show that Freeman Breached the Confidentiality Clause*

Freeman's Rule 12(b)(6) motion noted the deficiency of MindMed's pleading, without citing a single document, that violated the confidentiality clause in the separation agreement. (ECF No. 67, at 22-23.) But the complaint is not just inadequate; it is false. While Freeman ini-

39

tially had MindMed documents on his computer, once he was placed on leave MindMed remotely removed his access. (S. Freeman Decl. ¶ 11.) Further, once Freeman signed the separation agreement he destroyed any other MindMed documents on his personal computer to the best of his ability. (*See* S. Freeman Decl. ¶12.)[20]

MindMed's vague allegations of theft of confidential information seem to solely stem from a proxy presentation referencing minutes from the FDA and statements by Jake Freeman that he had access to confidential information that he could not disclose. Yet, the May 31 presentation's discussion of statements by the FDA was demonstrably not based on confidential information. (*See* ECF 2-R.) It simply parrots back a description of FDA communications that MindMed publicly provided. (*See* 3 App. 321; 4 App. 421.) MindMed seems to concede that the description of the FDA minutes was not, in itself, a breach of the confidentiality clause, only that Freeman's possession of the minutes themselves would have been. But there is nothing to suggest that Freeman had such information. Indeed, he could not have, since the FDA meeting occurred after Freeman's separation. (1 App. 156, 234; 2 App. 300, 320, 402.)

MindMed's statement that Jake Freeman had confidential information is similarly unconnected to any breach. MindMed does not identify what specific information it believes Jake Freeman has access to. Nor does MindMed adequately plead facts showing it was Freeman who provided the confidential information Jake Freeman references. Indeed it was not: the information referenced was provided to Jake Freeman by a dissatisfied MindMed former employee, Bradford Cross, *not* Freeman. (*See* J. Freeman Decl., ¶¶3, 5, 7; 3 App. 337.) FCM has consistently noted that its statements "represent the opinions of FCM . . . and are based on publicly available information." (ECF No. 2-N, 1.)

MindMed cannot show that Freeman violated any contractual confidentiality obligation.

---

[20] MindMed has made available to FCM and its counsel even the sealed exhibits to its complaint, without first obtaining a protective order or making any attorney's-eyes-only designations. Though MindMed has yet to establish any alter ego relationship, MindMed has apparently conceded that the agreements requiring confidentiality may nonetheless be disclosed to FCM and its members.

LEWIS ROCA

### 6. Even if Freeman Breached, MindMed's Initial Breach Excused It

When parties exchange promises to perform, one party's material breach of its promise discharges the non-breaching party's duty to perform. *Cain v. Price*, 134 Nev. 193, 196, 415 P.3d 25, 29 (2018). A material breach occurs where a party fails "to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." *Raiter v. Khosh*, 491 P.3d 29 (Nev. Ct. App. 2021) (quoting 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2021).)

MindMed and Freeman exchanged promises not to disparage the other. MindMed identifies the first supposed breach by Freeman as the August 11 letter to Vallone. Freeman was initially careful to limit his comments to events that occurred at MindMed after his ouster. This letter only discussed MindMed's *present* mismanagement. (ECF 2-C ("We believe that MindMed's management has divided its attention among too many different projects resulting in the delayed development of MindMed's core drugs."

As already explained—even assuming his comments regarding the company's corporate strategy and current leadership could be deemed disparagement, which they cannot—the non-disparagement clause allowed him to publish such criticism. *See* 2 App. 253, § 13 (no waiver of rights with respect to events "after the date this waiver is executed"). Further, after FCM and Freeman's comments, the MindMed stock "soared." (4 App. 470.) MindMed was not so judicious, publishing criticism of Freeman's leadership, which could be reasonably understood to comment on his performance while still employed at MindMed before the waiver was executed. (2 App. 257; 298.)

MindMed's breach was material. MindMed maligned Freeman's professional reputation. Complying with the non-disparagement clause in the face of these patently false statements as to Freeman's education, experience, and ability put Freeman was put in the impossible position of not defending himself. He chose, instead, to reveal what he knew about MindMed's mismanagement and its motivations for disparaging him. The material breach doctrine permits this.

MindMed continues to evince its disregard for the non-disparagement clause, using this

41

LEWIS ROCA

public complaint to trot out all manner of scandalous accusations, including pre-separation alle-

gations:

- "During his ten years at Savant, Dr. Freeman *unsuccessfully* attempted to develop and commercialize a formulation of 18-Methoxycoronaridine ('18-MC')." (ECF 2 ¶ 45 (emphasis added).)

- "Savant failed to bring a single product to market or generate any revenue *under Dr. Freeman's leadership*." (*Id.* at ¶ 46.)[21]

- "The FDA placed the IND on 'Full Clinical Hold,' prohibiting initiation of clinical research with 18-MC based on its concerns about findings from a preliminary study in mice that was conducted by Savant under Dr. Freeman's guidance. . . . Dr. Freeman did not take any action in response to [FDA] feedback." (*Id.* at ¶ 47.)

- "MindMed only fully discovered the extent of *Dr. Freeman's failures* with respect to MM-110 after the close of the Savant acquisition." (*Id.* at ¶ 52 (emphasis added).)

- "The *flawed* clinical and regulatory strategies adopted *during Dr. Freeman's tenure* ultimately led MindMed to reallocate resources away from the MM-110 program." (*Id.* at ¶ 53 (emphasis added).)

- "In June 2020, MindMed's leadership received a complaint regarding *Dr. Freeman's workplace behavior*, and Dr. Freeman was subsequently placed on a temporary paid administrative leave." (*Id.* at ¶ 54.)

MindMed is apparently banking on prevailing in this suit so that it can claim Freeman has "for-

feit[ed] all benefits of this Agreement." (2 App. 255 § 17.)

In sum, only one party has publicly aired disparaging comments about the other relating

to pre-separation conduct: MindMed. Indeed, in now publicizing the unsubstantiated basis for

Freeman's administrative suspension, MindMed has ensured litigation of the very issues that

Freeman had thought the separation agreement resolved. (2 App. 254, § 14 (MindMed's release

of claims "related to your employment with the Company arising, accruing, or based on any con-

duct occurring at any time before the date it executes this Agreement"). As the first breacher, it is

MindMed who has forfeited the agreement's benefits.

### 7. *MindMed Has No Damages*

Causation is an essential element of a claim for breach of contract. *Clark Cnty. Sch. Dist.*

*v. Richardson Const., Inc.*, 123 Nev. 382, 396, 168 P.3d 87, 96 (2007). So "[i]f the damage of

---

[21] This is an especially odd criticism since it applies equally to MindMed—also without a marketable drug or revenue.



1  which the promisee complains would not have been avoided by the promisor's not breaking his

2  promise," the claim should be dismissed. *Id.*

3  　　MindMed has failed to plead facts sufficient to support that any supposed breach by Free-

4  man or FCM resulted in its damages. Freeman agrees, MindMed's stock has precipitously

5  dropped in value. (ECF 2-J, 15; ECF 2-K 16.) But its 95 percent decline preceded any statements

6  made in the proxy contest. Indeed, it is best explained by the appointment of Barrow and

7  MindMed's subsequently ill-advised public offering of seven million new shares in late Septem-

8  ber 2022. (ECF 2-J, 15; ECF 2-K, 16; ECF 2-N, 7.)

9  　　By the time the parties were openly discussing the events that preceded Freeman's sepa-

10  ration, so as to even arguably implicate the non-disparagement clause, MindMed's stock had

11  fallen from a high of $ 55.65 per share to around $3.00 per share. (ECF 2-J, 15-16; ECF 2-K 16.)

12  　　In short, even accepting the facts as MindMed has presented them, it cannot show that

13  any supposed breach by defendants caused its damages.

14  　　　　　　　　　　　　　　　　* * *

15  　　MindMed is unlikely to succeed on a claim of breach based on disparagement. The agree-

16  ment is invalid, and regardless, the provisions do not cover Freeman's protected communications

17  with the SEC and as part of the proxy campaign—all related to events postdating the separation

18  agreement. In any case, MindMed breached the same non-disparagement clause first. Alterna-

19  tively MindMed's claims should be dismissed for lack of causation.

20  　　　　　　**8.**　　**Laches Bars MindMed's Claims**

21  　　A complaint may also be dismissed on the grounds of laches. *See Home Sav. Ass'n v. Bi-*

22  *gelow*, 105 Nev. 494, 496, 779 P.2d 85, 86 (1989). Laches prohibits a party from sitting on its

23  rights, where the "delay by one party works to the disadvantage of the other." *Bldg. & Const.*

24  *Trades Council of N. Nevada v. State*, 108 Nev. 605, 610–11, 836 P.2d 633, 636–37 (1992) (cit-

25  ing *Erickson v. One Thirty-Three, Inc.*, 104 Nev. 755, 766 P.2d 898 (1988)).[22]

26

27  ───────────────

28  [22] State law governs the availability of laches in diversity actions. *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 697 n.22 (9th Cir. 1990); *see also Teachers Ins. & Annuity Ass'n of Am. v. Pub. Storage, Inc.*, 930 F.2d 29 (9th Cir. 1991) (unpublished) (applying state laches law in diversity suit).

LEWIS ROCA

43

1    The party asserting laches must have been so disadvantaged that "he cannot be restored to

2    his former state." *Bldg. & Const. Trades Council*, 108 Nev.at 610–11, 836 P.2d at 636–37. Ne-

3    vada applies laches against those asserting rights under a contract. *United Bhd. of Carpenters &*

4    *Joiners of Am. v. Dahnke*, 714 P.2d 177 (Nev. 1986) (holding claim under labor agreement barred

5    by laches); *Grayson v. State Farm Mut. Auto. Ins.*, 971 P.2d 798 (Nev. 1998) (analyzing laches as

6    defense against a claim for breach of insurance contract); *Miller v. Walser*, 181 P. 437 (Nev.

7    1919) (analyzing applicability of laches to breach of contract claim).

8    Here, MindMed's delay was tactical: it lay in wait for Freeman's proxy contest to con-

9    clude before suggesting that doing so had breached the separation agreement. And based on these

10   tactics, Freeman's position has "become so changed that he cannot be restored to his former

11   state." *Cf. Bldg. & Const. Trades Council*, 108 Nev. at 610–11, 836 P.2d at 636–37.

12   MindMed knew that if it had communicated early on its belief that statements in a run-of-

13   the-mill proxy contest were in breach of the settlement agreement, the issue would have been set-

14   tled or judicially resolved. In that event MindMed could not claim, as it now does, "millions of

15   dollars" in damages supposedly due to the full proxy campaign. (Compl. ¶ 198.)

16   MindMed now feigns need for injunctive relief because it "will suffer irreparable injury if

17   Defendants continue to make disparaging statements regarding Plaintiff's business, goods, and

18   services and to disclose MindMed's confidential, proprietary, and trade secret information."

19   (Compl. ¶ 214.) But if MindMed were correct, it could have come to court at any time for a tem-

20   porary restraining order and preliminary injunction. And such relief would have been far more

21   effective in August or October 2022, when MindMed claims the "disparagement" began, than

22   now, months after the proxy campaign has concluded.

23   MindMed was well-aware of FCM's campaign. In fact, before the election Freeman told

24   MindMed he was going to start a proxy competition. MindMed sent a cease-and-desist letter ad-

25   vising him against other course of conduct but not asking him to abandon his campaign.

26   [O]ur clients have no issue with a spirited discourse, and in fact fully em-
     brace stockholder engagement aimed at increasing returns for all stockhold-

27   ers, your conduct has veered far beyond that into targeted personal attacks
     premised on blatant lies and other misdirection.

28

44

1   (3 App. 344). In fact, FCM spoke the truth as there has been corporate mismanagement and mis-

2   conduct which is the spirited discourse aimed at increasing returns for all shareholders by riding

3   MindMed of corruption

4        MindMed had to know a proxy contest of this sort could open its management up to in-

5   tense shareholder scrutiny. And as discussed in greater detail *supra* at I(A)(2), competitions for

6   corporate control are known for the rhetoric they engender. Yet MindMed acquiesced to the com-

7   petition and its implications. It waived any challenge Freeman or FCM's statements during the

8   course of a campaign it authorized. *Nevada Yellow Cab Corp. v. Eighth Judicial Dist. Court ex*

9   *rel. Cty. of Clark*, 123 Nev. 44, 49, 152 P.3d 737, 740 (2007) (holding that "the intentional relin-

10  quishment of a known right . . . the waiver of a right may be inferred when a party engages in

11  conduct so inconsistent with an intent to enforce the right as to induce a reasonable belief that the

12  right has been relinquished."

13       It appears instead that MindMed wished to *maximize* its damages—contrary to the duty to

14  *mitigate* them, *see Conner v. So. Nev. Paving*, 103 Nev. 353, 355, 741 P.2d 800, 801 (1987)—to

15  make the present suit as threatening as possible for Freeman. The laches doctrine is meant to pro-

16  tect against exactly this. It should bar MindMed's suit here.

## CONCLUSION

18       MindMed's complaint is a SLAPP, solely based on Freeman's protected right to comment

19  on a publicly traded company. MindMed cannot demonstrate a probability of success on the mer-

20  its. Accordingly, this Court should dismiss the complaint under NRS 41.660.

21       Dated this 31st day of October, 2023.

22                                LEWIS ROCA ROTHGERBER CHRISTIE LLP

23                                By: */s/ Abraham G. Smith*
                                      DANIEL F. POLSENBERG (SBN 2376)
24                                    ABRAHAM G. SMITH (SBN 13,250)
                                      LAUREN D. WIGGINTON (SBN 15,835)
25                                    3993 Howard Hughes Parkway Suite 600
                                      Las Vegas, Nevada 89169
26                                    (702) 949-8200

27                                    *Attorneys for Defendants*

28

1                                 **C**ERTIFICATE OF **S**ERVICE

2          I certify that on October 31, 2023, I served the foregoing "Scott Freeman's Anti-SLAPP

3 Special Motion to Dismiss" through the Court's electronic filing system to the following counsel:

4       Justin J. Bustos                            Robert J. Cassity
      DICKINSON WRIGHT PLLC                 Erica C. Medley

5       100 West Liberty Street, Suite 940        HOLLAND & HART LLP
      Reno, Nevada 89501                       9555 Hillwood Drive, 2nd Floor

6                                           Las Vegas, Nevada 89134
      Sarah Lightdale

7       Kaitland Kennelly                         *Attorneys for Defendant FCM MM*
      Amanda Liverzani                        *Holdings, LLC*

8       COOLEY LLP
      55 Hudson Yards

9       New York, New York 10001

10      Alexandra Rex Mayhugh
      COOLEY LLP

11      355 South Grand Avenue,
      Suite 900

12      Los Angeles, California 90071

13      *Attorneys for Plaintiff*

14                        */s/ Emily Kapolnai*
                       An Employee of Lewis Roca Rothgerber Christie LLP

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1  DANIEL F. POLSENBERG (SBN 2376)
   ABRAHAM G. SMITH (SBN 13,250)
2  LAUREN D. WIGGINTON (SBN 15,835)
   LEWIS ROCA ROTHGERBER CHRISTIE LLP
3  3993 Howard Hughes Parkway, Suite 600
   Las Vegas, Nevada 89169-5996
4  (702) 949-8200
   (702) 949-8398 (Fax)
5  DPolsenberg@LewisRoca.com
   ASmith@LewisRoca.com
6  LWigginton@LewisRoca.com

7  *Attorneys for Defendant*

8              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA

9   MIND MEDICINE (MINDMED) INC., a        Case No. 2:23-cv-1354-MMD-EJY
    British Columbia corporation,
10                                          **DECLARATION OF SCOTT**
                 Plaintiff,                 **FREEMAN IN SUPPORT OF**
11  vs.                                     **ANTI-SLAPP SPECIAL**
                                            **MOTION TO DISMISS**
12  SCOTT FREEMAN, an individual, and
    FCM MM HOLDINGS, LLC, a Wyoming
13  limited liability company,

                 Defendants.
14

15      I, Scott Freeman, declare the following under penalty of perjury of the

16  laws of the United States:

17      1.    I am over the age of eighteen and competent to testify as to the

18  matters set forth herein.

19      2.    Unless otherwise stated in this declaration, I have personal

20  knowledge of the facts set forth herein.

21      3.    On May 25, 2020, MindMed's then-CEO Jamon Rahn (JR) told me

22  to file the BOL-148 patent I was working on. I was not able to get the

23  MindMed patent attorney (outside counsel) to file it. When told JR about the

24  issue he responded by telling me that the patent attorney was conflicted in

25  that he was working on BOL-148 for Turnbull and needed to speak to Steve on

26  how to do this "without creating a massive problem with carrie [Turnbull]."

27

28

4.    JR once expressed concern that Turnbull would "fuck up" MindMed's LSD program.

5.    Barrow and Vallone continually "refresh" its members on the MindMed board, so they all have "plausible deniability."

6.    FCM observed all the corporate formalities.

7.    I stepped down from FCM leadership to avoid any perception that I was driving its activism for personal reasons. I was not.

8.    I initially had MindMed documents on my computer and was blocked from my computer on June 15, 2020, at noon upon my suspension, so although MindMed claims I took documents during my suspension that is patently false.

9.    Once I signed the Separation Agreement, I destroyed any other MindMed documents off my computer to the best of my ability.

10.   JR told me that Carol Nast, the Chief Operating Officer, was unwilling to give board updates about LSD manufacturing and Jeanne Bonelle, who was overseeing LSD manufacturing refused to have 1 on 1 meetings with JR, so JR was essentially kept in the dark about LSD manufacturing issues and problems.

11.   The text messages in my exhibits are true copies of text messages from JR which I saved as screenshots on my iPhone.

12.   On June 15, 2023, Jake Freeman sent an email to Vallone proposing a settlement, whereby MindMed would agree to appoint two unspecified candidates from FCM's slate in exchange for suspension of the proxy contest. I was opposed to this course of action because I knew MindMed's choices would not be candidates who would have the same drive as me.

13.   I made each and every statement MindMed attributed to me in its complaint in good faith, and reasonably believed them to be true.

14.     I did not make statements on FCM's behalf, but to the best of my knowledge, the statements MindMed attributes to FCM were likewise made in good faith, supported by a reasonable basis, and believed to be true.

Dated this 31st day of October, 2023.


*/s/ Scott Freeman*
Scott Freeman

1 DANIEL F. POLSENBERG (SBN 2376)
ABRAHAM G. SMITH (SBN 13,250)
2 LAUREN D. WIGGINTON (SBN 15,835)
LEWIS ROCA ROTHGERBER CHRISTIE LLP
3 3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
4 (702) 949-8200
(702) 949-8398 (Fax)
5 DPolsenberg@LewisRoca.com
ASmith@LewisRoca.com
6 LWigginton@LewisRoca.com

7 *Attorneys for Defendant*

8 UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| 9 MIND MEDICINE (MINDMED) INC., a British Columbia corporation, | Case No. 2:23-cv-1354-MMD-EJY |
| 10 Plaintiff, | **DECLARATION OF JAKE FREEMAN IN SUPPORT OF ANTI-SLAPP SPECIAL MOTION TO DISMISS** |
| 11 vs. | |
| 12 SCOTT FREEMAN, an individual, and FCM MM HOLDINGS, LLC, a Wyoming limited liability company, | |
| 13 Defendants. | |

I, Jake Freeman, declare the following under penalty of perjury of the laws of the United States:

1.  I am over the age of eighteen and competent to testify as to the matters set forth herein.

2.  Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.

3.  On or about September 30, 2022, Bradford Cross contacted me through Reddit regarding Mind Medicine (MindMed) Inc. ("MindMed"). Mr. Cross informed me that he was the chief technology officer of MindMed. Mr. Cross informed me he had been investigating securities fraud at MindMed prior to his termination and was preparing to mount a legal challenge to that termination.

4. On October 24, 2022, I, on behalf of FCM, sent a letter to Mind Medicine detailing certain allegations that Mr. Cross presented to me with a demand for MindMed to terminate Mr. Robert Barrow. Attached to this declaration as **Exhibit A** is a true and correct copy of the letter.

5. On November 4, 2022, I gave an interview with "Psychedelic Invest" (the "Interview"). During the Interview, I was asked "I assume you have confidential info that you cannot make public, can you submit that to the SEC." I responded, "yes and we will provide the SEC with a litany of non-public info regarding these allegations" (the "Response").

6. My answer "yes" was in response to whether "I" could submit confidential information to the Securities and Exchange Commission ("SEC"). My understanding at the time was that a private contract could not frustrate the ability to communicate with the SEC or other law enforcement.

7. The non-public information I referenced in the second portion of the Response was non-public information (1) provided to me by Mr. Cross (2) obtained through my membership in Savant HWP Holdings, LLC, or (3) otherwise post-dating Dr. Freeman's termination from MindMed on August 31, 2020 – i.e. the information pertained to events beyond August 31, 2020.

Dated this 31st day of October, 2023.

*/s/ Jake Freeman*
Jake Freeman

LEWIS ROCA

122712468.2

# EXHIBIT A

Board Letter, dated October 24, 2022

# EXHIBIT A

**STRICTLY CONFIDENTIAL**

October 24, 2022

Carol Vallone
Chairman of the Board of Directors
Mind Medicine (MindMed) Inc.
One World Trade Center
Suite 8500
New York, New York 10007

Dear Ms. Vallone,

FCM MM HOLDINGS, LLC ("FCM") has been made aware of Bradford Cross's impending litigation and allegations which independently mirror and expand on those of Dr. Freeman. Dr. Freeman alleges that Stephan Hurst and Carey Turnbull conspired to misappropriate Mind Medicine (MindMed) Inc. ("MindMed")'s intellectual property to Ceruvia Lifesciences LLC ("Ceruvia"), a company formed from Savant HWP, Inc. and its affiliates (collectively or individually, "Savant"). Dr. Freeman's lawsuit alleges that this was undertaken by co-mingling of Ceruvia employees with MindMed and engaging in non-arms-length, self-dealing transactions. **Mr. Cross's allegations take this several steps further: Mr. Robert Barrow knew of this activity, covered-it-up, and blocked an investigation into activities alleged by Dr. Freeman, among other allegations of misconduct at MindMed.**

In FCM's letter to shareholders[1] on October 13, 2022, and our letter to the Board of Directors dated October 21, 2022, we presented a timeline of the alleged activities with respect to Dr. Freeman's allegations and believe that the timeline is integral to understand these complex interactions. Mr. Cross's allegations illustrate that Mr. Barrow was aware of the alleged intellectual property transaction, that Mr. Barrow had seen the original agreement between Mr. Turnbull and Mr. Hurst, and that Mr. Barrow misled investors when he stated, "I don't know of any MindMed IP that has been mishandled" while covering up an alleged internal investigation by Mr. Cross. Mr. Cross's alleged internal investigation shows that Mr. Barrow was aware of intellectual property mishandling with respect to Medihuasca which appears to be cloned from the internal source code of MindMed's website and misappropriates a significant amount of MindMed intellectual property. The Medihuasca site implies that Nico Forte, the current Chief of Staff for MindMed, is the CEO of the "Medihuasca" entities.

Mr. Hurst and Mr. Turnbull could not have accomplished these alleged activities this without assistance. FCM strongly advises the Board to seek independent counsel and not Cooley LLP in this matter. As we understand it, Mr. Kenneth Krisko, a partner at Cooley LLP, is also a decades long associate of Stephan Hurst. Furthermore, we believe that in the interest of strong governance procedures both Mr. Barrow and Ms. Brigid Makes should recuse themselves from any discussions

---

[1] To which you were carbon copied c/o Robert Barrow

on this matter as discussed herein. Ms. Makes is a current Savant Addiction Medicine, LLC member and a decades long associate of Mr. Hurst. Mr. Hurst appointed her to the Board when MindMed was formed. Beyond the nature of their relationship, we are aware of allegations that Ms. Makes received pecuniary interests from Mr. Hurst in the past two years.

**We demand that Mr. Barrow resign from all positions at MindMed by noon EST on October 25, 2022.** We believe the foregoing is critical to ensuring the optimal resolution for MindMed. If the foregoing condition is met, FCM is willing and looking forward to meeting with the entire Board of Directors to discuss next steps. The next steps need to be agreed upon by midnight EST October 25, 2022. Otherwise, we will have little choice but to publicly call for Mr. Barrow's resignation and explore alternative avenues of holding executives to account.


Sincerely,

Jake Freeman
Chad Boulanger


cc: Dr. Roger Crystal, Andreas Krebs, Dr. Suzanne Bruhn
    Mind Medicine (MindMed) Inc.

1  DANIEL F. POLSENBERG (SBN 2376)
   ABRAHAM G. SMITH (SBN 13,250)
2  LAUREN D. WIGGINTON (SBN 15,835)
   LEWIS ROCA ROTHGERBER CHRISTIE LLP
3  3993 Howard Hughes Parkway, Suite 600
   Las Vegas, Nevada 89169-5996
4  (702) 949-8200
   (702) 949-8398 (Fax)
5  DPolsenberg@LewisRoca.com
   ASmith@LewisRoca.com
6  LWigginton@LewisRoca.com

7  *Attorneys for Defendant*

8              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA

9  MIND MEDICINE (MINDMED) INC., a          Case No. 2:23-cv-1354-MMD-EJY
   British Columbia corporation,
10                                           **DECLARATION OF ABRAHAM**
                    Plaintiff,                        **SMITH**
11  vs.

12  SCOTT FREEMAN, an individual, and
    FCM MM HOLDINGS, LLC, a Wyoming
13  limited liability company,

                    Defendants.
14

15      I, Abraham Smith, declare the following under penalty of perjury of the

16  laws of the United States:

17      1.      I am over the age of eighteen and competent to testify as to the

18  matters set forth herein.

19      2.      Unless otherwise stated in this declaration, I have personal

20  knowledge of the facts set forth herein.

21      3.      Exhibits 1–60, attached to this declaration as Appendices Vol 1-4,

22  are all true and correct copies of documents provided to me by Dr. Scott Free-

23  man as described in the index to the appendix.

24      Dated this 31st day of October, 2023.

25

26              */s/ Abraham Smith*_____

27              Abraham Smith

28

                        1

LEWIS ROCA